Lloyd B. Miller, Esq.
Sonosky, Chambers, Sachse,
   Miller & Munson, LLP
900 West Fifth Avenue, Suite 700
Anchorage, Alaska  99501-2029
(907) 258-6377

Reid Peyton Chambers, Esq.
Sonosky, Chambers, Sachse,
   Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHUGACH REGIONAL RESOURCES COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. _____ |
| DIRK A. KEMPTHORNE, Secretary, U.S. Department of the Interior; CARL J. ARTMAN, Assistant Secretary for Indian Affairs, U.S. Department of the Interior, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Chugach Regional Resources Commission (CRRC) respectfully moves the Court

for issuance of a temporary restraining order directing the Defendants, their officers, agents and

employees, from obligating or disbursing to any third party the sum of $466,105 from the Fiscal Year

2008 appropriation to the Department of the Interior, and directing defendants to pay said sum into

the registry of the Court pending the outcome of this action. A restraining order is necessary to prevent the disbursement of the subject funds to third parties, as well as to preserve the corpus beyond September 30, 2008, the close of the current fiscal year 2008.

In support of this Application, the Court is respectfully referred to the accompanying combined Memorandum in Support of Applications for Temporary Restraining Order and for Preliminary Injunction, filed this date.

Respectfully submitted this 5th day of February, 2008.


By: /s/ Reid Peyton Chambers
    Reid Peyton Chambers, Esq.
    D.C. Bar No 148296
    SONOSKY, CHAMBERS, SACHSE,
      ENDRESON & PERRY, LLP
    1425 K Street, N.W., Suite 600
    Washington, D.C. 20005
    Telephone: 202-682-0240
    Facsimile: 202-682-0249

By: /s/ Lloyd Benton Miller
    Lloyd Benton Miller
    D.C. Bar No. 317131
    SONOSKY, CHAMBERS, SACHSE
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Telephone: 907-258-6377
    Facsimile: 907-272-8332

    Of Counsel:

    Peter G. Ashman
    AK Bar No. 8306018

    Carole A. Holley
    AK Bar No. 0611076

    SONOSKY, CHAMBERS, SACHSE,
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Tel: (907) 258-6377
    Fax: (907) 272-8332

92722.1

Lloyd B. Miller, Esq.
Sonosky, Chambers, Sachse,
    Miller & Munson, LLP
900 West Fifth Avenue, Suite 700
Anchorage, Alaska  99501-2029
(907) 258-6377

Reid Peyton Chambers, Esq.
Sonosky, Chambers, Sachse,
    Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHUGACH REGIONAL RESOURCES COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>DIRK A. KEMPTHORNE, Secretary, U.S. Department of the Interior; CARL J. ARTMAN, Assistant Secretary for Indian Affairs, U.S. Department of the Interior,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMBINED MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND APPLICATION FOR PRELIMINARY INJUNCTION

### INTRODUCTION AND SUMMARY OF ISSUES

Pursuant to Fed. R. Civ. P. 65(a) & (b), plaintiff Chugach Regional Resources Commission

(CRRC) respectfully requests that this Court (1) issue an injunction *pendente lite* requiring

defendants to segregate and preserve sufficient federal funds within the Bureau of Indian Affairs'

2008 appropriation to award and fund the automatic renewal of CRRC's self-determination contract with the Secretary, and (2) issue a preliminary and permanent injunction directing the Secretary immediately to award and fund the renewal of CRRC's self-determination contract with the Secretary. The defendants have without explanation refused to fulfill their ministerial duties under the Indian Self-Determination Act (ISDA) and its implementing regulations to renew and fund CRRC's contract for fiscal year 2008. *See* Indian Self-Determination and Education Assistance Act of 1975, as amended, Pub. L. 93-638, 88 Stat. 2203, *codified as amended at* 25 U.S.C. §§ 450 - 450n (ISDA); 25 C.F.R. part 900.[1]

## LEGAL BACKGROUND

The Indian Self-Determination Act represented a major policy shift in the federal government's ongoing relationship with Native American Tribes—a shift away from government domination and control of Indian programs toward greater Indian self-determination, and greater tribal control and administration of those programs and services.[2]  Congress recognized "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in ... Federal services to Indian communities," and by providing funding to Tribes "to render such services more responsive to the needs and desires of those communities."[3]

---

[1] As used herein, "Secretary" includes defendants Secretary Kempthorne; Assistant Secretary for Indian Affairs Carl Artman; and additional Interior Department and Bureau of Indian Affairs (BIA) officials exercising delegated authority from the Secretary or Assistant Secretary.

[2] *See* 25 U.S.C. § 450 (congressional statement of findings); *Lesoeur v. United States*, 21 F.3d 965, 968-69 (9th Cir. 1994) ("The United States had made a clear policy decision to diminish [federal] regulation of Indian tribal activities [through passage of the ISDA]").

[3] 25 U.S.C. § 450a(a).

The ISDA authorizes a Tribe (or, as here, a "tribal organization" like CRRC) to enter into a "self-determination contract" for the operation of all Interior Department programs that are "for the benefit of Indians,"[4] including all such "programs, functions, services, or activities ... without regard to the organizational level within the Department that carries out such functions."[5] Here, the BIA Director has agreed that CRRC's contract covers programs that are contractible under the ISDA—reflecting the parties' conduct for the past 14 years.[6]

The ISDA contains a mandatory form of contract which the Secretary must use, and which the parties here have used ever since the statutory contract was added to the ISDA in 1994.[7] The ISDA also addresses the funding of contracts. First, a contract is to include "not less than the appropriate Secretary would have otherwise provided for the operation of the programs" covered by the contract (the so-called "Secretarial Amount").[8] Second, a contract is to include additional "contract support costs."[9] Third, the Secretary cannot reduce the contract funding amount from one

---

[4] 25 U.S.C. § 450f(a)(1)(E).  *See also* 25 U.S.C. § 450b(j) (defining "self-determination contract").

[5] 25 U.S.C. § 450f(a)(1).

[6] *See* Pl. Exh. 10, Letter of Oct. 24, 2005, from BIA Director William P. Ragsdale to CRRC counsel Melanie Osborne at 1 ("The Bureau of Indian Affairs . . . has determined that, under the contract [CRRC] carries out activities that the Secretary is authorized to administer for the benefit of Indians") (agreeing on this basis to award CRRC "contract support costs" due under the ISDA).

[7] 25 U.S.C. § 450*l*(c).

[8] 25 U.S.C. § 450j-1(a)(1).  *See Ramah Navajo School Board v. Babbitt*, 87 F.3d 1338, 1341 (D.C. Cir. 1996) ("Secretarial amount").

[9] 25 U.S.C. § 450j-1(a)(2). These "contract support costs" are of two types: additional "direct program expenses," § 450j-1(a)(3)(A)(i); and "additional administrative or other expenses," § 450j-1(a)(3)(A)(ii). The second type of contract support costs is generally known as "indirect costs." *See generally Cherokee v. Leavitt*, 543 U.S. 631 (2005); *Ramah*, 87 F.3d at 1341 (both discussing contract support costs).

-3-

year to the next, absent one of five specific conditions not presented here.[10]

Finally (and insofar as pertinent here), the Secretary can "decline" a Tribe's request for a self-determination contract under only one of five narrow criteria.[11] The process for reviewing a contract for such issues is called the "declination" process, and it is described in 25 C.F.R. part 900, subpart E. However, § 900.33 of the regulations expressly exempts routine contract renewals from this process—which is to say, all of Subpart E—whenever the Tribe or Tribal organization does not propose a "material and substantial change" to its contract.[12] Here, CRRC has not proposed any such

---

[10] 25 U.S.C. § 450j-1(b)(2) provides:

The amount of funds required by subsection (a) ... shall not be reduced by the Secretary in subsequent years except pursuant to --

    (A)  a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

    (B)  a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

    (C)  a tribal authorization;

    (D)  a change in the amount of pass-through funds needed under a contract; or

    (E)  completion of a contracted project, activity, or program.

[11] 25 U.S.C. § 450f(a)(1).

[12] 25 C.F.R. § 900.33 provides that "the [BIA] will not review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization." *See also* 61 Fed. Reg. 32482, 32487 (June 24, 1996) (explaining that "In the past, as a matter of practice, neither [the Indian Health Service] nor the BIA has reviewed contract renewal proposals for declination issues.  Therefore, the Departments have agreed that IHS and the BIA will not use the declination process in contract renewals where there is no material or significant change to the contract.") (emphasis added).

changes to its renewal contract.[13]

## FACTUAL BACKGROUND

The Chugach Regional Resources Commission is a non-profit Alaska corporation controlled by the several Tribal governments located within the Chugach Region of southcentral Alaska (encompassing seven Alutiiq Native communities in Prince William Sound and along the coast of the lower Kenai Peninsula).[14]  CRRC is also a "tribal organization" authorized to enter into a self-determination contract with the Secretary.[15]  CRRC has been contracting with the BIA on behalf of its member Tribes for at least 14 years to carry out various natural resource management activities to assist the Tribes in the development of their natural resource programs.  The CRRC Board of Directors is composed of one representative (usually the Chief) appointed by the Nanwalek IRA Council, Port Graham Village Council, Chenega IRA Council, Tatitlek IRA Council, Native Village of Eyak, Qutekcak Native Tribe and Valdez Native Tribe.

In 1993, the BIA awarded CRRC a self-determination contract to carry out vital resource management services in the wake of the EXXON VALDEZ disaster (primarily aquaculture and mariculture programs involving salmon and oyster resource development). The original contract and all subsequent renewals supported various natural resource management and development projects.[16] Over the years the contract has been successively renewed, with the last contract renewed in 2004

---

[13] *See* Pl. Exh. 11, CRRC FY 2008 Contract Renewal Proposal to the BIA.

[14] *See* 43 U.S.C. §§ 1601, 1606(a)(9) (defining Chugach Region under the Alaska Native Claims Settlement Act); 5 HANDBOOK OF NORTH AMERICAN INDIANS 198-199 (Smithsonian Institution 1984) (describing Alutiiq village tribes); Aff. of Patricia Schwalenberg, ¶ 3.

[15] *See* 25 U.S.C. §§ 450b(*l*) (defining "tribal organization").

[16] Aff. of Patricia Schwalenberg, ¶¶ 3, 4, 6.

for a three-year period covering FY 2005 through FY 2007.[17]

In July 2006, CRRC requested its annual funding agreement ("AFA") for the upcoming third fiscal year of its three-year contract (FY 2007). But the BIA delayed awarding the requested funding agreement, and CRRC was in turn compelled to take out a $100,000 line of credit to maintain its administrative operations. Eventually, the BIA's conduct made it plain that the BIA was not going to locate any FY 2007 funding, notwithstanding CRRC's contract.[18]

The BIA next relayed that it expected to have no appropriations to pay CRRC for FY 2008. Initially, CRRC believed these representations and did not request a contract renewal.[19] At no time did the BIA offer CRRC any technical assistance, despite its duty to do so.[20] But after consulting with counsel and reviewing the BIA's anticipated appropriation, CRRC made a formal demand upon the BIA for a three-year renewal contract (covering the period FY 2008 through FY 2010).[21]

Effective December 26, 2007 (and following a succession of temporary spending measures), Congress enacted a final spending bill for the current fiscal year 2008.[22] The 2008 Appropriations Act contained a lump sum appropriation of $2,080,261,000 for the BIA for "Operation of Indian

---

[17] Aff. of Patricia Schwalenberg, ¶ 6; Pl. Exh.1, FY 2005 - FY 2007 Contract and FY 2005 Amended Annual Funding Agreement.

[18] Aff. of Patricia Schwalenberg, ¶¶ 10-15.

[19] Aff. of Patricia Schwalenberg, ¶ 15.

[20] Aff. of Patricia Schwalenberg, ¶ 15; *see* 25 U.S.C. §§ 450h(d), (e) (authorizing the Secretary to provide technical assistance or provide a grant for technical assistance.)

[21] Aff. of Patricia Schwalenberg, ¶ 20; *see also supra* at 5 n.13. CRRC simultaneously submitted Contract Disputes Act claims challenging the BIA's failure to pay CRRC in FY 2007 (as well as the BIA's failure to pay CRRC in full in FY 2006). *See* Pl. Exhs. 6 and 7. These claims remain pending.

[22] Pub. L. No. 110-161, 121 Stat. 1844 (2007) ("Consolidated Appropriations Act, 2008").

Programs."[23]  In advance of that measure, CRRC on November 14, 2007, submitted to the BIA its

contract renewal request.[24]  CRRC proposed no material and substantial changes from the scope of

work contained in its prior contracts.  As subsequently revised, the renewal contract identified fiscal

year 2008 funding in the amount of $466,105,[25] the same amount defendants were required to pay

CRRC in fiscal year 2007.[26]

By law, the Secretary must automatically approve and award contract renewals that propose

"no material and substantial changes" from the Tribal organization's prior contract.[27]  By law, the

---

[23] *Id.* at 267.

[24] Pl. Exh. 2, Letter of Nov. 14, 2007, from CRRC Executive Director Patricia  Brown-Schwalenberg to BIA Alaska Regional Director Niles C. Cesar.

[25] *See* Pl. Exh. 2, Nov. 14, 2007, Schwalenberg Letter, as modified by Pl. Exh. 3, Letter of Dec. 27, 2007, from CRRC counsel Lloyd Miller to DOI Regional Solicitor attorney Roger Hudson (transmitting amended budget and scope of work), and by Pl. Exh. 4, Letter of Jan. 8, 2008, from CRRC counsel Lloyd Miller to DOI Regional Solicitor attorney Roger Hudson, at 1-2 (transmitting second amended budget).

[26] In fiscal year 2007, defendants were required to pay CRRC the sum of $466,105.  This sum was comprised of $347,000 in direct agency program funding (25 U.S.C. § 450j-1(a)(1)); $101,105 in indirect administrative "contract support cost" funding (§ 450j-1(a)(3)(A)(ii)); and $18,000 in "direct" contract support cost funding (§ 450j-1(a)(3)(A)(i)); all such sums to be paid subject only to the availability of appropriations. *See* Pl. Exh. 5, Revised Budget for FY 2008 Contract.  Due to defendants' failure timely to pay these sums, CRRC has submitted claims to the BIA contracting officer for damages under 25 U.S.C. §§ 450m-1(d) (entitling Tribes and Tribal organizations to invoke the Contract Disputes Act, 41 U.S.C. §§ 601 - 612, to remedy a breach of a self-determination contract) (Pl. Exhs. 6 and 7).  *See generally Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) (discussing ISDA damage claims under the Contract Disputes Act).

*See also* Pl. Exh. 8, Letter of Aug. 25, 2006, from James Cason, Associate Deputy Interior Secretary to "Dear Tribal Leader" (announcing and transmitting Dep't of the Interior 2006 National Policy Memorandum No. NPM-SELFD-1(adopted May 8, 2006) (addressing the calculation and payment of contract support costs)).

[27] 25 C.F.R. § 900.33.

Secretary must fund such contracts at no less than the amount required in the preceding year, because under the Act "the amount of funds required [to be paid] shall not be reduced by the Secretary in subsequent years" absent circumstances not presented here.[28] Notwithstanding these twin statutory directives, and despite having in late December 2007 <u>agreed</u> to award the renewal contract, the Secretary has since failed and refused to award and fund the contract.[29]    After several communications with defendants warning that CRRC would take legal action if defendants did not promptly award and fund CRRC's renewal contract, CRRC filed this lawsuit.

Section 450m-1(a) of the ISDA authorizes immediate injunctive and mandamus relief.[30] Pursuant to this authorization and the Court's equitable power, CRRC seeks an immediate temporary restraining order directing the defendants to pay into the registry of this Court $466,105, so that defendants do not spend these funds on other purposes and thereby potentially moot CRRC's claims.[31]   Such relief is necessary to preserve CRRC's statutory right to its renewal contract and to

---

[28] 25 U.S.C. § 450j-1(b)(2) (*supra* at 4 n.10).

[29] Pl. Exh. 9, Letter of Jan. 3, 2008, from Roger Hudson, Alaska Regional Solicitor, to Lloyd Miller, counsel, CRRC at 1 ("First, the BIA will prepare the new contract, which the Assistant Secretary has decided to award.") and 4 ("Both my office and the BIA's Alaska Region will make every effort to secure from the Central Office the earliest possible sub-allotment to fund renewal of CRRC's contract for 2008").

[30] 25 U.S.C. § 450m-1(a) (authorizing "mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this Act or regulations promulgated hereunder (including immediate injunctive relief ... to compel the Secretary to award and fund an approved self-determination contract)."). *See also Susanville Indian Rancheria v. Leavitt*, No. 2:07-cv-259-GEB-DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008) (discussing mandamus remedy).

[31] Aff. of Schwalenberg, ¶ 23. *See Ramah Navajo School Board, Inc. v. Babbitt*, 87 F.3d 1338, 1340 (D.C. Cir. 1996) ("We then granted the plaintiffs' emergency motions for an administrative stay to preserve approximately $410,000 in fiscal year 1995 funds which would otherwise have lapsed to the Treasury during pendency of this appeal."); *City of Houston v. Dept.*

have that contract funded in full in fiscal year 2008. The failure of the Secretary to reserve these funds would result in very substantial and irreparable harm to the several tribes of Prince William Sound and Lower Cook Inlet who depend upon CRRC's continuing natural resource management and development programs. [32]

CRRC also seeks an expedited hearing for a preliminary and/or permanent injunction requiring defendants to award and fund CRRC's renewal contract in this current fiscal year 2008. Defendants are continuing to violate the statutory and regulatory command to automatically award a renewal contract and to fund that contract in fiscal year 2008 at the same level the contract was required to be funded in fiscal year 2007. Such a "mandamus" order and "immediate injunctive relief" are expressly authorized under the ISDA. *Supra* at 8 n.30.

The BIA's failure to award CRRC its FY 2008 through FY 2010 contract, and to fund the contract in the current fiscal year, has placed CRRC in extreme financial straits, bringing to a complete halt CRRC's ability to support and fund most of the central activities previously administered under its contract, including oyster farming and salmon hatchery operations of vital concern to CRRC's remote Alaska Native villages. Projects have been suspended, CRRC's bank is owed nearly $100,000, and all village staff funded exclusively under the contract have been laid off.[33]

---

*of Housing and Urban Development*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994); *Cronin v. F.A.A.*, 73 F.3d 1126, 1133 (D.C. Cir. 1996) (citing *City of Houston* for the same proposition).

[32] Aff. of Patricia Schwalenberg, ¶¶ 16-18.

[33] Aff. of Patricia Schwalenberg, ¶ 16-19.

## ARGUMENT

**A.    CRRC is Entitled to a Temporary Restraining Order and Immediate Injunctive Relief.**

1.    CRRC is Entitled to Injunctive and Mandamus Relief Under the ISDA.

Congress in the operative statute, the ISDA, has expressly authorized the movant to secure extraordinary relief for a statutory violation -- here "mandamus" and "immediate injunctive relief."[34] Under such circumstances, the movant "is entitled to the injunctive and mandamus relief requested without a balancing of any equities," nor any inquiry into the adequacy of remedies at law.[35]  This is so because, in the case of a "statutorily authorized injunction ... rather than an equitable injunction,"[36] Congress has already made a judgment that once a statutory violation has been established, an injunction should issue.   Since the traditional 'balancing of hardships' risks undermining Congress's judgment, when statutory injunctions are authorized "[t]he traditional requirements for equitable relief need not be satisfied."[37]  As the Eighth Circuit has noted:

> It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. ... In such situations, it is not the role of the courts to balance the equities between the parties. The controlling issue is whether

---

[34] 25 U.S.C. § 450m-1(a); *supra* at 8 n.30.

[35] *Susanville* at *10 - *11 (issuing an injunction against the Indian Health Service for refusing to award a contract under the ISDA). *See also Crownpoint Inst. of Tech. v. Norton*, Civ No. 04-531 JP/DJS, Findings of Fact and Conclusions of Law at 26, ¶ 30) (discussed in *Susanville* at *11) ("The specific mandamus relief authorized by ISDA relieves [a tribal organization] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law.").

[36] *Susanville* at * 10.

[37] *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000) (citing *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983)). *See also Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004); *Atchison, Topeka & Santa Fe Ry. v. Lennen*, 640 F.2d 255, 260 (10th Cir. 1981) (*per curiam*).

-10-

Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits. <u>The proper role of the courts is simply to determine whether a violation of the statute has or is about to occur.</u>[38]

Here, CRRC has shown a high likelihood of prevailing on its claim that the BIA has violated CRRC's rights under the ISDA and its implementing regulations. Once a self-determination contract is awarded, the regulations <u>command</u> that renewal is automatic "where no material and substantial change to the scope or funding ... has been proposed."[39] The regulations leave the Secretary no discretion in the matter. This is understandable, since, as this Circuit has noted in connection with the funding of self-determination contracts:

> Congress has clearly expressed in the ISDA both its intent to circumscribe as tightly as possible the discretion of the Secretary, *see* ISDA [25 U.S.C.] § 450k(a) (prohibiting the Secretary from promulgating any regulation on or imposing any nonregulatory requirement, except for regulations pertaining to sixteen carefully delineated topics not relevant here), and its intent to make available judicial review of all agency action, *see id.* § 450m-1(a). The statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; <u>Congress left the Secretary with as little discretion as feasible in the allocation of CSF [contract support cost funds].</u>[40]

The Defendants have therefore violated their clear duty under the Act and implementing regulations

---

[38] *Burlington N. R.R. Co. v. Bair* 957 F.2d 599, 601-602 (8th Cir. 1992) (emphasis added).

[39] 25 C.F.R. § 900.33.

[40] *Ramah*, 87 F.3d at 1344 (emphasis added). *See also id.* at 1345 (noting the "clear congressional irritation both with the agencies' 'failures to administer self-determination contracts in conformity with the law' and with their arguments that the Tribes have no legal remedies for the agencies failure to comply with the Act") (citation omitted); 1345 n.9 ("Precisely *because* the Secretary had consistently failed to behave in a reasonable manner (despite the risk of 'outraged reactions to such a misuse of discretion,' *id.*), Congress elected specifically to cabin the Secretary's discretion under the Act.") (citing dissent).

to renew CRRC's contract.[41]

The defendants have also violated their duty under the Act to fund CRRC's contract in FY 2008. The only means by which a contract can be funded less in one year than in a prior year is pursuant to 25 U.S.C. § 450j-1(b)(2), *supra* at 4 n.10. With reference to subsection (b)(2), here: (A) there has been no "reduction in appropriations"—indeed, the BIA's FY 2008 appropriation is <u>larger</u> than its FY 2007 appropriation; (B) there is no "directive in the statement of the managers accompanying [the] conference report" on the FY 2008 Consolidated Appropriations Act—indeed, CRRC is not mentioned <u>at all</u> in the relevant conference report; (C) there has been no "tribal authorization" permitting a reduction; (D) there are no "pass-through funds" at issue; and (E) the program under contract is not "completed" because it is an ongoing program (as is true of most contracted BIA programs).

With specific respect to 25 U.S.C. § 450j-1(b)(2)(B) (authorizing a reduction to reflect a directive in a conference report), the absence of any reference to CRRC in the pertinent conference report is the end of the matter. But even if there were such language, it would not be legally binding. *Cherokee Nation*, 543 U.S. at 646.[42] Where specific restrictive language is not binding, the absence of any such language can have no legal effect.

There is accordingly no lawful basis for eliminating (much less reducing) CRRC's funding in FY 2008, nor—as the defendants' attorneys now acknowledge—was there any basis for not paying

---

[41] To the extent defendants argue that they have a 90-day grace period to award CRRC's renewal contract, the argument must fail. The only 90-day period provided for in the ISDA is the 90-day approval-declination period, and the defendants' own regulations make the declination procedures inapplicable to renewal contracts such as CRRC's. *Supra* at 4, n.12.

[42] *See also Ramah*, 87 F.3d at 1349 n.14 (noting the Secretary's position that subparagraph (b)(2)(B) is unconstitutional under *INS v. Chadha*, 462 U.S. 919 (1983)).

CRRC in full in FY 2007 and FY 2006. The BIA's counsel acknowledged "the BIA is now prepared to agree that the reference to CRRC in the Conference Report accompanying the FY 2006 Interior Appropriations Act did not justify reducing the direct program dollars to be included in the 2006 AFA."[43] The BIA's counsel also admitted that the failure to fund CRRC in FY 2007 "was evidently the result of an erroneous Central Office interpretation of the legal effect of the 2007 Continuing Resolution's silence with regard to inclusion of any amount of funding specifically identified for CRRC."[44] Thus, the BIA is required by law both to award CRRC's renewal contract and to fund it in FY 2008.

In sum, either statutory violation standing alone would warrant "mandamus" and "immediate injunctive relief" under the ISDA. The two violations combined make granting the requested relief particularly compelling here, and are more than sufficient to meet CRRC's burden of showing its "likelihood of success on the merits." Thus, the requested statutory injunction and mandamus relief should issue immediately.

2.    CRRC Also Prevails Under the Equitable Balancing Test.

Even if this Court were to apply the traditional equitable balancing test, CRRC would prevail. The traditional preliminary injunctive relief standard asks "1) whether there is the threat of imminent

_____

[43] Pl. Exh. 9, Hudson Letter of Jan. 3, 2008, at 3.

[44] Pl. Exh. 9, at 3-4. The Regional Solicitor attorney went on to say: "Both my office and the BIA's Alaska Region will make every effort to secure from the Central Office the earliest possible sub-allotment to fund renewal of CRRC's contract for 2008 ... [I]t is regrettable that BIA Central Office personnel misinterpreted the legal effect of the Appropriations Conference Committee mention of funding for CRRC in its report on the FY 2006 Interior Appropriations Act, and the lack of any specific references to funding for your client or its contract in the FY 2007 Continuing Resolution." *Id.* at 4.

-13-

irreparable injury; 2) whether the balance of the hardship favors equitable relief; 3) whether the Plaintiffs may possibly succeed on the merits; 4) whether equitable relief is in the public interest."[45] The granting of equitable relief "is committed to the sound discretion of the Court."[46] While a "reasonable likelihood of success on the merits" is important, a court needs to ask "whether the 'equitable' factors—irreparable harm, the balance of the hardships, and the public interest—justify" a preliminary injunction.[47] The D.C. Circuit, however, has also stated that: "[i]n deciding whether to grant an injunction, the district court must balance the strengths of the requesting party's arguments in each of the four required areas. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."[48]

    a.    <u>Likelihood of success on the merits.</u>

As demonstrated *supra* at 10-13, CRRC has demonstrated a very high likelihood of success on the merits. Thus, although "it will ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so serious, substantial and difficult as to make them a fair ground for

---

[45] *Armstrong v. Bush*, 807 F.Supp. 816, 820 (D.C. Cir. 1992) (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir.1989); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir.1977); and *Housing Study Group v. Kemp*, 732 F. Supp. 180 (D.D.C. 1990)).

[46] *Armstrong*, 807 F.Supp. at 820.

[47] *Crucible Materials Corp. v. Sumitomo Special Metals Co. Ltd.*, 719 F. Supp. 14, 17 (D.D.C. 1989).

[48] *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (citing *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir. 1986)).

litigation and thus for more deliberative investigation,"[49] here the controlling statute and implementing regulation provide no room for justifying defendants' conduct. This conclusion is particularly compelled given the statutory command that "[e]ach provision of the [ISDA] ... shall be liberally construed for the benefit of the Contractor ... ," 25 U.S.C. § 450*l*(c), sec. 1(a); the identical provision in the implementing regulations, 25 C.F.R. § 900.3(a)(5); and the comparable provisions regarding liberal construction of the regulations themselves, 25 C.F.R. § 900.3(b)(8) & (11). Thus, CRRC has shown a high probability of success.

      b.    <u>Irreparable injury.</u>

      CRRC's motion also satisfies the "irreparable injury" standard. Plaintiff will suffer immediate and irreparable injury in the absence of relief, and legal remedies would be inadequate to mitigate this harm.[50] If the BIA is able to obligate its FY 2008 appropriation to other purposes (or if unobligated funds lapse to the Treasury at the close of the fiscal year), CRRC will be irreparably harmed by the possibility of the permanent loss of its contract funding.[51] In a long line of cases spanning *National Ass'n of Regional Councils* to *City of Houston* and *Ramah* (*cited supra* at 11) the D.C. Circuit has recognized the irreparable harm that flows to potential appropriations recipients when an appropriation is permitted to lapse or be spent while litigation proceeds over the agency's underlying conduct. In *City of Houston*, the D.C. Circuit explained the problem well:

---

[49] *Washington Metro. Area Transit Comm'n. v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir. 1977).

[50] *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 ( D. Cir. 2006); *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate")).

[51] Aff. of Patricia Schwalenberg, ¶¶ 22-23.

-15-

Indeed, even if a plaintiff brings suit before an appropriation lapses, this circuit's case law unequivocally provides that once the relevant funds have been obligated, a court cannot reach them in order to award relief. In *West Virginia Health Centers*, for example, we acknowledged the equitable doctrine permitting courts to award funds after an appropriation has lapsed, if a suit is timely filed (as that case was), but held that no relief was available for one of the fiscal years in question because "all of these funds ha[d] been awarded by the Secretary to various recipients." 734 F.2d at 1577. We have relied on similar reasoning in at least two other cases. *See Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (quoting *Ambach* and *West Virginia Health Centers*, and noting that "if the government in the instant case is permitted to distribute the $10 million to other organizations, the appeal will become moot"). <u>Thus, to avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses and seek a preliminary injunction preventing the agency from disbursing those funds.</u>[52]

CRRC faces the very same situation, and it will therefore suffer substantial and irreparable harm if an injunction is not immediately issued.

CRRC's harm goes deeper yet. As CRRC's Executive Director Patricia Schwalenberg attests, the nearly $500,000 at stake in FY 2008 funding represents a significant portion of all CRRC's funding for the natural resource management and development programs serving CRRC's seven Native communities. These activities provide employment, subsistence foods, traditional ecological knowledge (TEK) and baseline data for the Tribes when evaluating changes in the environment.[53] They support salmon hatchery and oyster farming operations.[54] Due to the extreme geographic isolation of these Tribes, CRRC's programs provide a critical means for protecting the

---

[52] 24 F. 3d at 1426-27 (emphasis added).

[53] Aff. of Patricia Schwalenberg at ¶¶ 3-4.

[54] *Id.*

-16-

natural environment, gathering valuable knowledge and developing the economies of these areas still suffering from the impact of the EXXON VALDEZ disaster.[55] Already CRRC has been required to drastically reduce the scope of its ongoing activities, resulting in the layoff of over one dozen village project employees. The defendants' conduct has also directly contributed to the closure of the Port Graham salmon hatchery, the closure of the Tatitlek oyster farm, and the termination of funding for the Alutiiq Pride shellfish hatchery. In addition, CRRC has been forced to suspend its traditional use mapping project and its subsistence harvest surveys of hunters and fishers of the region.[56]

CRRC thus readily establishes the requisite "possibility of irreparable injury." Indeed, even if CRRC only raised "serious questions" on the merits, the balance of hardship still tips decidedly in its favor.

c.    Burden on the Secretary.

The BIA is largely an intermediary for contract and grant funding, and thus it has little direct stake in these funds. The BIA's overriding statutory obligation is to administer the funding process in accordance with the ISDA and other applicable law and, within those parameters, not to act arbitrarily.[57] All that a restraining order will do is slow that process down sufficiently to permit all sides to carefully present their arguments to the Court. In this sense, the injunction will serve, rather than hinder, the federal government's interest in promoting a lawful process for allocating the agency's appropriation. The slight administrative burden of segregating and depositing with the

---

[55] *Id.*

[56] *Id.* at ¶ 16.

[57] *See, e.g.*, Section 106(n), 25 U.S.C. § 450j-1(n).

Court the targeted funds is minor:

> Only a modest administrative burden would have been involved in requiring [the agency] to take this preservative action, a burden devoid of expenditure and of impact on any other sponsor's right to its funds.[58]

The only other entities potentially affected by the requested injunction are other recipients that might receive the funds at issue (unless they are spent by the BIA itself).  But, as the D.C. Circuit in *Population Institute* recognized, if CRRC's legal arguments are correct, these funds represent a windfall to others:

> The funds [a]re available for commitment only because they were withheld from [the Contractor], and the other organizations are entitled to receive the funds only if the amount earmarked for [the Contractor] has been lawfully reduced.  <u>Any harm they suffer by delay in disbursement is outweighed by the clearly irreparable harm that appellant would sustain absent an injunction.</u>[59]

On the other hand, if it turns out that the BIA lawfully withheld these funds from CRRC, the funds will eventually be spent or disbursed at the conclusion of this litigation.[60]

Considering that the funds claimed by CRRC represent a tiny fraction of the over $2 billion dollars appropriated to the BIA – just 0.0002% – the effect on other BIA activities will be negligible. Under these circumstances, the relative balance of hardships tips decidedly in CRRC's favor.

    d.    <u>Public interest.</u>

The final traditional criterion for a preliminary injunction is whether issuance of the injunction favors the public interest.  Here, again, the D.C. Circuit's reasoning in *Population*

---

[58] *Jacksonville Port Authority*, 556 F.2d 52, 58 (D.C. Cir. 1977); *see also Population Institute v. Mcpherson*, 797 F.2d 1062, 1073 (D.C. Cir. 1986).

[59] *Population Institute,* 797 F.2d at 1082 (emphasis added).

[60] *See City of Houston*, 24 F.3d at 1426.

*Institute* is compelling:

> The public has an interest in assuring that public funds are appropriated and distributed pursuant to Congressional directives. ... If [the agency] is not enjoined from distributing the funds to others, and appellant prevails on appeal, the public interest will be frustrated by the failure to distribute the funds as directed by Congress. By contrast, the public interest will be furthered by an injunction pending appeal, which will preserve [the organization's] ability to receive the funds if appellant is successful on appeal.[61]

This is equally true for the misallocation of BIA funds here. Perhaps even more compelling is the fact that the BIA's actions run directly afoul of Congress's stated policy controlling the federal government's dealing with Indian Tribes, as reflected in the ISDA. If the BIA is permitted to violate the Act with impunity and thereby deny CRRC its statutory entitlement to a contract and associated funding, with CRRC unable to litigate the issue because the appropriations are gone, the historic "federal domination of tribal programs" which Congress in the ISDA overturned will be the victor and the ISDA's principle of "meaningful participation by the Indian people" and "tribal self-determination" will be subverted.[62] The public interest thus heavily favors the injunction.

An injunction ordering the Secretary to award CRRC's renewal contract and to fund it in fiscal year 2008 is in order. CRRC has demonstrated an overwhelming likelihood of success on the merits, and withholding the injunction for months (or longer) will cause irreparable harm to CRRC and the Native villages it serves. To be clear, none of the previously operated natural resource programs that were funded exclusively by this contract can carry on (or, where suspended—as most programs were—be restored) absent the contract award. Under these circumstances, the balance tips decidedly, and decisively, in CRRC's favor.

---

[61] *Population Institute*, 797 F.2d at 1082.

[62] 25 U.S.C. § 450.

-19-

## CONCLUSION

For two years the BIA has ignored its legal obligations to CRRC by underfunding its existing contract, then refusing to award its renewal contract. For the foregoing reasons, CRRC respectfully requests a temporary restraining order and preliminary and permanent injunction: (1) directing defendants to pay into the registry of the Court the sum of $466,105 within five days from the date of issuance of the Court's Order; (2) directing defendants to award CRRC a three-year renewal contract for FY 2008 - FY2010; and (3) directing defendants, pursuant to said renewal contract, to award and fund a FY 2008 annual funding agreement in the amount of $466,105.

RESPECTFULLY SUBMITTED this 5th day of February 2008.


By: /s/ Reid Peyton Chambers
    Reid Peyton Chambers, Esq.
    D.C. Bar No 148296
    SONOSKY, CHAMBERS, SACHSE,
      ENDRESON & PERRY, LLP
    1425 K Street, N.W., Suite 600
    Washington, D.C. 20005
    Telephone: 202-682-0240
    Facsimile: 202-682-0249

By: /s/ Lloyd Benton Miller
    Lloyd Benton Miller
    D.C. Bar No. 317131
    SONOSKY, CHAMBERS, SACHSE
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Telephone: 907-258-6377
    Facsimile: 907-272-8332

    Of Counsel:

    Peter G. Ashman
    AK Bar No. 8306018

    Carole A. Holley
    AK Bar No. 0611076

    SONOSKY, CHAMBERS, SACHSE,
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Tel: (907) 258-6377
    Fax: (907) 272-8332

92671.1

Lloyd B. Miller, Esq.
Sonosky, Chambers, Sachse,
   Miller & Munson, LLP
900 West Fifth Avenue, Suite 700
Anchorage, Alaska  99501-2029
(907) 258-6377

Reid Peyton Chambers, Esq.
Sonosky, Chambers, Sachse,
   Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHUGACH REGIONAL RESOURCES COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) | Case No. _____ |
| ) | |
| DIRK A. KEMPTHORNE, Secretary, U.S. Department of the Interior; CARL J. ARTMAN, Assistant Secretary for Indian Affairs, U.S. Department of the Interior, ) ) ) ) ) | |
| Defendants. ) ) | |

**CERTIFICATE OF COUNSEL**

Pursuant to LCvR 65.1(a), undersigned counsel hereby certifies that actual notice of the

time of making the applications for temporary restraining order and preliminary injunction filed

in this action, and copies of all pleadings and papers filed in the action to date or to be presented

at the hearing, have been furnished to defendants.

Respectfully submitted this 5th day of February 2008.

By: */s/ Reid Peyton Chambers*
    Reid Peyton Chambers, Esq.
    D.C. Bar No 148296
    SONOSKY, CHAMBERS, SACHSE,
       ENDRESON & PERRY, LLP
    1425 K Street, N.W., Suite 600
    Washington, D.C. 20005
    Telephone: 202-682-0240
    Facsimile: 202-682-0249

By: */s/ Lloyd Benton Miller*
    Lloyd Benton Miller
    D.C. Bar No. 317131
    SONOSKY, CHAMBERS, SACHSE
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Telephone: 907-258-6377
    Facsimile: 907-272-8332

    Of Counsel:

    Peter G. Ashman
    AK Bar No. 8306018

    Carole A. Holley
    AK Bar No. 0611076

    SONOSKY, CHAMBERS, SACHSE,
    MILLER & MUNSON, LLP
    900 W. 5th Avenue, Suite 700
    Anchorage, AK 99501
    Tel: (907) 258-6377
    Fax: (907) 272-8332

92723.1

09/29/2005 13:53 FAX                                                    ☑001/013



# United States Department of the Interior

### OFFICE OF THE SOLICITOR
Washington, D.C. 20240

Reply to:
1849 C St., N.W., Mail Stop 6456
Washington, D.C. 20240

# Fax Transmission
### Number of pages:  Cover + 12

*If you get this fax by mistake,* please tell Sabrina McCarthy at 202-219-2139 and destroy the fax. This fax is meant only for the person to whom it is addressed. Thanks for your help.

---

| | | Fax | Phone |
|---|---|---|---|
| **Date:** | September 29, 2005, 1:50 p.m. ET | | |
| **To:** | Melanie Osborne | 907-272-8332 | 907-258-6377 |
| **From:** | Sabrina A. McCarthy *Smcc* | 202-208-4115 | 202-219-2139 |
| **Re:** | Amended 2005 Annual Funding Agreement and Amended Contract Modification No. 2 (showing calculation of contract support funds) | | |

Melanie,

Attached are copies of the amended 2005 annual funding agreement and amended contract modification no. 2 that the awarding official, Norma Jean Dunne, has prepared. She is faxing these documents to the Chugach Regional Resources Commission (the "Commission").

Ms. Dunne hopes to get back a signed copy of the amended 2005 Annual Funding Agreement from the Commission by fax before the close of business on Friday, September 30, 2005.

The contract support funds will be distributed to the Commission after the end of Fiscal Year 2005.

Please call me at 202-219-2139 if you have questions.
Thanks!
Sabrina

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 1 of 37

;907  562  4939            #  2/ 25

U.S. DEPARTMENT OF THE INTE~
BUREAU OF INDIAN AI ~ IRt **Contractor Copy**
ALASKA REGION OFFICE
INDIAN SELF-DETERMINATION CONTRACT AWARD

| 1. Contract Number:<br>CTE01X84923 | 2. Effective Date:<br>**October 1, 2004** | 3. Term Date:<br>**September 30, 2007** |
|---|---|---|

| 4. Issued To:<br>**Chugach Regional Resources Commission**<br>6200 Lake Otis Parkway, Suite 201<br>Anchorage, Alaska 99507<br><br>Tele: (907) 562-6647    FAX: (907) 562-4939 | 5. Issued By:<br>Bureau of Indian Affairs, Juneau Area<br>Branch of Contracting<br>P. O. Box 25520<br>Juneau, Alaska 99802-5520<br>Tele: 800/645-8397        FAX 907/ 586-7525 |
|---|---|

6.  Contents of Contract
    Item

| SCHEDULE | | Page No. |
|---|---|---|
| | Section (a) - Authority and Purpose | 1 |
| | Section (b) - Terms, Provisions & Conditions | 1 |
| | Section (c) - Obligations of the Tribe | 8 |
| | Section (d) - Obligations of the United States | 9 |
| | Section (e) - Other Provisions | 9 |
| | Section (f) - Attachments | 11 |

7.  ATTACHMENTS:  The following are hereby incorporated into this Contract.
    Attachment 1    Tribal Resolutions
    Attachment 2    Annual Funding Agreement
    Attachment 3    Accounting & Appropriation Data
    Attachment 4    Scopes of Work
    Attachment 5    P-638 Payment Information

This Contract is hereby awarded pursuant to the Indian Self-Determination and Education Assistance Act (P.L. 93-638, as amended); 25 U.S.C. 450 et. seq; which Act is hereby incorporated into this contract.  This contract includes the programs, activities, and funding identified in the attached annual funding agreement for each year of the contract term, and is otherwise subject to the terms and conditions included herein.

|  | 8.    TOTAL AMOUNT OF CONTRACT    $        125,000 |
|---|---|

| 9.    For the CONTRACTOR: | 10. For the BUREAU OF INDIAN AFFAIRS: |
|---|---|
| *[signature]* Patricia K Brown Edwards   1-4-05<br>Signature                               Date<br>*Printed Name and Title*<br>Patricia K. Brown-Schwalenberg<br>Executive Director | *[signature]* Darryl J. Guthrie   12/23/04<br>Signature                               Date<br>*Printed Name and Title*<br>Darryl G. Guthrie, Awarding Official<br>Certificate No. BIA-2004-L1-000059 |

*CHUGACH REGIO... ...L RESOURCES COMMISSION*
Contract No. CTE01X84923

Award

# CONTRACT AGREEMENT
# No. CTE01X84923

### BETWEEN

# THE SECRETARY OF THE DEPARTMENT OF THE INTERIOR

## AND

# CHUGACH REGIONAL RESOURCES COMMISSION

# OCTOBER 1, 2004

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 3 of 37

*CHUGACH REGI(  L RESOURCES COMMISSION*
Contract No. CTE01X84⅄ぇ3

Award

# TABLE OF CONTENTS

## (a) Authority and Purpose

| | | |
|---|---|---|
| 1. | Authority | 1 |
| 2. | Purpose | 1 |

## (b) Terms, Provisions and Conditions

| | | |
|---|---|---|
| 1. | Term | 1 |
| 2. | Effective Date | 2 |
| 3. | Program Standards | 2 |
| 4. | Funding Amount | 2 |
| 5. | Limitation of Costs | 2 |
| 6. | Payment | 2 |
| 7. | Records and Monitoring | 3 |
| 8. | Property | 4 |
| 9. | Availability of Funds | 5 |
| 10. | Transportation | 6 |
| 11. | Federal Program Guidelines, Manuals or Policy Directives | 6 |
| 12. | Disputes | 6 |
| 13. | Administrative Procedures of the Contractor | 7 |
| 14. | Successor Annual Funding Agreement | 7 |
| 15. | Contract Requirements; Approval by Secretary | 7 |

## (c) Obligation of the Contractor

| | | |
|---|---|---|
| 1. | Contract Performance | 8 |
| 2. | Amount of Funds | 8 |
| 3. | Contracted Programs | 8 |
| 4. | Trust Services for Individual Indians | 8 |
| 5. | Fair and Uniform Services | 9 |

## (d) Obligation of the United States

| | | |
|---|---|---|
| 1. | Trust Responsibility | 9 |
| 2. | Programs Retained | 9 |

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 4 of 37

*CHUGACH REGIONAL RESOURCES COMMISSION*
Contract No. CTE01X84223                                                    Award

## (e) Other Provisions

| | | |
|---|---|---|
| 1. | Designated Officials | 9 |
| 2. | Contract Modifications or Amendments | 9 |
| 3. | Officials Not to Benefit | 10 |
| 4. | Covenant Against Contingent Fees | 10 |
| 5. | Cost Principles and Audits | 10 |
| 6. | Investment of Funds | 10 |
| 7. | Submission of Audit Reports | 11 |

## (f) Attachments                                                    11

| | | |
|---|---|---|
| 1 | Approval of Contract | 11 |
| 2. | Annual Funding Agreement | 12 |

| | |
|---|---|
| Approval of Contract (Tribal Resolutions) | Attachment 1 |
| Annual Funding Agreement | Attachment 2 |
| Accounting & Appropriation Data | Attachment 3 |
| Scopes of Work | Attachment 4 |

*CHUGACH REGI    :L RESOURCES COMMISSION*
Contract No. CTE01X84923

Award

# AGREEMENT BETWEEN

# THE SECRETARY of INTERIOR

# and

# CHUGACH REGIONAL RESOURCES COMMISSION

## (a) AUTHORITY AND PURPOSE.--

(1) **AUTHORITY.--** This agreement, denoted a Self-Determination Contract (referred to in this agreement as the "Contract"), is entered into by the Secretary of the Interior (referred to in this agreement as the "Secretary"), for and on behalf of the United States pursuant to title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and by the authority of **CHUGACH REGIONAL RESOURCES COMMISSION** (referred to in this agreement as the "Contractor"). The provisions of title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) are incorporated in this agreement.

(2) **PURPOSE.--** Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs (or portions thereof), that are otherwise contractible under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor:   **Refer to the Annual Funding Agreement, Attachment 2.**

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 6 of 37

*CHUGACH REGIO   L RESOURCES COMMISSION*
Contract No. CTE01X849z3                                                              Award

## (b)  TERMS, PROVISIONS AND CONDITIONS.–

**(1) TERM.–** Pursuant to section 105(c)(1) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j(c)(1)), the term of this Contract shall be for **Three (3) years** on 105(d)(1) of such Act (25 U.S.C. 450j(d)), upon the election by the Contractor, the period of this Contract shall be determined on a basis of a calendar year, unless the Secretary and the Contractor agree on a different period in the annual funding agreement incorporated by reference in subsection (f)(2).

**(2) EFFECTIVE DATE.–** This Contract shall become effective October 1, 2004 and shall extend through September 30, 2007.

**(3) PROGRAM STANDARDS.–** The Contractor agrees to administer the program, services, functions and activities (or portions thereof) listed in subsection (a) (2) of the Contract in conformity with the standards listed in **the Annual Funding Agreement, Attachment 2.**

**(4) FUNDING AMOUNT.–** Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the Annual Funding Agreement incorporated by reference in subsection (f)(2).   Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j-1).

**(5) LIMITATION OF COSTS.–** The Contractor shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract.   If, at any time, the Contractor has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the Contractor shall provide reasonable notice to the Secretary.  If the Secretary does not take such action as may be necessary to increase the amount of funds awarded under this Contract, the Contractor may suspend performance of the Contract until such time as additional funds are awarded.

**(6) PAYMENT.–**

*CHUGACH REGIONAL RESOURCES COMMISSION*
Contract No. CTE01X84323                                    Award

(A)  **IN GENERAL**-- Payments to the Contractor under this Contract shall:

(i)   be made as expeditiously as practicable; and
(ii)  include financial arrangements to cover funding during periods covered by joint resolutions adopted by Congress making continuing appropriations, to the extent permitted by such resolutions.

(B)  **QUARTERLY, SEMIANNUAL, LUMP-SUM, AND OTHER METHODS OF PAYMENT.-**

(i)   **IN GENERAL.—**Pursuant to section 108(b) of the Indian Self-Determination and Education Assistance Act, and notwithstanding any other provision of law, for each fiscal year covered by this Contract, the Secretary shall make available to the Contractor the funds specified for the fiscal year under the Annual Funding Agreement incorporated by reference pursuant to subsection (f)(2) by paying to the Contractor, on a quarterly basis, one-quarter of the total amount provided for in the annual funding agreement for that fiscal year, in a lump-sum payment or as semiannual payments, or any other method of payment authorized by law, in accordance with such method as may be requested by the Contractor and specified in the Annual Funding Agreement.

(ii)  **METHOD OF QUARTERLY PAYMENT.**--If quarterly payments are specified in the Annual Funding Agreement incorporated by reference pursuant to subsection (f)(2), each quarterly payment made pursuant to clause (i) shall be made on the first day of each quarter of the fiscal year, except that in any case in which the Contract year coincides with the Federal fiscal year, payment for the first quarter shall be made not later than the date that is 10 calendar days after the date on which the Office of Management and Budget apportions the appropriations for the fiscal year for the programs, services, functions, and activities subject to this Contract.

(iii) **APPLICABILITY.**  Chapter 39 of title 31, United States Code, shall apply to the payment of funds due under this Contract and the Annual Funding Agreement referred to in clause (i).

(7)  **RECORDS AND MONITORING.—**

(A)  **IN GENERAL.**-- Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the record keeping system of the Department

of the Interior, records of the Contractor shall not be considered Federal records for purposes of chapter 5 of title 5, United States Code.

(B)    **RECORDKEEPING SYSTEM.—** The Contractor shall maintain a record keeping system and, upon reasonable advance request, provide reasonable access to such records to the Secretary.

(C)    **RESPONSIBILITIES OF THE CONTRACTOR.—** The Contractor shall be responsible for managing the day-to-day operations conducted under this Contract and for monitoring activities conducted under this Contract to ensure compliance with the Contract and applicable Federal requirements. With respect to the monitoring activities of the Secretary, the routine monitoring visits shall be limited to not more than one performance monitoring visit for this Contract by the head of each operating division, departmental bureau, or departmental agency, or duly authorized representative of such head unless--

(i)   the Contractor agrees to one or more additional visits; or
(ii)  the appropriate official determines that there is reasonable cause to believe that grounds for reassumption of the Contract, suspension of Contract payments, or other serious Contract performance deficiency may exist.

No additional visit referred to in clause (ii) shall be made until such time as reasonable advance notice that includes a description of the nature of the problem that requires the additional visit has been given to the Contractor.

## (8)   PROPERTY.—

(A)    **IN GENERAL.—** As provided in section 105(f) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j(f)), at the request of the Contractor, the Secretary may make available, or transfer to the Contractor, all reasonably divisible real property, facilities, equipment, and personal property that the Secretary has used to provide or administer the programs, services, functions, and activities covered by this Contract. A mutually agreed upon list specifying the property, facilities, and equipment so furnished shall also be prepared by the Secretary, with the concurrence of the Contractor, and periodically revised by the Secretary, with the concurrence of the Contractor.

**CHUGACH REGI AL RESOURCES COMMISSION**

Contract No. CTE01X849∠3

Award

    **(B)**    **RECORDS.--** The Contractor shall maintain a record of all property referred to in subparagraph (A) or other property acquired by the Contractor under section 105(f)(2)(A) of such Act for purposes of replacement.

    **(C)**    **JOINT USE AGREEMENTS.--** Upon the request of the Contractor, the Secretary and the Contractor shall enter into a separate joint use agreement to address the shared use by the parties of real or personal property that is not reasonably divisible.

    **(D)**    **ACQUISITION OF PROPERTY.--** The Contractor is granted the authority to acquire such excess property as the Contractor may determine to be appropriate in the judgment of the Contractor to support the programs, services, functions, and activities operated pursuant to this Contract.

    **(E)**    **CONFISCATED OR EXCESS PROPERTY.--** The Secretary shall assist the Contractor in obtaining such confiscated or excess property as may become available to tribes, tribal organizations, or local governments.

    **(F)**    **SCREENER IDENTIFICATION CARD.--** A screener identification card (General Services Administration form numbered 2946) shall be issued to the Contractor not later than the effective date of this Contract. The designated official shall, upon request, assist the Contractor in securing the use of the card.

    **(G)**    **CAPITAL EQUIPMENT.--** The Contractor shall determine the capital equipment, leases, rentals, property, or services the Contractor requires to perform the obligations of the Contractor under this subsection, and shall acquire and maintain records of such capital equipment, property rentals, leases, property, or services through applicable procurement procedures of the Contractor.

**(9)**    **AVAILABILITY OF FUNDS.--** Notwithstanding any other provision of law, any funds provided under this Contract:

    **(A)**    Shall remain available until expended; and

    **(B)**    with respect to such funds, no further:

        (i) approval by the Secretary, or

(ii) justifying documentation from the Contractor,  shall be required prior to the expenditure of such funds.

**(10) TRANSPORTATION.**—Beginning on the effective date of this Contract, the Secretary shall authorize the Contractor to obtain interagency motor pool vehicles and related services for performance of any activities carried out under this Contract.

**(11) FEDERAL PROGRAM GUIDELINES, MANUALS, OR POLICY DIRECTIVES.**—Except as specifically provided in the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) the Contractor is not required to abide by program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Contractor and the Secretary, or otherwise required by law.

**(12) DISPUTES.**—

(A)    **THIRD-PARTY MEDIATION DEFINED.**—For the purposes of this Contract, the term "Third-Party Mediation" means a form of mediation whereby the Secretary and the Contractor nominate a third party who is not employed by or significantly involved with the Secretary of the Interior, or the Contractor, to serve as a third-party mediator to mediate disputes under this Contract.

(B)    **ALTERNATIVE PROCEDURES.**— In addition to, or as an alternative  to, remedies and procedures prescribed by section 110 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450m-1), the parties to this Contract may jointly:

(i)    submit disputes under this Contract to third-party mediation;
(ii)   submit the dispute to the adjudicatory body of the Contractor, including the tribal court of the Contractor;
(iii)  submit the dispute to mediation processes provided for under the laws, policies, or procedures of the Contractor; or
(iv)   use the administrative dispute resolution processes authorized in subchapter IV of chapter 5 of title 5, United States Code. **EFFECT OF DECISIONS.**— The Secretary shall be bound by decisions made pursuant to the procedures set forth in subparagraph (B), except that the Secretary shall not be bound by any decision that significantly conflicts with the interests of Indians or the United States.

**CHUGACH REGIONAL RESOURCES COMMISSION**
Contract No. CTE01X8                                                    Award

**(13) ADMINISTRATIVE PROCEDURES OF THE CONTRACTOR. –**
Pursuant to the Indian Civil Rights Act of 1968 (25 U.S.C. 1301 et seq.), the laws, policies, and procedures of the Contractor shall provide for administrative due process (or the equivalent of administrative due process) with respect to programs, services, functions, and activities that are provided by the Contractor pursuant to this Contract.

## (14) SUCCESSOR ANNUAL FUNDING AGREEMENT.–

**(A) IN GENERAL.–** Negotiations for a successor Annual Funding Agreement provided for in subsection (f) (2), shall begin not later than 120 days prior to the conclusion of the preceding Annual Funding Agreement. Except as provided in section 105(c)(2) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j(c)(2)) the funding for each such successor Annual Funding Agreement shall only be reduced pursuant to section 106(b) of such Act (25 U.S.C. 450j-1(b)).

**(B) INFORMATION.––** The Secretary shall prepare and supply relevant information, and promptly comply with any request by the Contractor for information that the Contractor reasonably needs to determine the amount of funds that may be available for a successor Annual Funding Agreement, as provided for in subsection (f)(2) of this Contract.

## (15) CONTRACT REQUIREMENTS; APPROVAL BY SECRETARY.-

**(A) IN GENERAL.––** Except as provided in subparagraph (B), for the term of the Contract, section 2103 of the Revised Statutes (25 U.S.C. 81) and section 16 of the Act of June 18, 1934 (48 Stat. 937, chapter 576; 25 U.S.C. 475; 25 U.S.C. 476), shall not apply to any contract entered into in connection with this Contract.

**(B) REQUIREMENTS.––** Each contract entered into by the Contractor with a third party in connection with performing the obligations of the Contractor under this Contract shall:

    (i)   be in writing;
    (ii)  identify the interested parties, the authorities of such parties, and purpose of the Contract;
    (iii) state the work to be performed under the Contract; and
    (iv) state the process for making any claim, the payments to be made, and the terms of the Contract, which shall be fixed.

*CHUGACH REGIONAL RESOURCES COMMISSION*
Contract No. CTE01X84... 3                                          Award

## (c)  OBLIGATION OF THE CONTRACTOR.--

**(1) CONTRACT PERFORMANCE.--** Except as provided in subsection (d)(2), the Contractor shall perform the services, functions, and activities as provided in the Annual Funding Agreement under subsection (f)(2) of this Contract.

**(2) AMOUNT OF FUNDS.--** The total amount of funds to be paid under this Contract pursuant to section 106(a) shall be determined in an Annual Funding Agreement entered into between the Secretary and the Contractor, which shall be incorporated into this Contract.

**(3) CONTRACTED PROGRAMS.--** Subject to the availability of appropriated funds, the Contractor shall administer the programs, services, functions, and activities identified in this Contract and funded through the Annual Funding Agreement under subsection (f)(2).

**(4) TRUST SERVICES FOR INDIVIDUAL INDIANS.--**

**(A) IN GENERAL.--** To the extent that the Annual Funding Agreement provides funding for the delivery of trust services to individual Indians that have been provided by the Secretary, the Contractor shall maintain at least the same level of service as the Secretary provided for such individual Indians, subject to the availability of appropriated funds for such services.

**(B) TRUST SERVICES TO INDIVIDUAL INDIANS.--** For the purposes of this paragraph only, the term "trust services for individual Indians" means only those services that pertain to land or financial management connected to individually held allotments.

**(5) FAIR AND UNIFORM SERVICES.--** The Contractor shall provide services under this Contract in a fair and uniform manner and shall provide access to an administrative or judicial body empowered to adjudicate or otherwise resolve complaints, claims, and grievances brought by program beneficiaries against the Contractor arising out of the performance of the Contract.

*CHUGACH REGI*  *AL RESOURCES COMMISSION*
Contract No. CTE01X84223                                                    Award

# (d) OBLIGATION OF THE UNITED STATES.--

## (1) TRUST RESPONSIBILITY.—

(A) IN GENERAL.-- The United States reaffirms the trust responsibility of the United States to the *CHUGACH REGIONAL RESOURCES COMMISSION* to protect and conserve the trust resources of the Indian Tribe and the trust resources of individual Indians.

(B) CONSTRUCTION OF CONTRACT.-- Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the tribe or individual Indians. The Secretary shall act in good faith in upholding such trust responsibility.

## (2) PROGRAMS RETAINED.-- As specified in the Annual Funding Agreement, the United States hereby retains the programs, services, functions, and activities with respect to the Tribe(s) that are not specifically assumed by the Contractor in the Annual Funding Agreement, under subsection (f)(2).

# (e) OTHER PROVISIONS.--

## (1) DESIGNATED OFFICIALS.-- Not later than the effective date of this Contract, the United States shall provide to the Contractor, and the Contractor shall provide to the United States, a written designation of a senior official to serve as a representative for notices, proposed amendments to the Contract, and other purposes for this Contract.

## (2) CONTRACT MODIFICATIONS OR AMENDMENTS.--

(A) IN GENERAL.-- Except as provided in subparagraph (B), no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to the Contract, and the Contractor and the Secretary provide written consent for the modification.

(B) EXCEPTION.-- The addition of supplemental funds for programs, functions, and activities (or portions thereof) already included in the Annual Funding Agreement under subsection (f) (2), and the reduction of funds pursuant to section 106(b)(2), shall not be subject to subparagraph (A).

**CHUGACH REGI AL RESOURCES COMMISSION**
Contract No. CTE01X823                                                    Award

(3) **OFFICIALS NOT TO BENEFIT.**— No Member of Congress, or resident commissioner, shall be admitted to any share or part of any contract executed pursuant to this Contract, or to any benefit that may arise from such contract. This paragraph may not be construed to apply to any contract with a third party entered into under this Contract if such contract is made with a corporation for the general benefit of the corporation.

(4) **COVENANT AGAINST CONTINGENT FEES.**— The parties warrant that no person or selling agency has been employed or retained to solicit or secure any contract executed pursuant to this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business.

(5) **COST PRINCIPLES AND AUDITS.**— The Contractor shall comply with the following:

(A) The costs of this Contract and each Annual Funding Agreement consist of the direct and contract support costs, including indirect costs, incurred in the performance of this Contract and each Annual Funding Agreement, determined in accordance with the cost principles set forth in OMB Circular A-87, except as modified by section 106(k) of the Act.

(B) Audits shall be performed in accordance with OMB Circular A-133. Any claim by the Federal Government against the Tribe based on any audit under this section shall be subject to the provisions of section 106(f) of the Act.

(6) **INVESTMENT OF FUNDS**

(A) Advanced funds not immediately spent for program activities may be invested only in obligations of the United States or in obligations or securities that are guaranteed or insured by the United States.

(B) If not invested, advanced funds must be deposited into accounts that are insured by an agency or instrumentality of the United States or must be fully collateralized to ensure protection of the funds.

(C) Interest and investment income that accrue on any funds provided for by contract become the property of the grantee.

**CHUGACH REGI    AL RESOURCES COMMISSION**
Contract No. CTE01X84~~3                                          Award

### (7)  SUBMISSION OF AUDIT REPORTS

If a grantee spends more than $500,000 in total Federal financial assistance form all sources, the following submission requirements apply.

(A)  To fulfill single audit Act requirements.

    (i)  Send one copy of the audit report with Form SF-SAC (Data Collection Form) to the Federal Audit Clearinghouse:

        Federal Audit Clearinghouse
        U.S. Bureau of the Census
        1201 East Tenth Street
        Jeffersonville, IN  47132

    (ii)  submit one additional copy to the Clearinghouse for <u>each</u> funding agency that has a finding, either current or prior year, related to the grant/contracts provided by them.

(B)  All contractors/grantees/Self-Governance Tribes must send two copies of their audit reports to the Office of Audit and Evaluation to meet the reporting requirements of the Indian Self-Determination and Education Assistance Act and the Tribally Controlled School Grants Act Interior. The address is:

        U.S. Department of the Interior
        Office of Audit & Evaluation
        2051 Mercator Drive, Parker Building
        Reston, VA 20191

## (f) ATTACHMENTS.—

**(1)  APPROVAL OF CONTRACT.–** Unless previously furnished to the Secretary, the resolution(s) of **CHUGACH REGIONAL RESOURCES COMMISSION** authorizing the contracting of the programs, services, functions, and activities identified in this Contract are attached to this Contract as Attachment 1.

**(2)  ANNUAL FUNDING AGREEMENT.–**

    **(A)  IN GENERAL.--** The Annual Funding Agreement under this Contract shall only contain-

CHUGACH REGIᴏɴᴀʟ RESOURCES COMMISSION
Contract No. CTB01X8    3                                                    Award

    (i)  terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment; and

    (ii) such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree.

**(B)**  **INCORPORATION BY REFERENCE.–**  The Annual Funding Agreement is hereby incorporated in its entirety in this Contract and attached to this Contract as Attachment 2.

**CHUGACH REGI...AL RESOURCES COMMISSION**
Contract No. CTE01X84923

Award

# ATTACHMENT 2.

# ANNUAL
# FUNDING
# AGREEMENT

*Chugach Regio. Resources Commission*
*Contract No. CTE01X84923*

*2005 AFA*

# FISCAL YEAR 2005

# ANNUAL FUNDING AGREEMENT

## BETWEEN

# CHUGACH REGIONAL
# RESOURCES COMMISSION

## AND

## THE UNITED STATES OF AMERICA
## SECRETARY OF THE
## DEPARTMENT OF THE INTERIOR

**Sec. 1.    AUTHORITY AND PURPOSE —**

This Annual Funding Agreement is executed by and between **Chugach Regional Resources Commission** (hereafter the "Contractor") and the Bureau of Indian Affairs (hereafter the "BIA"), pursuant to Title I of the Indian Self-Determination and Education Assistance Act, as amended, and is incorporated into and governed by the Tribal Contract (hereafter the "Contract") between the Contractor and BIA **dated October 1, 2004.**   Pursuant to the terms of this Agreement, the Contractor is authorized to plan, conduct, and administer the programs, functions, services and activities identified in **Section 10** below.

**Sec. 2.    EFFECTIVE DATE AND TERM —**

This Agreement shall become effective **October 1, 2004** and shall extend through **September 30, 2005.**

1-11-08; 5:22PM;CRRC

*Chugach Region... Resources Commission*                                          **2005 AFA**
*Contract No. CTE01X84923*

### Sec. 3.    AMOUNT OF FUNDS —

The Bureau of Indian Affairs shall provide the Contractor **the amount of $125,000.00** in accordance with Section (b)(4) of the Contract. Accounting and appropriation data is set forth in Attachment 1.

*No Contract Support Funds have been appropriated for support of this contract. Section 106(a)(2) of the Indian Self-Determination and Education Assistance Act does not apply to this contract. Funding for indirect costs shall be budgeted within the available direct program funding identified in the Annual Funding Agreement.*

### Sec. 4.    SERVICE AREA —

The Contractor agrees to administer the programs, services, functions and activities (or portions thereof) listed in **Section 10** of this Annual Funding Agreement in the following service area:

|  | Resolution No. |
|---|---|
| **Chugach Regional Resources Commission** | **Resolution No. 04-01** |
| **Chenega Bay** | **Resolution No. 93-09** |
| **Native Village of Eyak** | **Resolution No. 93-6-1** |
| **Nanwalek** | **Resolution No. 93-09** |
| **Native Village of Port Graham** | **Resolution No. 93-10** |
| **Tatitlek Village IRA Council** | **Resolution No. 93-09** |
| **Mount Marathon Native Association** | **Resolution No. 93-06** |

"For all programs other than Scholarships, the contractor shall serve all eligible Alaska Native and American Indian *Residents* within the service area. For the Scholarship Program the contractor's service area is defined as the eligible Alaska Native *Enrolled* members of *Chenega Bay; The Native Village of Eyak (Cordova); Nanwalek; Port Graham; Tatitlek; and Seward (Qutekcak Native Tribe); and Valdez Native Tribe* and their descendents."

### Sec. 5.    TRIBAL SHARES —

(1) The Contractor agrees that the acceptance of Tribal Shares includes the responsibility of all programs, activities, services, and functions associated with the program tribal shares taken by the contractor/tribe, except for those listed by program in the Proposed list of Inherently Federal Functions of the Bureau of Indian Affairs. May 1997. This listing was sent to each tribe and tribal organization by the Deputy Commissioner of Indian Affairs on May 19, 1997.

*Chugach Regio   Resources Commission*    **2005 AFA**
*Contract No. CTE01X84923*

(2) The Tribal Shares process is currently under review. FY-03 Tribal Shares are
based upon formulas agreed upon for the FY-03 Annual Funding Agreement
and DO NOT increase the contractor's Tribal Priority Allocation (TPA) funding.
Formulas and process may be different after FY-03 and funding is subject to
the availability of funds.

*Sec. 6.    PAYMENT OF FUNDS —*

Payments shall be made to the Contractor in advance upon request of the
Contractor utilizing the Bureau of Indian Affairs "P-638" payment system.
Section 105(b) of the Act is hereby incorporated into this Contract.

*Sec. 7.    INVESTMENT OF FUNDS —*

(A) Advanced funds not immediately spent for program activities may be invested
only in obligations of the United States or in obligations or securities that are
guaranteed or insured by the United States.

(B) If not invested, advanced funds must be deposited into accounts that are
insured by an agency or instrumentality of the United States or must be fully
collateralized to ensure protection of the funds.

(C) Interest and investment income that accrue on any funds provided for by
contract become the property of the grantee.

*Sec. 8.  PROGRAMS RETAINED —*

(A) GOVERNMENT PERFORMANCE AND RESULTS ACT- "The Chugach
Regional Resources Commission agrees to provide applicable data and
information to the BIA Alaska Regional Office pursuant to the Government
Performance and Results Act of 1993 (P.L. 103-62). Before providing such
information, the Chugach Regional Resources Commission will work with its
respective Regional Office to determine applicable data and information needed
to meet the requirements pursuant to the Government Performance and Results
Act of 1993. (P.L. 103-62)".

**Sec. 9. MOTOR VEHICLE OPERATION POLICY —**

*"The Chugach Regional Resources Commission certifies that it will self-
administer a motor vehicle operations policy that promotes the safe
operation of motor vehicles while performing duties to implement the terms
of the funding agreement.  The Chugach Regional Resources Commission
policy is either comparable or superior to the March 19, 2004 Motor Vehicle*

1-11-08; 5:22PM;CRRC                                    ;907 -582 .4939         # 22/ 25

**Chugach Regional Resources Commission**                          **2005 AFA**
**Contract No. CTE01X84923**

*Operation Policy for the Bureau of Indian Affairs issued by the Assistant*
*Secretary- Indian Affairs ".*

### Sec. 10    SUBMISSION OF AUDIT REPORTS.—

If a Contractor spends more than **$500,000** in total Federal financial assistance
from all sources, the following submission requirements apply.

(A) To fulfill single audit Act requirements.

> (1) Send one copy of the audit report with Form SF-SAC (Data Collection
> Form) to the Federal Audit Clearinghouse:
>
> > Federal Audit Clearinghouse
> > U.S. Bureau of the Census
> > 1201 East Tenth Street
> > Jeffersonville, IN  47132
>
> (2) Submit one additional copy to the Clearinghouse for <u>each</u> funding
> agency that has a finding, either current or prior year, related to the
> grant/contracts provided by them.

(B) All contractors/grantees/Self-Governance Tribes must send two copies of
their audit reports to the Office of Audit and Evaluation to meet the reporting
requirements of the Indian Self-Determination and Education Assistance Act
and the Tribally Controlled School Grants Act Interior.  The address is:

> Office of Audit & Evaluation
> U.S. Department of the Interior
> Parker Building
> 2051 Mercator Drive
> Reston, VA     21092

*Sec. 11.  AUDIT SANCTIONS.- Failure to submit the required audit reports*
*will result in the implementation of Audit Sanctions as shown in the*
*following table:*

| Period of Non-compliance | Sanction | Authority |
|---|---|---|
| 1 year | Level 1 sanctions – The tribe or tribal organization will be limited to monthly advance payments of all contract funds, including contract support funds. | OMB Circular A-133 |
| 2 years | Level 2 sanctions – The tribe or tribal organization will continue on monthly advance payments of all contract funds | OMB Circular A-133 |

1-11-08, 5:22PM;CRRC                                                                 5907 562 4950          # 23/ 25

**Chugach Regio.... ... Resources Commission**                                      *2005 AFA*
**Contract No. CTE01X84923**

|            | payments of all contract funds and all contract support funds will be withheld. |                              |
|------------|----------------------------------------------------------------------------------|------------------------------|
| 3 years    | Level 3 sanctions – BIA will initiate non-emergency program reassumption procedures. | OMB Circular A-133 and 25 USC § 450m |

### Sec. 12.  PURPOSE —

Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs (or portions thereof), that are otherwise contractible under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor.  Refer to the following programs which have been proposed by the contractor and authorized by resolution referenced in Section 4.

   A.  CFDA No. 15.034 – Natural Resources

A.    CFDA No. 15.034 – Natural Resource:  Services will be confined to trust lands.

   (1)    Statutes:

      (i)    Title 25 U.S.C., 13 Snyder Act and applicable appropriation acts.

      (ii)    Applicable to Wildlife and Parks - Water Resources, Agriculture and Agriculture Ex.
         Archeological Resources Protection Act - 1979
         Archeological and Historic Preservation Act - 1974
         Antiquities Act - 1906
         Executive Order 11593 (Protection and Enhancement of Cultural Environment)
         Resource Conservation and Recovery Act - 1976
         Federal Land Policy and Management Act
         Surface Mining Control and Reclamation Act - 1977
         Federal Water Pollution Control Act
         Endangered Species Act.

      (iii)    Applicable to Wildlife and Parks and Water Resources
         - Coastal Zone Management Act - 1972
         - National Trails System Act
         - U.S./Canada (Inter-Field Office Agreement - DOI) Yukon Salmon Treaty - 1985
         - Migratory Bird Treaty

*Chugach Regio   Resources Commission*
*Contract No. CTE01X84923*                                    *2005 AFA*

        - Cooperative Effort between BIA/BSFW
        - MOA-DOI Inter-Field Office Agreement on Policy - Trusteeship Tribal Fishery Resources
        - Mineral Leasing Act Amendments - 1973
        - Land and Water Conservation Fund Act - 1965
        - Marine Mammal Act - 1982
        - Estuary Protection Act
        - Executive Order 11990 (Wetland Protection)
        - Clean Water Act
        - Comprehensive Environmental Resource, Compensation, Liability Act (CERCLA) Wild and Scenic Rivers Act - 1969
        - Water Resources Planning Act - 1969
        - Federal Water Project Recreation Act
        - Fish and Wildlife Coordination Act – 1973

(iv) <u>Applicable to Agriculture and Agriculture Extension</u>
        - 48 U.S.C. 250K (Reindeer Act of 1937) AG
        - Toxic Substance Control Act
        - Forest and Range and Renewable Resources Act
        - Federal Insecticide, Fungicide and Rodenticide Act

(2) Regulations:

(i) 25 CFR, Sub Chapter H - Land and Water, Sub Chapter I Energy and Mineral and Sub Chapter J - Fish and Wildlife.

(3) Reports:

(i) Quarterly Financial Report
(ii) Annual Narrative Report

For each program, the contractor will provide the necessary personnel, facilities, equipment, and supplies, except as otherwise specified, which are required to fulfill the objectives of this program activity portion of the contract within the contract service area.

## Sec. 13.   *AUTOMATED INFORMATION TECHNOLOGY TRAINING.--*

"*Automated Information Technology Training.* Prior to being granted access to DOI automated information technology systems, Contractor employees will successfully complete BIA automated technology systems training, the costs of which will be met by the BIA."

## Sec. 14.   *TRUST PROGRAMS RECORDS MANAGEMENT.-*

"*Trust Programs Records Management.* The Contractor agrees to preserve and maintain records that adequately and properly document performance of Federal

*Chugach Regional Resources Commission*
*Contract No. CTE01X84923*                                    **2005 AFA**

Indian trust functions under federal regulations in Title 25 of the CFR. The Contractor and the Department of the Interior agree to work cooperatively in records creation, maintenance and disposition, and training activities, and to address trust records issues and activities in accordance with Executive Order # 13175 (Consultation and Coordination with Indian Tribal Governments) and the BIA Government-to Government Consultation Policy."

### Sec. 16.   USE OF FUNDS SANCTIONS.-

Failure to maintain the integrity of contract funds shall result in imposition of one or more of the following sanctions:

(a)    Pursuant to Section 5(d) of Public Law 93-638, as amended (25 USC 450c(d)), funds paid to the Contractor and not used for the purposes for which they were paid shall be repaid to the Treasury of the United States; and,

(b)    Cancellation of Advance Payment methodology and invocation of payments on a cost-reimbursable basis.

(c)    Sanctions shall remain in place until the Contractor provides assurance that the impropriety, which resulted in the imposition of sanctions, has been rectified and will not reoccur.


*Chugach Regional Resources Commission*


By: _____  1-4-05
                                            Date


*United States of America*
*Department of the Interior*
*Bureau of Indian Affairs*


By: _____  12/23/04
       Awarding Official                    Date
       Certificate No. BIA-2004-L1-000059

09/29/2005 13:53 FAX ⌐002/013

*Chugach Regional Resources Commission*
*Contract No. CTE01X84923*

*2005 AFA*

# CONTRACT/FISCAL YEAR 2005

# AMENDED ANNUAL FUNDING AGREEMENT

## BETWEEN

# Chugach Regional Resources Commission

## AND

# THE UNITED STATES OF AMERICA SECRETARY OF THE DEPARTMENT OF THE INTERIOR

### Sec. 1.   *AUTHORITY AND PURPOSE —*

This Annual Funding Agreement is executed by and between Chugach Regional Resources Commission (hereafter the "Contractor") and the Bureau of Indian Affairs (hereafter the "BIA"), pursuant to Title I of the Indian Self-Determination and Education Assistance Act, as amended, and is incorporated into and governed by the Tribal Contract (hereafter the "Contract") between the Contractor and BIA dated October 1, 2004. Pursuant to the terms of this Agreement, the Contractor is authorized to plan, conduct, and administer the programs, functions, services and activities identified in **Section 10** below.

**Chugach Regional Resources Commission**                                    **2005 AFA**
**Contract No. CTE01X84923**

### Sec. 2.   EFFECTIVE DATE AND TERM —

This Agreement shall become effective October 1, 2004 and shall extend through September 30, 2005.

### Sec. 3.   AMOUNT OF FUNDS —

The Bureau of Indian Affairs shall provide the Contractor the amount of $417,984.00 in accordance with Section (b)(4) of the Contract. Accounting and appropriation data is set forth in Attachment 1.

### Sec. 4.   SERVICE AREA —

The Contractor agrees to administer the programs, services, functions and activities (or portions thereof) listed in **Section 10** of this Annual Funding Agreement in the following service area:

|  | Resolution No. |
|---|---|
| Chugach Regional Resources Commission | Resolution No. 04-01 |
| Chenega Bay | Resolution No. 93-09 |
| Native Village of Eyak | Resolution No. 93-6-1 |
| Nanwalek | Resolution No. 93-09 |
| Native Village of Port Graham | Resolution No. 93-10 |
| Tatitlek Village IRA Council | Resolution No. 93-09 |
| Mount Marathon Native Association | Resolution No. 93-06 |

"For all programs other than Scholarships, the contractor shall serve all eligible Alaska Native and American Indian *Residents* within the service area. For the Scholarship Program the contractor's service area is defined as the eligible Alaska Native *Enrolled* members of Chenega Bay; the Native Village of Eyak (Cordova); Nanwalek; Port Graham; Tatitlek; and Seward (Qutekcak Native Tribe); and Valdez Native Tribe and their descendents."

### Sec. 5.   TRIBAL SHARES —

(1) The Contractor agrees that the acceptance of Tribal Shares includes the responsibility of all programs, activities, services, and functions associated with the program tribal shares taken by the contractor/tribe, except for those listed by program in the Proposed list of Inherently Federal Functions of the Bureau of Indian Affairs, May 1997. This listing was sent to each tribe and tribal organization by the Deputy Commissioner of Indian Affairs on May 19, 1997.

09/29/2005  13:53 FAX                                                                                    Ø004/013

*Chugach Regional Resources Commission*                                    **2005 AFA**
*Contract No. CTE01X84923*

(2) The Tribal Shares process is currently under review.  FY-05 Tribal Shares are
based upon formulas agreed upon for the FY-05 Annual Funding Agreement
and DO NOT increase the contractor's Tribal Priority Allocation (TPA) funding.
Formulas and process may be different after FY-05 and funding is subject to
the availability of funds.

### Sec. 6.    PAYMENT OF FUNDS —

Payments shall be made to the Contractor in advance upon request of the
Contractor utilizing the Bureau of Indian Affairs "P-638" payment system.
Section 105(b) of the Act is hereby incorporated into this Contract.

### Sec. 7.    INVESTMENT OF FUNDS —

(A) Advanced funds not immediately spent for program activities may be invested
only in obligations of the United States or in obligations or securities that are
guaranteed or insured by the United States.

(B) If not invested, advanced funds must be deposited into accounts that are
insured by an agency or instrumentality of the United States or must be fully
collateralized to ensure protection of the funds.

(C) Interest and investment income that accrue on any funds provided for by
contract become the property of the grantee.

### Sec. 8.   PROGRAMS RETAINED —

(A) GOVERNMENT PERFORMANCE AND RESULTS ACT- "The Chugach
Regional Resources Commission agrees to provide applicable data and
information to the BIA Alaska Regional Office pursuant to the Government
Performance and Results Act of 1993 (P.L. 103-62). Before providing such
information, the Chugach Regional Resources Commission will work with its
respective Regional Office to determine applicable data and information needed
to meet the requirements pursuant to the Government Performance and Results
Act of 1993. (P.L. 103-62)".

### Sec. 9.  MOTOR VEHICLE OPERATION POLICY —

*"The Chugach Regional Resources Commission certifies that it will self-
administer a motor vehicle operations policy that promotes the safe
operation of motor vehicles while performing duties to implement the terms
of the funding agreement.  The Chugach Regional Resources Commission*

09/29/2005 13:54 FAX                                                    ☑ 005/013

*Chugach Regional Resources Commission*                        ***2005 AFA***
*Contract No. CTE01X84923*

*policy is either comparable or superior to the March 19, 2004 Motor Vehicle*
*Operation Policy for the Bureau of Indian Affairs issued by the Assistant*
*Secretary- Indian Affairs ".*

**Sec. 10    SUBMISSION OF AUDIT REPORTS.—**

If a Contractor spends more than $500,000 in total Federal financial assistance
from all sources, the following submission requirements apply.

(A) To fulfill single audit Act requirements.

   (1) Send one copy of the audit report with Form SF-SAC (Data Collection
       Form) to the Federal Audit Clearinghouse:

       Federal Audit Clearinghouse
       U.S. Bureau of the Census
       1201 East Tenth Street
       Jeffersonville, IN  47132

   (2) Submit one additional copy to the Clearinghouse for each funding
       agency that has a finding, either current or prior year, related to the
       grant/contracts provided by them.

(B) All contractors/grantees/Self-Governance Tribes must send two copies of
    their audit reports to the Office of Audit and Evaluation to meet the reporting
    requirements of the Indian Self-Determination and Education Assistance Act
    and the Tribally Controlled School Grants Act Interior.  The address is:

       Office of Audit & Evaluation
       Office of the Assistant Secretary – Indian Affairs
       U.S. Department of the Interior
       Parker Building, 2051 Mercator Drive
       Reston, VA     21092
       703-390-6357

**Sec. 11.  AUDIT SANCTIONS.-  *Failure to submit the required audit reports***
***will result in the implementation of Audit Sanctions as shown in the***
***following table:***

| Period of Non-compliance | Sanction | Authority |
|---|---|---|
| 1 year | Level 1 sanctions – The tribe or tribal organization will be limited to monthly advance payments of all contract funds, including contract support funds. | OMB Circular A-133 |
| 2 years | Level 2 sanctions – The tribe or tribal | OMB Circular A- |

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 29 of 37

09/29/2005 13:54 FAX                                                    ☑ 006/013

*Chugach Regional Resources Commission*                    *2005 AFA*
*Contract No. CTE01X84923*

| | organization will continue on monthly advance payments of all contract funds and all contract support funds will be withheld. | 133 |
|---|---|---|
| 3 years | Level 3 sanctions -- BIA will initiate non-emergency program reassumption procedures. | OMB Circular A-133 and 25 USC § 450m |

### *Sec. 12.  PURPOSE*—

Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs (or portions thereof), that are otherwise contractible under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor.  Refer to the following programs which have been proposed by the contractor and authorized by resolution referenced in Section 4.

   CFDA No. 15.039 – Fish, Wildlife and Parks Programs on Indian Lands

**A.    CFDA No. 15.039 – Natural Resource:  Fish, Wildlife and Parks**

   (1)    Statutes:

      (i)    Title 25 U.S.C., 13 Snyder Act and acts.

      (ii)    Applicable to Wildlife and Parks Agriculture and Agriculture Ex.
            Archeological Resources Protection Act
            Archeological and Historic Preservation /
            Antiquities Act - 1906
            Executive Order 11593 (Protection and enhancement of Cultural Environment)
            Resource Conservation and Recovery Act - 1976
            Federal Land Policy and Management Act
            Surface Mining Control and Reclamation Act - 1977
            Federal Water Pollution Control Act
            Endangered Species Act.

      (iii)    Applicable to Wildlife and Parks and Water Resources
            - Coastal Zone Management Act - 1972
            - National Trails System Act

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 30 of 37

08/29/2005 13:54 FAX                                                                                  ☒007/013

*Chugach Regional Resources Commission*                              *2005 AFA*
*Contract No. CTE01X84923*

- U.S./Canada (Inter-Field Office Agreement - DOI) Yukon Salmon Treaty - 1985
- Migratory Bird Treaty
- Cooperative Effort between BIA/BSFW
- MOA-DOI Inter-Field Office Agreement on Policy - Trusteeship Tribal Fishery Resources
- Mineral Leasing Act Amendments - 1973
- Land and Water Conservation Fund Act - 1965
- Marine Mammal Act - 1982
- Estuary Protection Act
- Executive Order 11990 (Wetland Protection)
- Clean Water Act
- Comprehensive Environmental Resource, Compensation, Liability Act (CERCLA) Wild and Scenic Rivers Act - 1969
- Water Resources Planning Act - 1969
- Federal Water Project Recreation Act
- Fish and Wildlife Coordination Act — 1973

(iv)  Applicable to Agriculture and Agriculture Extension
- 48 U.S.C. 250K (Reindeer Act of 1937) AG
- Toxic Substance Control Act
- Forest and Range and Renewable Resources Act
- Federal Insecticide, Fungicide and Rodenticide Act

(2) Regulations:

(i)  25 CFR, Sub Chapter H - Land and Water, Sub Chapter I Energy and Mineral and Sub Chapter J - Fish and Wildlife.

(3) Reports:

(i) . Quarterly Financial Report
Annual Narrative Report

For each program, the contractor will provide the necessary personnel, facilities, equipment, and supplies, except as otherwise specified, which are required to fulfill the objectives of this program activity portion of the contract within the contract service area.

### Sec. 13.  *AUTOMATED INFORMATION TECHNOLOGY TRAINING.*–

"*Automated Information Technology Training.* Prior to being granted access to DOI automated Information technology systems, Contractor employees will successfully complete BIA automated technology systems training, the costs of which will be met by the BIA."

*Chugach Regional Resources Commission*          **2005 AFA**
*Contract No. CTE01X84923*

### Sec. 14.   TRUST PROGRAMS RECORDS MANAGEMENT.-

"*Trust Programs Records Management.* The Contractor agrees to preserve and maintain records that adequately and properly document performance of Federal Indian trust functions under federal regulations in Title 25 of the CFR.   The Contractor and the Department of the Interior agree to work cooperatively in records creation, maintenance and disposition, and training activities, and to address trust records issues and activities in accordance with Executive Order # 13175 (Consultation and Coordination with Indian Tribal Governments) and the BIA Government-to Government Consultation Policy."

### Sec. 16.   USE OF FUNDS SANCTIONS.-

Failure to maintain the integrity of contract funds shall result in imposition of one or more of the following sanctions:

(a)    Pursuant to Section 5(d) of Public Law 93-638, as amended (25 USC 450c(d)), funds paid to the Contractor and not used for the purposes for which they were paid shall be repaid to the Treasury of the United States; and,

(b)    Cancellation of Advance Payment methodology and invocation of payments on a cost-reimbursable basis.

(c)    Sanctions shall remain in place until the Contractor provides assurance that the impropriety, which resulted in the imposition of sanctions, has been rectified and will not reoccur.

09/29/2005 13:54 FAX

*Chugach Regional Resources Commission*
*Contract No. CTE01X84923*

**2005 AFA**

*Chugach Regional Resources Commission*

By: _____ Date

United States of America
Department of the Interior
Bureau of Indian Affairs

By: _____
Awarding Official            Date
Certificate No. BIA-2004-L1-000059

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 33 of 37

09/29/2005 13:54 FAX                                                      ☒010/013

## U.S. DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS
#### Alaska Region

| Indian Self-Determination Contract Modification | | | |
|---|---|---|---|
| 1. Contract Number CTE01X84922 | 2. Effective Date September 29, 2005 | 3. Modification Number: Two (2) | Page of Pages 1 3 |
| 4. Issued To: Chugach Regional Resources Commission 4201 Tudor Centre Drive, Suite 300 Anchorage, Alaska 99508-5916 Tele: (907) 562-6647   FAX: (907) 562-4939 | | 5. Issued By: Bureau of Indian Affairs, Alaska Region Branch of Contracting P.O. Box 25520 Juneau, Alaska 99802-5520 Phone: (800) 645-8397   Fax: (907) 586-7525 | |

6. This Public Law 93-638 contract is hereby modified as follows:

**I. ANNUAL FUNDING AGREEMENT:**

This FY-2005 AFA is hereby increased from:     347,000

by: $     70,984

for a new FY-2005 Total of: $     417,984

**II. COST REIMBURSABLE PROGRAMS:**

0   Remains unchanged, CFDA 15.039 Awarded at the FY-2005 Resource Management program funds to 100%.

0   Remains unchanged, CFDA 15.034 Awarded at the FY-2005 Natural Resources program funds to 100%.

0

**III. INDIRECT COSTS:**

570,984  Contract Support reflects application of Chugach Regional Resources Commission approved Indirect Cost Rate Agreement, applicable to the period 10/01/04 through 09/30/05 and is funded at the Final Allocation Level of 90.233%.

**IV. CONTRACT TOTAL**

FY-2005  $     417,984
FY-2006  $     -
FY-2007  $     -
         $     417,984  Contract Total

**V. THIS IS THE FIRST YEAR OF A THREE YEAR TERM CONTRACT.**

*All other terms and conditions of this contract shall remain the same.*

| 7. Signatures: Contractor is required to sign: | Yes (XX)   No ( ) |
|---|---|
| Signature             Date | Signature             Date |
| Printed Name and Title | Darryl G. Guthrie, Awarding Official Certificate No. BIA-2004-L1-000059 Printed Name and Title |

09/29/2005 13:54 FAX                                                    @017/019

Chugach Regional Resources Commission
CONTRACT NO.: CTE01X84922
MODIFICATION Two (2)
FY-2005 Annual Funding Agreement

**PART D - CONTRACT SUPPORT FUNDS**                                    Page 3

| | Program Amount | | Approved Indirect Rate | | | | Contract Support Limitation | | Contract Support Funding |
|---|---|---|---|---|---|---|---|---|---|
| Chugach Reg. Shellfish Mariculture | 59,500 | x | 27.70% | = | 16,482 | x | 90.233% | = | 14,872 |
| Contractual | 18,700 | x | 27.70% | = | 5,180 | x | 90.233% | = | 4,674 |
| Nanwalek Sockeye Salmon Dev. P. | 17,500 | x | 27.70% | = | 4,848 | x | 90.233% | = | 4,374 |
| Contractual | 1,500 | x | 27.70% | = | 416 | x | 90.233% | = | 375 |
| Port Graham Pink Salmon Project | 0 | x | 27.70% | = | 0 | x | 90.233% | = | 0 |
| Contractual | 53,000 | x | 0.00% | = | 0 | x | 90.233% | = | 0 |
| Contractual/applied 2005 NICR | 25,000 | x | 27.70% | = | 6,925 | x | 90.233% | = | 6,249 |
| Program Development | 70,895 | x | 27.70% | = | 19,638 | x | 90.233% | = | 17,720 |
| Contractual | 10,000 | x | 0.00% | = | 0 | x | 90.233% | = | 0 |
| Contractual/applied 2005 NICR | 25,000 | x | 27.70% | = | 6,925 | x | 90.233% | = | 6,249 |
| Administrative Program | 43,400 | x | 27.70% | = | 12,022 | x | 90.233% | = | 10,848 |
| Rent | 20,000 | x | 27.70% | = | 5,540 | x | 90.233% | = | 4,999 |
| Bookkeeping Services | 2,505 | x | 27.70% | = | 694 | x | 90.233% | = | 626 |
| **TOTAL** | **347,000** | | | | **78,668** | | | | **70,984** |

Contract Support reflects application of Chugach Regional Resources Commission approved indirect Cost Rate Agreement, applicable to the period 10/01/04 through 09/30/05 and is funded at the Final Allocation Level of 90.233%.

Pursuant to the Bureau's Contract Support Policy, Contractor is required to apply for and negotiate an indirect rate for FY-2005 and future years.

Program Funding received after June 15, 2005 is not eligible for Contract Support Funding.

05/25/2005  13:54 FAX                                                    @012/018

**CHUGACH REGIONAL RESOURCES COMMISSION**
**CONTRACT NO: CTE01X64923**
**'FY-2005 Annual Funding**
**MODIFICATION TWO (2)**

Page 2

| Acctg Line | | | | | | Prior Funding Level | Changes + or <-> | Current Funding Level | Program Total |
|---|---|---|---|---|---|---|---|---|---|
| | CFDA No. 15.039: Tribal Management and Development Programs: | | | | | | | | 347,000 |
| 001 | E00460 | 0508 | 31970 | 252i | 5E00460024 | 341,156 | 0 | 341,156 | |
| 002 | E00460 | 0506 | 39605 | 252i | 5E00460024 | 5,844 | 0 | 5,844 | |
| | | | Total Program Funding | | | 347,000 | 0 | 347,000 | 347,000 |
| | CFDA 15.024 - Indirect Costs | | | | | | | | 70,984 |
| 003 | E00460 | 0508 | 39270 | 252i | | 0 | 70,984 | 70,984 | |
| | | | *TOTALS* | | | $347,000 | 70,984 | $417,984 | $417,984 |

05/29/2005 13:54 FAX @013/013

## FY 2005 Chugach Regional Resources Commission (E01260)

| Mod 2 |
|---|

| 2005 FUNDING SOURCES | |
|---|---|
| Natural Res. | 347,000 |
| Subtotal: | 347,000 |
| | |
| Subtotal: | 0 |
| Total FY2005: | 347,000 |

| Awards | | |
|---|---|---|
| Award | | 347,000 |
| Mod 1 | 125,000 | 222,000 |
| Mod 2 | | 70,984 |
| Total Awarded: | | 417,984 |

### FY 2005 Approved Budgets

| | Chugach Reg. Sheldon Matl. Development | Narwalek S.Salmon Dev. Proj. | Port Graham Pink Salmon Hatchery | Program Development | Administrative Program | Total |
|---|---|---|---|---|---|---|
| Village Project Coordinator | | 7,200 | | | | 7,200 |
| Small weir Crew | | 5,000 | | | | 5,000 |
| Salaries | 30,000 | | | 45,000 | 25,000 | 100,000 |
| Fringe | 9,000 | 1,830 | | 13,500 | 7,500 | 31,830 |
| Travel & Perdiem | 5,000 | 1,000 | | 10,000 | 6,000 | 22,000 |
| Contractual | 18,700 | 1,500 | 78,000 | 35,000 | | 133,200 |
| Weir Supplies | | 1,500 | | | | 1,500 |
| Freight | | 970 | | | | 970 |
| Supplies | 15,000 | | | 1,000 | 800 | 16,800 |
| Telephone | | | | 1,395 | 800 | 2,195 |
| Postage | | | | | 800 | 800 |
| Insurance | | | | | 2,500 | 2,500 |
| Rent | | | | | 20,000 | 20,000 |
| Bookkeeping Services | | | | | 2,505 | 2,505 |
| Miscellaneous expense | 500 | | | | | 500 |
| Sub Budgets | 78,200 | 19,000 | 78,000 | 106,395 | 65,905 | 347,000 |
| Additional Funding | | | | | | |
| Sub Budgets | | | | | | |
| Contract Support | | | | | | 70,984 |
| Total Award | | | | | | 417,984 |

9/29/2005

Pl. Exh. 1
CRRC v. Kempthorne, et al.
Page 37 of 37



# Chugach Regional Resources Commission

November 14, 2007

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles C. Cesar
Regional Director
Alaska Regional Office
Bureau of Indian Affairs
P. O. Box 25520
Juneau, AK 99802-5520

Re: Renewal of Contract No. CTE01X84923

Dear Mr. Cesar:

This letter constitutes a proposal for renewal of the above-referenced contract for the three year period from October 1, 2007 through September 30, 2010. Chugach Regional Resources Commission asserts its entitlement to the renewal of the contract and requests that the Bureau immediately award a contract for the period of FY 2008 through FY 2010 and issue a funding agreement to cover the contract costs for FY 2008.

We hereby incorporate by reference the entire FY 2007 AFA as a proposal for FY 2008-2010. As you know, the BIA made no response whatsoever to CRRC's 2007 proposal for an annual funding agreement for the third year of its most recent contract – a matter which is being pursued in a separate claim. The inaction of the agency cannot impair CRRC's right to technical assistance for contract renewal nor to an award of the renewal contract itself.

Since the early 1990's the Bureau has contracted with CRRC for the operation of various natural resource projects and programs on behalf of the federal government. The term of the most recent contract was three years, from October 1, 2004 through September 30, 2007. The project undertaken by CRRC on behalf of the federal government is ongoing in nature and constitutes a continuing trust responsibility of the federal government.

This proposal for renewal contains no material and substantial change to the scope or funding of the program, functions, services and activities under the most recent contract, as amended over the course of the three-year term. As such, this proposal is not subject to declination criteria. 900 C.F.R. § 900.33.

Pl. Exh. 2
CRRC v. Kempthorne, et al.
Page 1 of 2

Niles C. Cesar
November 14, 2007
Page 2 of 2

The ISDA specifies that the amount of funds provided to a tribal contractor shall not be less than the Bureau would otherwise have provided for the operation of these programs. 25 U.S.C. § 450j-1. Annual funding for successive years may be reduced only under limited circumstances, none of which is applicable here. 25 U.S.C. § 450j-1(b)(2). *See also* 25 U.S.C. § 450*l*(c), Model Contract, Sec. 1(b)(14(A). Thus the FY 2008 funding agreement must be awarded at no less than the amount the BIA was required by law and contract to award CRRC in FY 2007 (not less than $347,000 plus CSC at 22.07%).[1]

Under the current circumstances, we request that the BIA issue the subject contract within ten days. Please be advised that in the event the Bureau fails to issue a renewal contract, 25 U.S.C. § 450m-1(a) authorizes a federal district court to grant mandamus relief, damages, and costs and attorneys fees under the Equal Access to Justice Act.

CRRC looks forward to your prompt action on this request.

Sincerely,

Patty Brown-Schwallenberg
Executive Director

cc:    Darryl G. Guthrie
       Bureau of Indian Affairs, Alaska Region
       Branch of Contracting
       PO Box 25520
       Juneau, AK 99802-5520

---

[1] This sum is drawn from the 2005 and 2006 AFAs. To the extent that appropriations increases have occurred in FY 2007 and FY 2008, this sum should be correspondingly increased.

LAW OFFICES

# SONOSKY, CHAMBERS, SACHSE, MILLER & MUNSON, LLP

900 WEST FIFTH AVENUE, SUITE 700

ANCHORAGE, ALASKA 99501-2029

(907) 258-6377

FACSIMILE (907) 272-8332

WEBSITE: WWW.SONOSKY.NET

MARVIN J. SONOSKY (1909-1997)
HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER*
DOUGLAS B.L. ENDRESON
DONALD J. SIMON
MYRA M. MUNSON*
ANNE D. NOTO
MARY J. PAVEL
DAVID C. MIELKE
JAMES E. GLAZE*
GARY F. BROWNELL
COLIN C. HAMPSON
DOUGLAS W. WOLF
RICHARD D. MONKMAN*

MARISSA K. FLANNERY*
WILLIAM F. STEPHENS
ADDIE C. ROLNICK
JENNIFER J. THOMAS
CAROLE A. HOLLEY*
HILARY V. MARTIN*
MICHAEL E. DOUGLAS

OF COUNSEL
ARTHUR LAZARUS, JR.
ROGER W. DuBROCK*
KAY E. MAASSEN GOUWENS*
MATTHEW S. JAFFE
AARON M. SCHUTT*
PETER G. ASHMAN*

*ALASKA BAR

December 27, 2007
Via Facsimile

Roger Hudson, Esq.
Attorney,
Office of the Solicitor, Alaska Region
U.S. Dept. of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508

Re:    1.  Chugach Regional Resources Commission
           FY 2008 BIA Renewal Contract

       2.  Chugach Regional Resources Commission
           FY 2006 & 2007 CDA claims

Dear Roger:

Thank you for taking the time last week to visit with me about CRRC's pending FY2008 - FY2010 renewal contract, as well as matters relating to CRRC's Contract Disputes Act claims. I write to summarize where we are, to make a couple of requests of you, and to offer additional information in response to your requests.

1.  CRRC's FY 2008 BIA Renewal Contract.

I understand from our discussions, as well as from a message that Assistant Secretary Artman left on my phone, that the Bureau has now decided to award the requested contract. This is very welcome news, and CRRC is very pleased that the outstanding questions Secretary Artman posed to me earlier in the week have now been favorably resolved. Thank you to you, as well, for all the research you undertook to respond to those questions.

As you requested, I attach a brief scope of work and budget to accompany the FY2008 Annual Funding Agreement. The scope of work can also be referenced in the Master Contract.

Pl. Exh. 3
CRRC v. Kempthorne, et al.
Page 1 of 8

WASHINGTON, DC          ANCHORAGE          JUNEAU          SAN DIEGO          ALBUQUERQUE

Roger Hudson                                                    December 27, 2007
Attorney                                                          Page 2 of 4
Office of the Solicitor, Alaska Region
U.S. Dept. Interior

**Please let me know if there is anything further I can do to expedite prompt issuance of the Contract and the FY2008 Annual Funding Agreement.** For instance, I can certainly draft up the Master Contract and the funding agreement, if that would help. Given my understanding from our conversation that this year's funding for the AFA will be coming from the BIA Central Office, perhaps there is also someone in D.C. I should contact to further expedite the process.

In the meantime, and so far as I understand, CRRC's work continues to be funded from a bank loan and from other sources pending award of the new contract, a situation that cannot long continue. Given these circumstances, **your written estimate of the expected time frame for an award would be most appreciated.**

2. <u>CRRC FY 2006 & 2007 CDA claims.</u>

With regard to the pending CDA claims, I think you now have everything that the BIA needs, including CRRC's certification of the claims. I also understand from our conversation that the Bureau now anticipates approving these claims, as least in part. That, too, is welcome news, since CRRC has incurred substantial debt to keep these programs afloat these past two years.

To expedite the resolution of the CDA claims, CRRC is prepared to file a Notice of Appeal with the CBCA, and to then work out the details of any settlement with the Bureau. If those negotiations yield an agreement, any resulting award would then be paid from the Judgment Fund (as occurred in connection with the FY2005 settlement achieved when the IBCA was still functioning).

Before filing a Notice of Appeal (which would be based upon CRRC deeming the Bureau's inaction to date to be a 'denial'), we would prefer the Bureau's agreement on this procedural point, so that we dispense with any motion practice challenging the Notice as having been filed too early. Here, too, **your written agreement on this procedure would be most appreciated.**

Finally, I promised to get something to you on the issue of the constitutionality of 25 U.S.C. § 450j-1(b)(2)(B), the section under which I understand the Bureau is contemplating reducing any award of damages by $46,000 (due to the statement in the FY 2006 House-Senate Conference Committee report recommending $300,000 be used that year for CRRC, as compared with $346,000 recommended in prior years for CRRC).

Here, I have three points to offer.

Roger Hudson                                                    December 27, 2007
Attorney                                                              Page 3 of 4
Office of the Solicitor, Alaska Region
U.S. Dept. Interior

First (and as I noted when we spoke), the D.C. Circuit in Ramah Navajo School Board v. Babbitt, 87 F.3d 1338 (D.C. Cir. 1996) hinted that this provision was unconstitutional under INS v.Chadha, 462 U.S. 919 (1983). The Court made special note of the Secretary's position:

> The Secretary challenges the constitutionality of § 450j-1(b)'s attempt to incorporate into the statute language in a future conference report, citing the Supreme Court's decision in INS v. Chadha, 462 U.S. 919 (1983). Because we find "law to apply" elsewhere in the text of the ISDA, we need not look to the 1995 conference report and therefore need not address the constitutional concerns implicated by § 450j-1(b).

Ramah, 87 F.3d at 1349 n.14. Although this precise issue was briefed in Ramah pursuant to an Order issued by the Court after the close of oral argument, as noted above, the Court found it unnecessary to reach the issue. Nonetheless, the Secretary's position at the time, together with the Court's footnote, certainly gives one pause.

Second, in several signing statements issued over the past several years, President Bush has indicated he will not adhere to similar provisions of other laws due to his determination that under Chadha the Executive Branch cannot be compelled to follow instructions from congressional committees (as compared with statutory directives that are the product of full bicameral congressional action, followed by the President's signature of an engrossed bill into law). For several examples of such Presidential statements, see Letter of June 18, 2007, from Gary L. Kepplinger, General Counsel, Comptroller General of the United States, to Senator Robert C. Byrd, Chairman, Senate Committee on Appropriations, and Congressman John Conyers, Jr., Chairman, House Committee on Appropriations, Opinion No. B-308603, at 7-8 (available at http://www.gao.gov/decisions/appro/308603.pdf).

To the extent remarks contained in Appropriations Committee reports do not have the force of law, and thus are binding neither on the President nor on Congress, § 450j-1(b)(2)(B)'s reference to such reports and procedures likewise has no binding legal effect and cannot alter CRRC's rights under the Indian Self-Determination Act. On a closely related note, only two years ago the Supreme Court reiterated that statements in appropriation committee reports do not have the force of law. Cherokee Nation v. Leavitt, 543 U.S. 631, 646 (2005) ("The relevant case law makes clear that restrictive language contained in Committee Reports is not legally binding.")

Third, we note that the language at issue is not a good match to § 450j-1(b)(2)(B).

In the FY 2006 appropriations cycle, the Senate Appropriations Committee "recommend[ed] ... for other recurring programs ... increases of ... $5,784,000 for .. the Chugach Regional Resources Commission ($346,000)," S. Rep. 109-80, at 42 (the same as its

Roger Hudson                                                December 27, 2007
Attorney                                                    Page 4 of 5
Office of the Solicitor, Alaska Region
U.S. Dept. Interior

recommendation the preceding year, see S. Rep. 108-341, at 37). The House appropriations committee included no particular recommendation on the issue. The House-Senate Conference Committee then included "increases [from the House funding level] of ... $300,000 for the Chugach Regional Resources Commission." H. Conf. Rep. 109-188. (All these levels were independent of the separate statutory earmark contained elsewhere in the appropriations bill for contract support costs.)

The committee's recommendation of $300,000 for CRRC is not (in the words of § 450j-1(b)(2)(B)) "a directive in the statement of the managers accompanying a conference report on an appropriation bill."[1]  Thus, the Committee's recommendation is not a basis for reducing CRRC's statutory right to undiminished contract funding from one year to the next.

I trust that this information is helpful to you and the Bureau.

Very warmest regards for a joyous holiday season, not just for you and Mary, but for all our colleagues at the Regional Solicitor's office. I look forward to working together in the new year for the betterment of Alaska's Tribes.

                                    Sincerely,

                                    SONOSKY, CHAMBERS, SACHSE,
                                    MILLER & MUNSON, LLP

                                    Lloyd B. Miller

Enclosure

---

[1]  Section 450j-1(b)(2)(B) in pertinent part provides as follows:

(b)  The amount of funds required by subsection (a) –
        *    *    *
        (2) shall not be reduced by the Secretary in subsequent years except pursuant to –
                (B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution[.]



# Chugach Regional Resources Commission

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

## CHUGACH REGIONAL RESOURCES COMMISSION

### *FISHERIES ENHANCEMENT and NATURAL RESOURCES PROGRAM DEVELOPMENT PROJECT*

### FY08 P.L. 93-638 PROPOSAL TO THE BIA

## INTRODUCTION

The Chugach Regional Resources Commission (CRRC), a private non-profit consortium of all Alaska Tribal Governments (federally and non-federally recognized) located within Alaska's Chugach Native Region in southcentral Alaska, has been working with its member Tribes for the past 13 years in natural resource management and development. The CRRC board of directors is composed of one representative appointed by the Tribal government of each of the seven Tribes in the region. The majority of the Board consists of the Village Chiefs/Presidents from each Tribe. The member Tribes include the Nanwalek IRA Council, Port Graham Village Council, Chenega IRA Council, Tatitlek IRA Council and Native Village of Eyak, and the non-federally recognized Tribes from the cities of Seward (Qutekcak Native Tribe) and Valdez (Valdez Native Tribe).

Initially, the emphasis of the CRRC natural resource program was on the development of fisheries projects that would provide either an economic base for a village or create economic opportunities for Tribal members. In FY 96 CRRC initiated a natural resource management program with the objective of establishing natural resource management capabilities in the villages so that they can actively participate in resource use and allocation issues that affect them.

The success of these programs from both an economic and a social standpoint have made them an integral part of overall village and association development. The Chugach Native communities want to continue working with CRRC on these programs through the funding of a contract under the Bureau of Indian Affairs P.L. 93-638 Contract Program for the Chugach Fisheries Enhancement and Natural Resource Program Development Project.

## PROGRAM OVERVIEW

All projects initiated under the fisheries development program continue to progress. The salmon development project for Port Graham is currently working on developing value added processed fisheries products from their hatchery fish. CRRC has provided funding

Pl. Exh. 3
6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647, FAX 907/562-4939
*A Tribal Organization Focusing on Natural Resource Issues Affecting the Chugach Region of Alaska*
CRRC v. Kempthorne, et al.
Page 5 of 8

including Tatitlek. Work will begin in FY08 to develop culture and grow-out techniques for red king crab and blue king crab.

Since the inception of the natural resource management program the emphasis has been on the development of natural resource plans for each village. These plans include a description of the natural resource base surrounding each village, a village profile, and a discussion of the condition of the various local natural resources and its relative importance to each village. With this task nearly complete program emphasis has turned toward the development of a natural resource training curriculum, technical workshops and field trips to view other tribal natural resource management programs. Work will focus on the development of local management capabilities as well as exploring the possibility of developing and initiating co-management and/or cooperative agreements with federal and state agencies. In addition, the CRRC has been working with the University of Alaska-Fairbanks to develop and deliver this Tribal natural Resource management curriculum that integrates traditional ecological knowledge with western science. The University plans to open these classes to students statewide beginning in the spring semester of 2008.

The idea for a region-wide Gathering was conceived by the CRRC Board and staff in 1998, in response to the publicity surrounding the Exxon Valdez Oil Spill and the fact that it had been ten years since it occurred. The first Gathering was held on March 24, 1999, and was so successful, that the Board directed the staff to make this an annual event. The purpose of the Gathering is to provide a forum for all Tribes affected by the Exxon Valdez Oil Spill to come together to learn more about critical natural resource issues affecting the villages through panel presentations, enjoy a traditional meal, and get entertained by traditional village dance groups. The event concludes with a candlelight vigil in honor of those who have passed on, and a dance. Costs associated with this event average around $30,000 per year and donations are solicited from the Tribes, Tribal organizations, and village and regional corporations. This year, part of this cost will be supported by the P.L. 93-638 contract because the Gathering agenda will be focusing on new projects and programs currently being developed under this contract.

## CONCLUSION

By establishing the Chugach Regional Resources commission, the Tribal governments of the Chugach Region have made a commitment to the protection and preservation of the natural resources in their traditional use areas, including lands held in trust by the federal government, as well as village and regional corporation lands and state and federal lands. The Tribes depend upon CRRC to assist them in developing their resource management capabilities so that they can become better resource managers. The Tribal resolutions passed by the CRRC member Tribal Governments in 1993 serve as a testimony to their long-standing commitment to this organization and its mission. Support from the Bureau of Indian Affairs through this P.L. 93-638 contract goes a long way towards meeting the natural resource goals of the Tribes in the Chugach Region.

in the past under this contract to the Port Graham Village Council for this effort. The Port Graham Corporation's cannery and Tribal hatchery are working together to harvest and process the pink salmon returning to the hatchery. The Port Graham hatchery, which was also destroyed in the January 1998 fire, was rebuilt and has obtained sufficient broodstock holding, egg take, incubation and rearing equipment to allow it take up to 110 million pink salmon eggs and short term rear the resultant fry. This is an eight-fold increase over the hatchery's previous egg take capacity and will create hatchery pink salmon returns of around 3 million adults. The new hatchery is also equipped to incubate up to 10 million sockeye salmon eggs.

Activities during this coming year will build upon the work that has been accomplished thus far. The hatchery staff is planning an 80 million egg take for FY 08. Additional rearing pens purchased in FY05 enabled the hatchery to rear all the resultant fry from the FY 04 egg take. The new sockeye program for Port Graham Bay begun in FY04 is expected to result in the third egg take in FY08. In addition, the hatchery will continue incubating the sockeye eggs for the Nanwalek project.

The Nanwalek Sockeye Project, designed to enhance the sockeye run to the English Bay River adjacent to the village, has been working to develop a strategy for controlling outbreaks of IHN and to stabilize production. A professional biologist, under contract to CRRC, is involved with this program. In FY08, the Nanwalek Sockeye Project staff will continue weir operation to ensure accurate counts of sockeye are kept, and, if funds permit, conduct a small egg take in cooperation with the Port Graham Village Council. This project has helped insure that the sockeye subsistence needs for both Nanwalek and Port Graham are met every year as well as providing for a local commercial harvest that residents of both villages have benefited from.

The Mariculture Program that was initiated in Tatitlek is still on track with the goal of developing a large sized grow-out operation for oysters and plans will expand to include cockles in FY08. The market for Alaska oysters is steadily improving and the goal for FY08 is to market 600 dozen oysters a week. Tatitlek has plans to expand oyster production as rapidly as possible under new leadership. This will help to capture market share by taking advantage of the increased demand for this valuable product. The new processing facility is now housing the entire project and staff, which will be a great help in streamlining operations.

In FY06, the Qutekcak Native Tribe in Seward turned the management of the shellfish hatchery over to CRRC. Now called the Alutiiq Pride Shellfish Hatchery, it is currently producing oyster seed, littleneck clam seed, geoducks, cockles, razor clams, and continuing its research and development into the culture techniques for producing cockles. Work will continue in FY 08 to develop culture techniques for producing cockles and improving geoduck production and oyster production for local farmers,

# FY08 BUDGET

The Chugach Fisheries Enhancement and Tribal Natural Resource Management Program is being implemented through the Chugach Regional Resources Commission. Overall, the program budget will consist of the following budget categories.

## FY08 BIA Budget

| Project Components: | Projected Cost |
|---|---|
| A. Chugach Region Shellfish Mariculture Development<br>• Oyster grow-out operations in Tatitlek<br>• Oyster marketing<br>• Alutiiq Pride Shellfish Hatchery (Seward) | $40,000 |
| B. Nanwalek Sockeye Salmon Development Project<br><br>• Seek funds for disease free water engineering study<br>• Operate smolt out-migration weir | $20,000 |
| C. Port Graham Pink Salmon Hatchery<br><br>• Broodstock development<br>• Sockeye and pink salmon fry production<br>• Training and education for hatchery crew | $35,000 |
| D. Program Development<br>• Resource evaluation (Valdez Spot Shrimp)<br>• Project development (Chenega Fisheries/Eyak Shellfish)<br>• Gathering 2008 | $205,000 |
| **Total Direct Costs** | **$300,000** |
| **Indirect Cost (27.7%)** | **$83,100** |
| **TOTAL BUDGET** | **$383,100** |

LAW OFFICES

# SONOSKY, CHAMBERS, SACHSE, MILLER & MUNSON, LLP

900 WEST FIFTH AVENUE, SUITE 700
ANCHORAGE, ALASKA 99501-2029
(907)258-6377
FACSIMILE (907)272-8332
WWW.SONOSKY.COM

MARVIN J. SONOSKY (1909-1997)
HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER*
DOUGLAS B.L. ENDRESON
DONALD J. SIMON
MYRA M. MUNSON*
ANNE D. NOTO
MARY J. PAVEL
DAVID C. MIELKE
JAMES E. GLAZE*
GARY F. BROWNELL
COLIN C. HAMPSON
DOUGLAS W. WOLF
RICHARD D. MONKMAN*
MARISSA K. FLANNERY *

WILLIAM F. STEPHENS
ADDIE C. ROLNICK
JENNIFER T. THOMAS
CAROLE A. HOLLEY*
HILARY V. MARTIN *
MICHAEL E. DOUGLAS *
JAMES V. DEBERGH
APRIL DAY

OF COUNSEL
ARTHUR LAZARUS, JR., P.C.
ROGER W. DUBROCK*
KAY E. MAASSEN GOUWENS *
MATTHEW S. JAFFE
PETER G. ASHMAN *

*ALASKA. BAR

**January 8, 2008**

**[VIA FACSIMILE & U.S. MAIL]**

Roger Hudson, Esq.
U.S. Dept. of the Interior
Office of the Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, AK 99508

Re:    Chugach Regional Resouces Commission
FY 2008 Contract Award

Dear Roger:

Thank you for your follow-up letter on Friday, January 4. I appreciate the notice about the remaining FY 2006 funds. I am sure it was simply an oversight by CRRC. I have instructed my client to draw down those funds immediately.

Although there are many issues on the table, for now it is critical to focus on the FY 2008 contract award and the FY 2008 funding agreement. As I mentioned on my phone message yesterday, when I spoke with Debbie Clark in Secretary Artman's office she was completely unaware of CRRC, much less of our ongoing discussions and the conclusions you have reached. She was going to make contact with Mr. Artman, and also with Niles Cesar, but she also mentioned her general understanding that this sort of thing would be initiated at the contracting officer level. She was prepared to expedite things, but obviously she needs to be brought up to speed quickly. Toward that end, it would be very helpful if you could communicate directly with her by telefax so that the process of issuing the contract documents promptly can proceed.

With respect to the budget for the 2008 funding agreement, given our exchange of letters and our evolving thinking CRRC will be amending its FY 2008 budget to reflect (1) a principal contract amount of $346,000 (and not the $300,000 you initially mentioned to me); (2) 15% of

Roger Hudson, Esq.
January 8, 2008
Page 2 of 2

salaries for "direct support costs" (as reflected in the Associate Deputy Secretary Cason's "Dear Tribal Leader" letter of August 25, 2006, copy enclosed); and (3) indirect costs at the most recent rate of 27.7% (27.7% of $346,000 is $95,842). As you requested, this letter shall serve to confirm that CRRC expects its indirect costs to be funded at its last negotiated rate, which was the 27.7% rate negotiated for FY 2005.

With regard to these contract support cost elements, we understand that the Bureau's contract support appropriation in FY 2008 is sufficient to fully fund CRRC's indirect costs, but only sufficient to partly fund CRRC's direct contract support costs. For purposes of expediting the award, CRRC accepts a pro ration of its direct contract support cost requirement at whatever average level is being funded nationally for other contractors in FY 2008. This will make the contract award (1) $346,000; (2) $95,842 (for a subtotal of $441,842); and (3) a pro rated amount of CRRC's direct contract support costs.

I will write to you separately to discuss the remaining issues raised in your letter, all pertaining to CRRC's pending 2006 and 2007 claims. For now, we must do all that we can to secure a prompt contract award for 2008.

Let me close by once again acknowledging the extraordinary time and energy you have put into this matter. Given that CRRC is operating on a bank loan, your work is especially and deeply appreciated.

Sincerely,

SONOSKY, CHAMBERS, SACHSE,
MILLER & MUNSON, LLP

Lloyd B. Miller

08/25/2006 16:58 FAX                                                          ✉002



# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, D.C. 20240

AUG 2 5 2006

Dear Tribal Leader:

The purpose of this letter is to transmit the National Policy Memorandum on Contract Support Cost (CSC) (NPM-SELD-1) effective and applicable to awards made for fiscal year (FY) 2007 and subsequent fiscal years, signed May 8, 2006. This policy provides guidance on Public Law 93-638 contracts and compacts, new and continuing, to tribal, Bureau of Indian Affairs and Office of Self-Governance personnel. Due to Congressional report language, Direct Contract Support Costs (DCSC) will not be paid in FY 2006. However, the Bureau of Indian Affair's (BIA) plan is to initiate the implementation of the policy in FY 2006 after consultation with the CSC Policy workgroup. Subject to Congressional appropriations in FY 2007, it is the intent of the BIA to distribute DCSC in FY 2007 and until further notice, based on 15% of the salaries contained in tribal contracts. For this purpose, the Bureau will use the same salary data currently used to distribute pay cost increases.

If you have any questions, please contact Mr. Edward Mouss at (202) 513-7616 or (202) 281-0951, or at the following address:  Bureau of Indian Affairs, Office of Tribal Services, 1849 C Street N.W., MS: 4513-MIB, Washington, D.C. 20240.

Sincerely,

James E Cason

Associate Deputy Secretary

Enclosure

Pl. Exh. 4
CRRC v. Kempthorne, et al.
Page 3 of 3

**SONOSKY, CHAMBERS, SACHSE, MILLER & MUNSON, LLP**
**900 West Fifth Avenue, Suite 700**
**Anchorage, Alaska   99501**
**TELEPHONE:  (907) 258-6377**
**FACSIMILE:  (907) 272-8332**

### TELEFAX COVER PAGE

**DATE:**            **January 15, 2008**

| PLEASE DELIVER THE FOLLOWING PAGES TO: | |
|---|---|
| NAME | Roger L. Hudson, Esq. |
| FIRM | United States Department of the Interior, Office of the Solicitor |
| FAX NO. | 271-4143 |

| | |
|---|---|
| FROM | Lloyd Benton Miller / Peter G. Ashman |
| RE | Chugach Regional Resources Commission |

| DOCUMENTS BEING TRANSMITTED | NUMBER OF PAGES |
|---|---|
| Revised Budget for FY 2008 contract | 4 |
| | TOTAL PAGES:    5 |

| MESSAGE |
|---|
| Roger, Attached is the revised budget for the FY 2008 contract.  I have telefaxed a copy to Darryl Guthrie.  Please telefax a copy to Harry Rainbolt.  Thank you very much. |
| |

| | ORIGINAL WILL BE SENT BY REGULAR MAIL |
|---|---|
| | ORIGINAL WILL BE SENT BY OVERNIGHT MAIL SERVICE |
| | ORIGINAL WILL BE HAND DELIVERED |

**NOTICE OF CONFIDENTIALITY**

**This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited.  If your receipt of this transmission is in error, please notify this firm immediately by collect call to (907) 258-6377, and send the original transmission to us by return mail at the above address.**

* * * COMMUNICATION RESULT REPORT ( JAN.15.200  5:25PM ) * * *

TTI   SONOSKY & CHAMBERS

| FILE MODE |      OPTION      | ADDRESS (GROUP) | RESULT | PAGE |
|-----------|------------------|-----------------|--------|------|
| 482  MEMORY TX |             | 22714143        | OK     | P. 4/4 |

---

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL                E-2) BUSY
  E-3) NO ANSWER                           E-4) NO FACSIMILE CONNECTION

---

## SONOSKY, CHAMBERS, SACHSE, MILLER & MUNSON, LLP
### 900 West Fifth Avenue, Suite 700
### Anchorage, Alaska  99501
### TELEPHONE:  (907) 258-6377
### FACSIMILE:  (907) 272-8352

### TELEFAX COVER PAGE

DATE:          January 15, 2008

| PLEASE DELIVER THE FOLLOWING PAGES TO: | |
|------|------|
| NAME | Roger L. Hudson, Esq. |
| FIRM | United States Department of the Interior, Office of the Solicitor |
| FAX NO. | 271-4143 |

| | |
|------|------|
| FROM | Lloyd Benton Miller / Peter G. Ashman |
| RE | Chugach Regional Resources Commission |

| DOCUMENTS BEING TRANSMITTED | NUMBER OF PAGES |
|------|------|
| Revised Budget for FY 2008 contract | 4 |
| | TOTAL PAGES:   5 |

## CHUGACH REGIONAL RESOURCES COMMISSION
### FY08 BIA BUDGET

| Line Items | | Budget Amount |
|---|---|---|
| Salaries | | $120,000.00 |
| Fringe | | 38,400.00 |
| Travel - Board and Staff | | 44,300.00 |
| Telephone | | 10,000.00 |
| Supplies | | 35,800.00 |
| Insurance | | 14,500.00 |
| Printing/Publications | | 5,000.00 |
| Technical/Legal Assistance | | 40,000.00 |
| GIS Mapping | | 8,000.00 |
| Gathering 2008 | | 20,000.00 |
| Repairs and Maintenance | | 4,000.00 |
| Board Stipends | | 7,000.00 |
| SUBTOTAL (ISDA §§106(a)(1),(b) | | $347,000.00 |
| Direct Contract Support (15% of salaries) | | 18,000.00 |
| TOTAL DIRECT COSTS | | $365,000.00 |
| Indirect Contract Support (27.7% x $365,000) | | 101,105.000 |
| GRAND TOTAL | | $466,105.00 |
| | | |

## CHUGACH REGIONAL RESOURCES COMMISSION
## FY08 BUDGET JUSTIFICATION

<u>Salary</u>: Salary is covered under this line item for the Tatitlek Mariculture Project Coordinator and crew, the seasonal fisheries crew to operate the Nanwalek Sockeye Enhancement Project, a portion of the hatchery manager's time in Port Graham, and a portion of the CRRC Executive Director's time to provide oversight and guidance to the projects funded under this P.L. 93-638 contract.

<u>Fringe</u>: Payroll expenses, calculated at 33% of salary covers payroll taxes, workers compensation, and a full fringe benefits package, including health insurance, life insurance, disability, and a pension plan.

<u>Travel</u>: $44,300 is included in this budget to cover the cost of travel for seven CRRC Board members to attend four quarterly meetings, for CRRC staff and consultants to travel to villages of its member Tribes for project related meetings, and for village personnel to travel to Anchorage to attend meetings related to their projects.

<u>Telephone</u>:  Cover the cost of long distance, local telephone lines, and cellular service for all personnel associated with this project.

<u>Supplies</u>: This covers the cost of oyster seed for the Tatitlek Mariculture Project, as well as associated supplies and freight for both the Tatitlek Mariculture Project and the Alutiiq Pride Shellfish Hatchery.  Also included under this line item are fisheries supplies for the Nanwalek Sockeye Enhancement Project, and fish food for the Port Graham Hatchery.

<u>Insurance</u>:  Covers the cost of liability insurance and insurance on office contents.

<u>Printing/Publications</u>:  Covers the cost of informational brochures, publications, and other media designed to keep the member Tribes informed of the projects being developed under this contract.

<u>Technical/Legal Assistance</u>: In order to assist the villages in developing their various programs and initiatives, it is necessary to have the appropriate technical expertise available. Funds are included in this line item to pay for the services of Mr. David Daisy, Fisheries Development Consultant, on a limited basis. His assistance will be dedicated to planning and development, and a limited amount of technical assistance for the ongoing fisheries projects. In addition, technical expertise from other sources may be required in the areas of law, marketing, grant writing, and technical natural resource training.

<u>GIS Mapping Survey Costs</u>:  The CRRC is undertaking a project in coordination with the North Pacific Rim Housing Authority to continue to update the community profile maps.  Costs under this line item will cover stipends to surveyors and key respondents in order to gather information identifying the traditional use areas of the CRRC member Tribes, including harvest areas of each subsistence species used by each Tribe.

2

Gathering 2008: This line item is included to cover the cost of travel, meeting space, and meeting supplies associated with the Annual Subsistence Memorial Gathering 2008, an annual gathering hosted by CRRC for all Tribes in the oil spilled region to come together and discuss natural resource and environmental issues of mutual concern.

Repairs and Maintenance:  Covers the cost of repairs and maintenance of equipment for the Tatitlek Mariculture Project, the Alutiiq Pride Shellfish Hatchery, and the Port Graham Hatchery.

Board Stipends:  The Board passed a motion to authorize include $7,000 for stipends to the Board members and their alternates.  This was meant to help defray travel expenses that exceed the federal per diem amount, and to cover time away from work when they are attending meetings on behalf of CRRC.

Direct Costs: See Letter of August 25, 2006 from Assistant Deputy Secretary James E. Cason to "Dear Tribal Leader".

Indirect Costs: See 2005 IDC rate agreement.

Personnel: Partial salary for the Contracts/Grants Administrator. She is responsible for ensuring that all BIA programs are administered within federal guidelines.

Fringe: Payroll expenses, calculated at 33% for full time personnel, include payroll taxes, workers compensation, medical and dental insurance, as well as pension benefits.

Travel/Per Diem: Travel is included to allow administrative staff to attend training workshops directly related to the administration of this BIA P.L. 93-638 contract.

Telephone: Costs covered include the monthly charge for four telephone lines, plus internet charges and telephone calling cards.

Postage: Postage covers the cost of shipping materials and supplies to the village projects, as well as monthly rent for the postage meter, and daily outgoing mail to the BIA and other organizations relevant to this contract.

Supplies: This line item covers the cost of general office supplies to support the daily activities of the administrative staff.

Insurance: Covers the cost of directors and officers liability insurance, as necessary to meet the obligations for the management of this contract.

Space Cost: Covers the cost of office space for the administrative staff.  This is calculated at $3,000 per month x 12 months.

Bookkeeping Services: Covers a portion of the financial professional services required to maintain the financial records in accordance with federal regulations. Calculated at $1,500 per month, a portion of this cost is being provided as an in-kind contribution by CRRC.

3



# Chugach Regional Resources Commission

January 15, 2008

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

Re:    Contract Disputes Act claim for contract and contract support funds
        (FY 2006 and FY 2007)
        Contract No. CTE01X84923

Dear Director Cesar and Mr. Guthrie:

    Attached are updates of FY 2006 and FY 2007 claims already submitted by CRRC, now updated to reflect an indirect contract support cost rate of 27.7%. Research done subsequent to the initial filings shows that in each year CRRC was entitled to be awarded indirect costs at its then most recent negotiated rate, which was 27.7%. We understand from our attorneys' discussions with BIA attorney Roger Hudson that you concur in our understanding of the law and BIA policy regarding applicable indirect rates.

    Although this updated submission is not required by law, we provide these documents as a courtesy to you and at the request of Mr. Hudson, with the understanding that there will be no additional delay in acting on the pending claims by reason of this submission.

    Thank you for your continuing attention to this matter.

                                            Sincerely,

                                            Patty Brown-Schwalenberg
                                            Executive Director

cc:    Roger Hudson, Esq.
        Office of the Regional Solicitor

Pl. Exh. 6
CRRC v. Kempthorne, et al.
Page 1 of 8



# Chugach Regional Resources Commission

January 15, 2008

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

Re:    FY 2006 Contract Disputes Act claim for contract and contract support cost funds
       Contract No. CTE01X84923

Dear Mr. Cesar and Mr. Guthrie:

    Chugach Regional Resources Commission (CRRC) hereby updates its previously filed claim dated November 14, 2007, to assert the right to immediate payment of $118,142, plus interest (less any available draw-downs), due and owing to CRRC under the provisions of the above-referenced contract, as amended, in effect between the parties for FY 2006. The claim we are updating was submitted pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 601 *et seq.* and §§ 110(a) and (d) of the Indian Self-Determination and Education Assistance Act (ISDA), as amended, seeking all damages arising out of the failure of the Bureau to pay full contract costs, including direct costs and contract support costs, for FY 2006, all of which arise under the terms of a three-year contract executed on October 1, 2004 for the period from October 1, 2004 through September 30, 2007.

    CRRC's contracts and contract amendments, CRRC's funding agreements, and the ISDA, during FY 2006 obligated the United States to pay CRRC (1) no less in direct costs than the United States paid in the preceding year (FY 2005); and (2) no less than the full amount of contract support costs associated with those direct costs, as calculated under applicable BIA policies. CRRC continues to assert that the United States, through the BIA, failed to meet its contractual and statutory obligations by failing to pay the full amount of CRRC's direct costs and contract support costs for FY 2006 (see attached chart). The November 14, 2007, claim, as updated herein, seeks, without limitation, all damages arising out of the BIA's failure to pay the aforementioned costs as required by the ISDA and CRRC's contracts.

Pl. Exh. 6
CRRC v. Kempthorne, et al.
Page 2 of 8

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
January 15, 2008
Page 2 of 3


      Please recall that, under the terms of the Prompt Payment Act, 31 U.S.C. § 611 and the CDA, interest is continuing to accrue on the amount due.

      Thank you for your continuing attention to this claim.

                    Sincerely,

                    Patty Brown-Schwalenberg
                    Executive Director


cc:    Roger Hudson, Esq.
       Office of the Regional Solicitor

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
January 15, 2008
Page 3 of 3

| | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Secretarial amount | 347,000 | | |
| Secretarial amount due (no less than) | * | 347,000 | 347,000 |
| CSC Rate | 27.7% | 27.7% | 27.7% |
| CSC Due | 96,119 | 96,119 | 96,119 |
| Total due | 443,119 | 443,119 | 443,119 |
| Secretarial amount paid | 347,000 | 296,525 | 0 |
| CSC paid | 70,984 | 28,452 | 0 |
| Total paid | 417,984 | 324,977 | 0 |
| Total unpaid | * | (118,142) | (443,119) |

\* No claim.

## CERTIFICATION OF REVISION TO CONTRACT DISPUTES ACT CLAIMS

Contract Disputes Act claim for contract and contract support funds (FY 2006)
Contract No. CTE01X84923

I, Patty Brown-Schwalenberg, Executive Director, hereby certify as follows on behalf of Chugach Regional Resources Commission:

1.    The above revision to the Chugach Regional Resources Commission's pending CDA claim is made in good faith;

2.    The supporting data are accurate and complete to the best of my knowledge;

3.    The amount requested accurately reflects the adjustment for which Chugach Regional Resources Commission believes the Government is liable; and

4.    I have been duly authorized to certify this claim revision on behalf of Chugach Regional Resources Commission

DATED this 15th day of January 2008.

Chugach Regional Resources Commission

By _____
Patty Brown-Schwalenberg
Executive Director



# Chugach Regional Resources Commission

November 14, 2007

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
PO Box 25520
Juneau, AK 99802-5520

Re:    Contract Disputes Act claim for contract and contract support funds (FY 2006)
       Contract No. CTE01X84923

Dear Mr. Cesar and Mr. Guthrie:

        Chugach Regional Resources Commission (CRRC) hereby claims the right to immediate payment of $98,605, plus interest, due and owing to CRRC under the provisions of the above-referenced contract, as amended, in effect between the parties for FY 2006. This claim is submitted pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* and §§ 110(a) and (d) of the Indian Self-Determination and Education Assistance Act, as amended (ISDA), for all damages arising out of the failure of the Bureau to pay full contract costs, including direct costs and contract support costs, for FY 2006, all of which arise under the terms of a three-year contract executed on October 1, 2004 for the period from October 1, 2004 through September 30, 2007.

        CRRC's contracts and contract amendments, CRRC's funding agreements, and the ISDA, during FY 2006 obligated the United States to pay CRRC (1) no less in direct costs (*i.e.*, the Secretarial amount covered by 25 U.S.C. 450j-1(a)(1)) than the United States paid in the preceding year (FY 2005); and (2) no less than the full amount of contract support costs associated with those direct costs.

        In sum CRRC asserts that the United States, through the BIA, has failed to meet its contractual and statutory obligations by failing to pay the full amount of CRRC's direct costs and contract support costs for FY 2006 (see attached chart).

Pl. Exh. 6
CRRC v. Kempthorne, et al.
Page 6 of 8

6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647, FAX 907/ 562-4939

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
November 14, 2007
Page 2 of 2


    This claim seeks, without limitation, all damages arising out of the BIA's failure to pay the aforementioned costs as required by the ISDA and CRRC's contracts. This claim is supported by the originals of all contracts, contract modifications, funding agreements, amendments thereto and indirect cost agreements, all of which are in the custody of the Government.

    Please recall that, under the terms of the Prompt Payment Act, 31 U.S.C. § 611 and the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, interest is accruing on the amount due.

    Thank you for your prompt attention to this claim.

Sincerely,

Patty Brown- Schwallenberg
Executive Director


cc:    Carl J. Artman
       Assistant Secretary of Indian Affairs
       1849 C Street N.W., MS-4004-MIB
       Washington, DC 20240

| | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Secretarial amount | 347,000 | | |
| Secretarial amount due (no less than) | * | 347,000 | 347,000 |
| CSC Rate | 22.98% | 22.07% | 22.05%** |
| CSC Due | 79,740 | 76,582 | 76,582 |
| Total due | 426,740 | 423,582 | 423,582 |
| Secretarial amount paid | 347,000 | 296,525 | 0 |
| CSC paid | 70,984 | 28,452 | 0 |
| Total paid | 417,984 | 324,977 | 0 |
| Total unpaid | * | (98,605) | (423,582) |

* No claim.

** Estimated based on FY 2006 rate.



# Chugach Regional
# Resources Commission

January 15, 2008

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

Re:    Contract Disputes Act claim for contract and contract support funds
       (FY 2006 and FY 2007)
       Contract No. CTE01X84923

Dear Director Cesar and Mr. Guthrie:

·Attached are updates of FY 2006 and FY 2007 claims already submitted by CRRC,
now updated to reflect an indirect contract support cost rate of 27.7%. Research done
subsequent to the initial filings shows that in each year CRRC was entitled to be awarded
indirect costs at its then most recent negotiated rate, which was 27.7%. We understand from
our attorneys' discussions with BIA attorney Roger Hudson that you concur in our
understanding of the law and BIA policy regarding applicable indirect rates. ·

Although this updated submission is not required by law, we provide these
documents as a courtesy to you and at the request of Mr. Hudson, with the understanding that
there will be no additional delay in acting on the pending claims by reason of this
submission.

Thank you for your continuing attention to this matter.

Sincerely,

Patty Brown-Schwalenberg
Executive Director

cc:    Roger Hudson, Esq.
       Office of the Regional Solicitor

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 1 of 10

6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647, FAX 907/ 562-4939
*A Tribal Organization Focusing on Natural Resource Issues Affecting the Chugach Region of Alaska*



# Chugach Regional
# Resources Commission

January 15, 2008

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

Re:    FY 2007 Contract Disputes Act claim for contract and contract support cost funds
       Contract No. CTE01X84923

Dear Mr. Cesar and Mr. Guthrie:

　　　　Chugach Regional Resources Commission (CRRC) hereby updates its previously
filed claim dated November 14, 2007, to assert the right to immediate payment of
$443,119, plus interest, due and owing to CRRC under the provisions of the above-
referenced contract, as amended, in effect between the parties for FY 2007. The claim
we are updating was submitted pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §
601 *et seq.* and §§ 110(a) and (d) of the Indian Self-Determination and Education
Assistance Act (ISDA), as amended, seeking all damages arising out of the failure of the
Bureau to pay full contract costs, including direct costs and contract support costs for FY
2007, all of which arise under the terms of a three-year contract executed on October 1,
2004 for the period from October 1, 2004 through September 30, 2007.

　　　　CRRC's contracts and contract amendments, CRRC's funding agreements, and
the ISDA, during FY 2007 obligated the United States to pay CRRC no less than the full
amount of all contract funds, including direct program funds and full contract support
costs, associated with CRRC's operation of the various natural resource projects and
programs specified in the foregoing contract documents, including no less than the
United States should have paid in FY 2006 had the United States not breached its
obligation to CRRC that year. CRRC continues to assert that the United States, through
the BIA, failed to meet its contractual and statutory obligations by failing to pay any
funds and costs whatsoever for FY 2007 (see attached chart). CRRC's November 14,
2007, claim, as updated herein, seeks, without limitation, all damages arising out of the
BIA's failure to pay the aforementioned costs as required by the ISDA and CRRC's
contracts.

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 2 of 10

6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647, FAX 907/ 562-4939
*A Tribal Organization Focusing on Natural Resource Issues Affecting the Chugach Region of Alaska*

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
January 15, 2008
Page 2 of 3

Please recall that, under the terms of the Prompt Payment Act, 31 U.S.C. § 611 and the CDA, interest is continuing to accrue on the amount due.

Thank you for your continuing attention to this claim.

Sincerely,

Patty Brown-Schwalenberg
Executive Director

cc:     Roger Hudson, Esq.
        Office of the Regional Solicitor

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
January 15, 2008
Page 3 of 3

|  | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Secretarial amount | 347,000 |  |  |
| Secretarial amount due (no less than) | * | 347,000 | 347,000 |
| CSC Rate | 27.7% | 27.7% | 27.7% |
| CSC Due | 96,119 | 96,119 | 96,119 |
| Total due | 443,119 | 443,119 | 443,119 |
| Secretarial amount paid | 347,000 | 296,525 | 0 |
| CSC paid | 70,984 | 28,452 | 0 |
| Total paid | 417,984 | 324,977 | 0 |
| Total unpaid | * | (118,142) | (443,119) |

* No claim.

## CERTIFICATION OF REVISION TO CONTRACT DISPUTES ACT CLAIMS

Contract Disputes Act claim for contract and contract support funds (FY 2007)
Contract No. CTE01X84923

I, Patty Brown-Schwalenberg, Executive Director, hereby certify as follows on behalf of Chugach Regional Resources Commission:

1.    The above revision to the Chugach Regional Resources Commission's pending CDA claim is made in good faith;

2.    The supporting data are accurate and complete to the best of my knowledge;

3.    The amount requested accurately reflects the adjustment for which Chugach Regional Resources Commission believes the Government is liable; and

4.    I have been duly authorized to certify this claim on behalf of Chugach Regional Resources Commission.

DATED this 15th day of January 2008.

Chugach Regional Resources Commission

By _____
Patty Brown-Schwalenberg
Executive Director



# Chugach Regional Resources Commission

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

December 13, 2007

Niles Cesar, Regional Director
Bureau of Indian Affairs, Alaska Region
PO Box 25520
Juneau, AK 99802-5520

Re:  Contract Disputes Act Claim for contract and contract support cost funds (FY 2007)
     Contract No. CTE01X84923

Dear Mr. Cesar:

Attached is the certification required by 25 C.F.R. § 900.220.

Please feel free to contact me if you have any questions.

Sincerely,

Patricia K. Schwaleneberg
Executive Director

cc:   Carl Artman, Assistant Secretary of Indian Affairs
      Roger Hudson, Office of the Regional Solicitor

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 6 of 10



# Chugach Regional Resources Commission

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

## CERTIFICATION

Pursuant to 25 C.F.R. § 900.220, I hereby certify to the following:

I am the Executive Director of the Chugach Regional Resources Commission (CRRC) and I have personal knowledge of the contracts and claims at issue here.

As to CRRCs claim for direct contract costs and contract support costs for FY 07 (copy attached):

(a)     The subject claim is made in good faith; and

(b)     Supporting documents and/or data are accurate and complete to the best of my information and belief; and

(c)     The amount claimed accurately reflects the amount believed to be owed by the Federal government; and

(d)     I am authorized by CRRC to make this certification on its behalf.

Patricia K. Schwalenberg
Executive Director

Subscribed and sworn before me this _____14th_____ day of December 2007.

Notary
My commission expires: 6/26/2010

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 7 of 10

6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647, FAX 907/562-4939



# Chugach Regional
# Resources Commission

November 14, 2007

Chenega Bay

Eyak

Nanwalek

Port Graham

Qutekcak
Native Tribe

Tatitlek

Valdez Native
Tribe

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
Bureau of Indian Affairs, Alaska Region
PO Box 25520
Juneau, AK 99802-5520

Re:     Contract Disputes Act claim for contract and contract support funds (FY 2007)
        Contract No. CTE01X84923

Dear Mr. Cesar and Mr. Guthrie:

Chugach Regional Resources Commission (CRRC) hereby claims the right to immediate payment of $423,582, plus interest, due and owing to CRRC under the provisions of the above-referenced contract, as amended, in effect between the parties for FY 2007. This claim is submitted pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* and §§ 110(a) and (d) of the Indian Self-Determination and Education Assistance Act, as amended (ISDA), for all damages arising out of the failure of the Bureau to pay full contract costs, including direct costs and contract support costs for FY 2007, all of which arise under the terms of a three-year contract executed on October 1, 2004 for the period from October 1, 2004 through September 30, 2007.

CRRC's contracts and contract amendments, CRRC's funding agreements, and the ISDA, during FY 2007 obligated the United States to pay CRRC no less than the full amount of all contract funds, including direct program funds and full contract support costs, associated with CRRC's operation of the various natural resource projects and programs specified in the foregoing contract documents, including no less than the United States should have paid in FY 2006 had the United States not breached its obligation to CRRC that year.

In sum CRRC asserts that the United States, through the BIA, has failed to meet its contractual and statutory obligations by failing to pay any funds and costs whatsoever for FY 2007 (see attached chart).

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 8 of 10

6200 Lake Otis Parkway, Suite 201, Anchorage, Alaska 99507, 907/562-6647. FAX 907/562-4939

Niles Cesar, Regional Director
Darryl G. Guthrie, Awarding Official
November 14, 2007
Page 2 of 2

This claim seeks, without limitation, all damages arising out of the BIA's failure to pay the aforementioned costs as required by the ISDA and CRRC's contracts. This claim is supported by the originals of all contracts, contract modifications, funding agreements, amendments thereto and indirect cost agreements, all of which are in the custody of the Government.

Please recall that, under the terms of the Prompt Payment Act, 31 U.S.C. § 611 and the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, interest is accruing on the amount due.

Thank you for your prompt attention to this claim.

Sincerely,

Patty Brown- Schwallenberg
Executive Director

cc:    Carl J. Artman
       Assistant Secretary of Indian Affairs
       1849 C Street N.W., MS-4004-MIB
       Washington, DC 20240

Pl. Exh. 7
CRRC v. Kempthorne, et al.
Page 9 of 10

| | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Secretarial amount | 347,000 | | |
| Secretarial amount due (no less than) | * | 347,000 | 347,000 |
| CSC Rate | 22.98% | 22.07% | 22.05% ** |
| CSC Due | 79,740 | 76,582 | 76,582 |
| Total due | 426,740 | 423,582 | 423,582 |
| Secretarial amount paid | 347,000 | 296,525 | 0 |
| CSC paid | 70,984 | 28,452 | 0 |
| Total paid | 417,984 | 324,977 | 0 |
| Total unpaid | * | (98,605) | (423,582) |

* No claim.

** Estimated based on FY 2006 rate.

08/25/2006 16:56 FAX                                                    @002



**United States Department of the Interior**

OFFICE OF THE SECRETARY
Washington, D.C. 20240

AUG 2 5 2006

Dear Tribal Leader:

The purpose of this letter is to transmit the National Policy Memorandum on Contract Support Cost (CSC) (NPM-SELD-1) effective and applicable to awards made for fiscal year (FY) 2007 and subsequent fiscal years, signed May 8, 2006. This policy provides guidance on Public Law 93-638 contracts and compacts, new and continuing, to tribal, Bureau of Indian Affairs and Office of Self-Governance personnel. Due to Congressional report language, Direct Contract Support Costs (DCSC) will not be paid in FY 2006. However, the Bureau of Indian Affair's (BIA) plan is to initiate the implementation of the policy in FY 2006 after consultation with the CSC Policy workgroup. Subject to Congressional appropriations in FY 2007, it is the intent of the BIA to distribute DCSC in FY 2007 and until further notice, based on 15% of the salaries contained in tribal contracts. For this purpose, the Bureau will use the same salary data currently used to distribute pay cost increases.

If you have any questions, please contact Mr. Edward Mouss at (202) 513-7616 or (202) 281-0951, or at the following address: Bureau of Indian Affairs, Office of Tribal Services, 1849 C Street N.W., MS: 4513-MIB, Washington, D.C. 20240.

Sincerely,

James E. Cason

Associate Deputy Secretary

Enclosure

CRRC v. Kempthorne, et al.
Page 1 of 44



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
#### Washington, D.C. 20240



IN REPLY
REFER TO:

## National Policy Memorandum

**Number: NPM-SELFD-1**
**Title: CONTRACT SUPPORT COST**

### Contents

Section
1. Purpose
2. Scope
3. Policy
4. Authorizing Legislation
5. Definitions
6. Process for Determining Amounts of Start-Up, Direct and Indirect CSCs
7. Process for Allocating Funding Available for CSCs
8. Roles and Responsibilities
9. BIA CSC Shortfall Report
10. Effective Date
11. Approvals

Appendix A     Standards For Review and Approval of Contract
               Support Costs in the Bureau of Indian Affairs

## 1. Purpose

This policy is intended to provide guidance to both tribal, and Bureau of Indian Affairs (BIA) and Office of Self-Governance (OSG) personnel in the preparation and negotiation of requests for contract support funding in support of new and continuing Public Law (P.L.) 93-638 compacts and contracts. It will provide instructional guidance on:

* Determining amounts of start-up, direct, and indirect contract support costs (CSC);

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 2 of 44

- Allocating pools of Bureau of Indian Affairs (BIA) funding available for CSC;

- Prioritizing tribal requests for funding of CSC; and

- Reporting by the BIA to all tribes and to the Congress.

These instructions are not regulations establishing program requirements and are issued in accordance with 25 CFR section 900.5, which states:

> *Except as specifically provided in the Act, or as specified in subpart J, an Indian tribe or tribal organization is not required to abide by any unpublished requirements such as program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Indian tribe or tribal organization and the Secretary, or otherwise required by law.*

The goals of this policy, including section 6, are to: 1) stabilize funding to each tribe from year to year; 2) expedite payment to each tribe; and 3) respect the Act's prohibition against reducing contract amounts from one year to the next.

It accomplishes these goals by requiring that a tribe be paid the precise same amount it was paid in the preceding year (subject to an annualization adjustment for partial-year awards first made in the preceding year). Such a payment can be made very early in the fiscal year. The only limitation is that the BIA must ensure that the tribe is not going to receive over 100% of its total CSC requirements (as could happen if, for instance, the tribe experienced a large reduction in its indirect cost rate).

## 2. Scope

This policy applies to the following twelve BIA Regional Offices: Alaska, Navajo, Midwest, Great Plains, Northwest, Southwest, Pacific, Southern Plains, Western, Eastern, Eastern Oklahoma, and Rocky Mountain.

## 3. Policy

It is the policy of the BIA to provide for a uniform and equitable system of distributing CSC funds to new and existing P.L. 93-638 compacts and contracts, and to preserve and support each awardee's right to contract under P.L. 93-638.

## 4. Authorizing Legislation

This Policy is authorized pursuant to the Snyder Act and other legislation authorizing programs for the benefit of Indians. The development of this Policy has involved the

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 3 of 44

active participation of representatives from Indian tribes. The procedures discussed in this Policy will be applied to contracts awarded pursuant to Title I of the Indian Self-Determination and Education Assistance Act (the Act) and to compacts awarded to tribes that have been selected to participate in the Tribal Self-Governance Program pursuant to Title IV of P.L. 93-638, as amended. Section 106 of P.L. 93-638, as amended, specifies funding for all Indian Self-Determination and Self-Governance agreements under the Act.

**5. Roles and Responsibilities**

<u>Director, Bureau of Indian Affairs (BIA).</u> The BIA Director is responsible for the development of National Indian Self-Determination Policy.

<u>Deputy Director, Field Operations, BIA.</u> The BIA Deputy Director of Field Operations is responsible for overseeing the Regional Directors and disseminating policy to them.

<u>Deputy Director, Tribal Services, BIA.</u> The BIA Deputy Director of Tribal Services is responsible for assisting in the dissemination of Self-Determination policy and information to the Regional Directors.

<u>Regional Directors, BIA.</u> The BIA Regional Directors are responsible for carrying out policy as directed, and for overseeing the implementation of policy either directly or via Agency Superintendents.

<u>Awardees and BIA staff.</u> Awardees and BIA staff have distinct roles and responsibilities in facilitating the determination of tribal CSC requirements and in the allocation of CSC resources. The BIA staff responsibilities shall be set forth in a separate delegation of authority.

    (A)  <u>Other CSC Responsibilities.</u>

        (1)  <u>Disputes.</u> Disputes over CSC should be handled as either a formal declination appeal or as a Contract Disputes Act (CDA) claim. An informal conference (25 C.F.R. Section 900.153) or other alternative disputes mechanism (25 C.F.R. Section 900.217) may also be useful in resolving disagreements over CSC issues.

        (2)  <u>Pre-Award Declination Appeals.</u> Declination appeals might arise out of a pre-award decision to decline a proposal, in whole or in part; a pre-award decision to decline a proposed amendment to an award; or any of the other reasons cited at 25 C.F.R. Subpart L, Section 900.150. Declination appeals involving CSCs are most likely to occur as a result of disagreements over an awardee's ISD request, although declination appeals involving DCSCs and indirect CSCs are

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 4 of 44

also possible.  Declination appeals must be processed pursuant to 25 C.F.R. Subpart L, Sections 900.150 – 177.

    (3)  <u>Post-Award Contract Disputes Act Claims</u>.  CDA claims arise out of a post-award dispute regarding an awarding official's decision relating to a Self-Determination award.  Post-award contract disputes are likely to occur as a result of the parties failing to agree concerning the renegotiation of DCSC, the renegotiation of indirect type costs, or the allocation of CSC (although all these decisions can also arise in the declination setting). Post-award contract disputes must be handled pursuant to 25 C.F.R. Subpart N, Sections 900.215 – 230.

(B)  <u>BIA CSC Workgroup</u>.  The BIA shall annually convene the BIA CSC Workgroup, comprised of Federal and Tribal individuals who possess knowledge of CSC issues. This workgroup may provide advice and guidance to the BIA in the development of agency CSC policy, developing proposed common language (if any) for funding agreements, and in the ongoing management of CSC issues.  Although the workgroup is not a substitute for Tribal consultation, it will continue to be used to provide technical advice for the benefit of both Tribes and the BIA.

## 6. Definitions

(A)  <u>Award</u>.  An agreement authorized under Title I (contract), Title IV (compact) of P.L. 93-638, as amended, including the associated Annual Funding Agreement (AFA) or Funding Agreement (FA).  The term "award" may be used here interchangeably with the term "contract" to mean both self-determination contracts and self-governance compacts.

(B)  <u>Awardee</u>.  A tribe or tribal organization that is the recipient of an award as defined above.

(C)  <u>Awarding Official</u>.  Means any person, pursuant to the Act, who by appointment or delegation in accordance with applicable regulations has the authority to enter into and administer contracts on behalf of the United States of America and to make determinations and findings with respect thereto. For purposes of this Policy, this term also includes negotiators awarding compacts from the Office of Self-Governance.

(D)  <u>Contract Support Costs (CSC)</u>.  Costs for activities as described in Sections 106(a) (2) and (3) of the Act, which include start-up, direct, and indirect contract support costs.

(E)  <u>CSC Available</u>.  Total CSC funding allocated to an awardee.

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 5 of 44

(F) <u>CSC Requirement</u>. The full amount of CSC need (associated both with new or expanded contracts and compacts, and with ongoing contracts and compacts) as determined under this Policy pursuant to section 106 of P.L. 93-638, as amended.

(G) <u>CSC Shortfall</u>. The difference between the total CSC requirement and the total CSC allocated to the awardee.

(H) <u>Contract Support Fund (CSF)</u>. An appropriation from which the Bureau of Indian Affairs pays contract support needs of awardees.

(I) <u>Contract Proposal</u>. A proposal for programs, functions, services, or activities that the Secretary is authorized to perform but which the Indian tribe or tribal organization is not now carrying out. The content of a self-determination contract proposal can be found in 25 C.F.R. Section 900.8.

(J) <u>Direct Contract Support Costs (DCSC)</u>. Direct Contract Support Costs are costs incurred for activities that are necessary to operate a federal program under the Act and that are not contained in either the indirect cost (IDC) pool or the amount computed pursuant to section 106(a)(1).

(K) <u>Indian Self-Determination (ISD) Fund</u>. Funds specifically appropriated by Congress to pay CSC requirements associated with new or expanded programs under the Act. In fiscal years where the Congress does not specifically appropriate funds for an "ISD Fund," the ISD Fund will consist of those CSC funds that are identified by the Assistant Secretary for Indian Affairs for providing CSC for new or expanded awards, to the extent not prohibited by law.

(L) <u>Indirect Costs</u>. Costs incurred for a common or joint purpose benefiting more than one contract objective, and which are not readily assignable to the contract objectives specifically benefited, without effort disproportionate to the results achieved.

(M) <u>ISD Programs</u>. The Programs, Functions, Services, and Activities (PFSAs) associated with an ISD request that are eligible for ISD funding in accordance with paragraph 6(A)(1)(a) of this Policy.

(N) <u>Line Officer</u>. Generally, the agency official at the most local level of the PFSA under contract, who has the delegated authority to approve or decline a tribe's or tribal organization's contract proposal. In the case of self-governance, the appropriate line official is the Assistant Secretary for Indian Affairs or the Director, Office of Self-Governance.

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 6 of 44

(O)  Non-ISD Programs.  All PFSAs operated by an awardee, exclusive of PFSAs associated with an ISD request that are operated by an awardee in accordance with paragraph 6(A)(1)(a) of this Policy.

(P)  Non-Recurring Funds.  For purposes of this Policy (and without regard to how this term is used in the BIA tribal budget system), funds that require an annual justification, and are awarded based upon an annual resource allocation methodology that considers or is dependent upon other factors (e.g., an indirect cost rate applied to a direct program base that may change the amount to be reimbursed from a single agency as the programs under contract continue to increase).

(Q)  Programs, Functions, Services, and Activities (PFSA).  The PFSAs are those programs, functions, services, and activities that are contractible under the Act, including those administrative activities supportive of, but not included as part of, service delivery programs that are otherwise contractible, without regard to the organizational level within the department that carries out such functions (as authorized under P.L. 93-638, as amended).

(R)  Recurring Funds.  For purposes of this Policy (and without regard to how this term is used in the BIA tribal budget system), contract or compact funds that do not require justification each year to the Secretary.  Annual increases are provided through mandatory increases or other resource allocation methodologies applicable to the respective funding category of the award.

(S)  Secretary.  The Secretary of the Interior (DOI), or the person to whom the Secretary has delegated authority to carry out the Act.

(T)  Self-Governance Request.  A Self-Governance request is defined as any one of the following:

   (1)  An application from a tribe or tribal organization to enter into the Self-Governance Program for the first time, including Title IV; or

   (2)  An application from a tribe or tribal organization to join an existing self-governance compact; or

   (3)  An application from a tribe or tribal organization to negotiate for new or expanded programs in a subsequent year's compact or FA.

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 7 of 44

(U) <u>Start-Up Costs</u>.  The reasonable, allowable, and allocable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and to ensure compliance with the terms of the contract and prudent management.

**7. Process for Determining Amounts of Start-Up, Direct and Indirect CSC's.**

(A) <u>Overview</u>.  Sections 106 (a)(1) and 106(a)(2) and (a)(3) of the Act provide for funding of ISD awards for program costs and CSC respectively.

Section 106(a)(1) provides that:

*The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractible, is operated.*

In addition, Section 106(a)(2) provides that:

*There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—*

*(A) normally are not carried on by the respective Secretary in his [her] direct operation of the program; or*
*(B) are provided by the Secretary in support of the contracted program from resources other than those under contract*

And finally, Section 106(a)(3) provides that:

*(A) The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—*

*(i) direct program expenses for the operation of the Federal program that is the subject of the contract, and*
*(ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).*

NPM-SELFD-1
NEW

Page 7 of 18

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 8 of 44

      *(B) On an annual basis, during such period as a tribe or tribal organization operates a Federal program, function, service, or activity pursuant to a contract entered into under this Act, the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.*

(B)   <u>Determining CSC Requirements.</u>  Throughout the operation of the program by the awardee, total contract costs (including CSCs) are eligible to be paid as either direct or indirect costs.  Since tribes often operate more than one program, many of the costs incurred by the awardee are paid through an indirect cost allocation process, usually negotiated by the "cognizant Federal agency" as identified under the applicable Office of Management and Budget (OMB) Circular.  The procedures below are intended to ensure that CSC requirements are accurately identified while avoiding any duplication of funding between CSCs and PFSA funding amounts.  See Appendix A - *Standards for the Review and Approval of Contract Support Costs in the Bureau of Indian Affairs.*

Section 106(a)(3) authorizes awardees to be paid CSC costs, whether they are "indirect" in nature (benefiting multiple programs) or are "direct" in nature (as additional costs associated with operating a single program), except that such funding shall not duplicate any funding provided under section 106(a)(1).

To ensure that there is no duplication of costs in the CSC amounts, the Secretary will review the CSC request to identify any costs that are duplicative of the amounts that have been incurred by the Secretary in the operation of the program and included in the 106(a)(1) program funding to be transferred, or which may have been duplicated within the CSC amount.  When the PFSAs to be contracted have not previously been operated by the BIA (in the case of a newly recognized tribe or other special circumstance), the identification of the duplicative costs will be negotiated based on the program budget submitted by the awardee and a budget from the BIA reflecting the expenditure patterns of how the Secretary would have otherwise operated the PFSAs.  For awardees with indirect cost (IDC) rates, the IDC agreement and proposal will be analyzed and costs will be considered duplicative if the amounts historically used for specific costs under 106(a)(1) are duplicated in the IDC pool.

When duplicative costs are determined and agreed to between the awardee and the agency, these amounts will be deducted from the negotiated CSC requirement.  This adjusted CSC requirement is the 106(a)(2) amount that the awardee is eligible to receive subject to available appropriations.

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 9 of 44

(1)  Start-up Costs.  Sections 106(a)(5) and 106(a)(6) of the Act states:

    (a)(5)  *Subject to paragraph (6), during the initial year that a self-determination contract is in effect, the amount required to be paid under paragraph (2) shall include start-up costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary—*

        (A)  *to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and*

        (B)  *to ensure compliance with the terms of the contract and prudent management."*

    (a)(6)  *Costs incurred before the initial year that a self-determination contract is in effect may not be included in the amount required to be paid under paragraph (2) if the Secretary does not receive a written notification of the nature and extent of the costs prior to the date on which the costs are incurred.*

(i)  Initial Year Sec. 106(a)(5) – Start-up costs for PFSA's will only be provided to an awardee once in the initial year of transfer.  No additional start-up cost will be justified if the PFSA is subsequently transferred to a sub-awardee.  Start-up cost, payable from the ISD fund, do not include operational cost.  Operational costs are paid for with funds furnished under Section 106(a)(1) of the Act.  Start-up cost are normally defined in a budget request, negotiated and added to the Section 106(a)(1) amount.

Examples of start-up costs (excluding cost incurred before the contract award date) are described in Appendix A - *Standards for Review and Approval of Contract Support Cost in the Bureau of Indian Affairs* and include, but are not limited to:

- Purchase of administrative computer hardware and software;
- Required training and staff development;
- Systems development (including establishing required administrative and other management systems); and
- Equipment and furniture.

(ii)  Cost before the Initial Year of the Contract Sec. 106(a)(5) – These cost, pre-award costs, are cost incurred prior to the initial year that a contract is in effect; and, will only be provided once to an awardee to plan, prepare for, and assume the operation of

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 10 of 44

the program, function, service, or activity that is the subject of a new or expanded contract. These pre-award cost are incurred prior to the award date; and, are subject to notification and approval from the line officer.

These pre-award cost are computed on the basis of actual expended cost, are reimbursable, and are subject to review and approval by the Awarding Official. Pre-Award cost, payable from the ISD fund, do not include operational cost incurred during the operation of the contract. Prior notification is required pursuant to Sec. 106(a)(6). See item (iii) below.

Examples of pre-award costs (excluding cost incurred during the initial year of the contract award) are described in Appendix A - *Standards for Review and Approval of Contract Suport Costs in the Bureau of Indian Affairs* and may include, but are not limited to:

- Planning tribal program standards, redesign standards, and or otherwise planning improved program delivery;
- Development of specialized financial systems to handle the program requirements;
- Program management development (including establishing required administrative and/or program management systems); and
- Specialized training which might otherwise not be appropriate for Start-up costs, i.e. Software and Hardware maintenance of the Safety of Dams Early Warning System.

(iii) Pursuant to Section 106(a)(6) of the Act, notifications from Tribes for start-up costs to be incurred before the initial contract year that a new or expanded portion of a contract is in effect, must clearly indicate the nature and extent of the costs to be incurred and such notifications must be provided in writing before such start-up costs are actually incurred. A Tribe should provide its notice to the appropriate line officer as soon as it anticipates contracting or compacting a PFSA and before the Tribe incurs any such costs. If such a notice is received by any other office, it should be immediately forwarded to the appropriate line officer for the Tribe.

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 11 of 44

(2) <u>Direct CSC</u>.  Direct Contract Support Costs (DCSC) pay for activities that are not contained in either the IDC pool (or indirect type cost budget) or the amount computed pursuant to section 106(a)(1).  DCSC amounts are awarded on a recurring basis.

(i) Examples of DCSC are described in Appendix A - *Standards For Review and Approval of Contract Support Costs in the Bureau of Indian Affairs*.  These may include, but are not limited to:

- Unemployment taxes on direct program salaries;
- Workers compensation insurance on direct program salaries;
- Cost of retirement for converted Civil Service salaries;
- Insurance to the extent not already made available;
- Facilities support costs to the extent not already made available;
- Training required to maintain certification of direct program personnel to the extent not already made available; and
- Any other item of cost that meets the definition of CSC at section 106 (a)(2) but is not included in the awardee's IDC pool or 106(a)(1) amount.

(ii) DCSC funds are provided to the awardee on a recurring basis and need not be justified each year.  Notwithstanding this provision, if a cost that has previously been funded as DCSC is moved to the awardee's Indirect Cost Pool, the DCSC requirement shall be reduced.  In accordance with section 106(a)(3)(b) of the Act, however, the amount of funds needed for DCSC may be renegotiated on an annual basis at the option of the awardee.

(iii) If, to the extent allowed by law, the DCSC requirement is reduced, DCSC funds in excess of the awardee's reduced DCSC requirement shall be retained by the awardee to the extent necessary to fund the awardee's IDC requirements.  Any additional DCSC amount over and above such need shall be retained by the BIA.

(iv) DCSC requirements shall be determined in negotiations between the awardee and a delegated BIA representative.  The BIA representative shall compare the Sec. 106(a) budget, the Indirect Cost budget, and the proposed DCSC requirements for duplication of costs, consult Appendix A - *Standards for Review and Approval of Contract Support Cost in the Bureau*

NPM-SELFD-1
NEW

Page 11 of 18

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 12 of 44

*of Indian Affairs,* and applicable OMB circulars.

(3)   Indirect Costs.  Guidelines for the Principles Involved in Negotiating Indirect and Indirect Type Costs:  A plan for allocation of IDCs will be required to support the distribution of any IDC related to the awardee's program.  All IDC included in the plan will need to be supported by accounting records that will substantiate the propriety of the indirect costs.  The allocation plan should cover all IDC of the awardee, and contain, but not necessarily be limited to, the nature and extent of services provided and their relevance to the awardee's program, the item of expense to be included in the IDC pool, and the methods to be used in distributing costs.

Various OMB Circulars establish principles and standards for determining IDC applicable to the awardee.  Section 106(k) of P.L. 93-638, as amended, has made modifications to the OMB cost principles otherwise applicable to awardees.  See also Appendix A - *Standards For Review and Approval of Contract Support Costs in the Bureau of Indian Affairs.*

In determining the amount of CSC required, Awarding Officials shall review the awardee's cost allocation plan and its associated IDC proposal and approved IDC negotiation agreement.

(i)   Awardees With Negotiated IDC Rates.  The amount of IDC expected to be incurred by awardees using rates negotiated with the cognizant Federal agency will be determined by applying the negotiated rate(s) to the appropriate direct cost base amount.  The amount determined as the awardee's CSC requirement will be consistent with the individual awardee's IDC rate agreement, reflecting any exclusions required by the IDC agreement.

If an awardee's IDC rate is applicable to a fiscal year that is four or more years old, then the BIA shall not provide IDC associated with the application of that IDC rate.  In these cases, the appropriate Awarding Official shall negotiate "indirect type costs" with the awardee (see paragraph (ii) below).

(ii)  Awardees Without Negotiated IDC Rates (Guidelines for Awarding Officials).  A lump sum amount (lump sum agreement) for "indirect types of costs" may be computed for an awardee that does not have a formally negotiated IDC agreement. This lump sum amount may be calculated by negotiating a fixed amount for "indirect types of costs."

NPM-SELFD-1
NEW

Page 12 of 18

Categories of costs often considered "overhead" or "indirect type" are generally in the categories of Management and Administration, Facilities and Equipment, and General Services and Expenses. Indirect or indirect type costs may include:

| Management and Administration | Facilities and Facilities Equipment | General Services and Expenses |
|---|---|---|
| Governing Body | Building Rent/Lease/Cost Recovery | Insurance and Bonding |
| Management and Planning | Utilities | Legal Services |
| Financial Management | Housekeeping/Janitorial | Audit |
| Personnel Management | Building and Grounds | General Support Services |
| Property Management | Repairs and Maintenance | Interest |
| Records Management | Equipment | Depreciation/Use Fees |
| Data Processing | | |
| Office Services | | |

**8. Process for Allocating Funding Available for CSC's.**

    (A)  <u>Overview</u>. CSC funding is composed of three "pools." The first pool (Pool No. 1) is composed of any funding appropriated for CSCs associated with new and expanded awards (the "ISD Fund"). The second pool (Pool No. 2) is composed of the total amounts awarded by the BIA in the prior year for direct and indirect CSCs (the prior year's "CSC base"). The third pool (Pool No. 3) is composed of amounts, if any, appropriated for increases on the prior year "CSC base" to pay additional CSC requirements ("CSC increase"). Under this system, each tribe receives a stable amount for DCSC and indirect costs, an amount which can increase up to the full CSC requirement. Differences among tribes are minimized by the "bottom-up" distribution of Pool 3. Under this system, each year's CSC appropriation (other than the ISD fund, or "Pool 1") is divided into two more pieces (Pools 2 and 3). The first piece (Pool 2) is paid out as just indicated: to provide each tribe at least the same amount it was paid in the preceding year. The second part (Pool 3) is then paid out later in the year after the collection of all data, to deal with existing shortfalls. Pool 3 is paid out to those tribes with the most severe shortfalls (a "bottom-up approach"), so that the gap between the best and worst funded tribes is narrowed as much as Pool 3 funding permits.

    (1)  <u>Pool No. 1 - ISD Fund</u>.

        (a)  The ISD Fund will cover CSC requirements associated with the following awards:

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 14 of 44

(i)   an initial assumption of a PFSA by an awardee (without regard to whether the PFSA was previously operated by a different awardee).

(ii)  assumption of PFSAs available due to new appropriations (excluding general program increases and increases for inflation or pay costs).

(b)  <u>Initial Funding Period – New and Expanded Awards.</u>  CSC funds for new and expanded awards will be allocated by the BIA Central Office as expeditiously as possible after July 2 of each year.  To the extent available, funding is provided to each CSC request, after July 2 of each year, on the ISD list based on the total amount associated with the PFSAs awarded from the date of assumption through the end of the funding agreement's performance period, not to exceed 12 months.  CSC funding requests on the ISD list (known as "ISD Requests") will be distributed: first, on a pro rata basis until all start-up costs have been fully paid; and second, on a pro rata basis by dividing the total of all remaining ISD requests by the available remaining ISD Fund, up to the national average percentage of CSC currently being paid.

(i)   If there are no (or insufficient) ISD funds to be distributed in the current fiscal year to pay ISD requests, all unfunded requests will be considered for funding from Pool No. 3.

(ii)  If an awardee proposes to start a new or expanded activity for less than a full year, start-up costs shall be identified at their full amount and all other costs (i.e., other indirect and direct CSC) shall be prorated to reflect the reduced award period in the first year of the award.

(iii) If excess ISD funds remain after paying all ISD requests, the remaining ISD funding will be added to Pool No. 3 (to the extent not prohibited by law) and shall either be distributed according to the methodology described in paragraph 6(A)(3) below, or carried over to the next fiscal year if authorized by law.

(2)  <u>Pool No. 2 - Prior Year CSC Funding That Remains Justified in the Subsequent Fiscal Year.</u>

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 15 of 44

(a)    The amount of CSC funds (including the amount of ISD funds other than start up costs) that were allocated to a Region or to the Office of Self-Governance (OSG) in any year shall be provided to that Region and OSG as a recurring amount in the subsequent year. To these amounts shall be added amounts, if any, needed to annualize indirect CSC and DCSC funding that was paid to an awardee in the prior year from the ISD Fund on a partial year basis. The total of these amounts shall be called Pool No. 2. Subject to the terms of the award, Pool 2 amounts shall be awarded within 30 days of apportionment of funds. Amounts needed to fund Pool No. 2 shall be determined before funding Pool No. 3.

(b)    Each Region and OSG shall pay indirect CSC funds to the awardee as non-recurring funds, provided that prior year funding for an awardee's indirect CSC shall not be reduced in subsequent years so long as the CSC funding for indirect CSC in the subsequent year, when combined with the awardee's DCSC funding, does not exceed 100 percent of the awardee's total CSC requirement that year. If Congress reduces appropriations for CSC from the prior year, the Bureau will reduce each awardee's allocation *pro rata*.

(c)    Upon receipt of its Pool No. 2 allocation, each Region and OSG shall pay to each awardee no less than the awardee was paid in the prior year, except that, if Congress reduces appropriations for CSC from the prior year, the Bureau will reduce each awardee's allocation *pro rata*. In the case of a prior year 'partial year' payment, no less than the annualized amount of the awardee's CSC payment excluding start-up costs will be paid, except that appropriate amounts may be withheld to the extent necessary to minimize the risk that an awardee will receive in excess of 100 percent of the awardee's total CSC requirement based on currently available CSC data. Any amount so withheld shall be paid to the awardee if, prior to the end of the fiscal year, such awardee has established that the payment of the amounts so withheld will not result in an overpayment for the current year. Any withheld amounts not so paid shall be redistributed to other awardees, within the Region or OSG, with the greatest CSC needs so as to raise the minimum level of CSC being funded to the maximum percentage possible, given the available resources (a bottom-up approach). After any redistribution of CSC, if an awardee's CSC base is not adequate to meet all of the awardee's CSC

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 16 of 44

requirements, then any shortfalls shall be considered for funding under Pool No. 3.

(d) Prior year funds provided for CSC to each awardee (excluding start up costs), if justified in subsequent years, shall not be reduced by the BIA, except as authorized in section 106(b) of the Act. Awardees should expect to receive these funds continuously if they continue to justify at least the same level of total CSC requirements. If an awardee's current CSC base is not adequate to meet all of the awardee's CSC requirements, then the shortfall shall be considered for funding under Pool No. 3.

(3) Pool No. 3 – CSC Increases / Shortfall Funds.

(a) Several sources of revenue may be available to fund ongoing shortfalls in CSC. These include funds appropriated by Congress for general increases in the Contract Support Fund (CSF) and funds appropriated by Congress for CSC shortfalls. Such funds shall constitute Pool No. 3.

(b) Pool No. 3 funds shall be allocated to awardees with the greatest CSC shortfall (a "bottom-up" approach).

(c) The distribution of funds from Pool No. 3 shall be made within 180 days after apportionment.

To summarize, the Bureau shall administer the following pools of contract support cost funding:

| Pool | Description | Methodology of Payment |
|---|---|---|
| Pool 1 | ISD Fund | Pro rata (if insufficient to fully fund all CSC requirements associated with new and expanded contracts/compacts), with start-up costs paid in full first, followed by pro rata payment of combined DCSC and indirect CSC. |
| Pool 2 | Prior year amounts paid for DCSCs and indirect CSCs, annualized for any 'partial-year' awards in the preceding year | Full payment of prior year amount of DCSC and indirect CSCs, so long as no overpayment results |
| Pool 3 | Remainder of increased CSC appropriations over | 'Bottom-up' payment to most severely underfunded awardees (if insufficient to fully |

NPM-SELFD-1
NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 17 of 44

| | prior year | fund all CSC requirements) |
|---|---|---|

(4) OSG, Regions, Agencies, Field Offices, and appropriate line officials are expected to update the shortfall information used for the distribution of the Pool No. 3 fund (i.e., use most current IDC rate and changes to the direct program base in the current year) before they provide any CSC shortfall distributions in order to ensure that no awardee is funded in excess of 100% of its total CSC requirement.

(5) CSF funds to be redistributed by OSG, or a Region, agency, field office, or appropriate line official are to be made in such a way as to raise the minimum level of CSC being funded to the maximum percentage possible, given the available resources (bottom-up approach).

## 9. BIA CSC Shortfall Report.

(A) Requirements for Reporting and Documenting Amounts of CSC Available, Needed, and Requested. Regions and OSG shall maintain a historical record of funds negotiated and awarded in each of the categories listed below.

- Direct program funds;
- Start-up costs;
- Direct contract support funds;
- Indirect cost funding;
- Indirect-type cost funding;
- Indirect cost rates;
- Types of bases;
- Pass through/exclusions;
- Total IDC Base (direct cost base)
- Direct CSC requirements (including the unduplicated DCSC requirement associated with sub-awards)
- Indirect CSC requirements (including the unduplicated IDC requirement associated with sub-awards)

(B) Regions and OSG shall provide a report to Central Office by November 15th of each fiscal year that includes those data elements identified above for the previous fiscal year ended September 30. Before the report is submitted, the amounts included in the report shall be certified as accurate by the Regional Finance Management Officer and the Regional Director, and by OSG, respectively.

NPM-SELFD-1
NEW

Page 17 of 18

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 18 of 44

(C)   A copy of the Region's data and OSG's data shall be provided to the awardees within that Region and within OSG by November 15th. Any corrections or changes to the data resulting from awardee review shall be certified by the Regional FMO and by OSG, respectively, and submitted to the Central Office by December 15th of each fiscal year.

(D)   The Central Office shall consolidate all reports into the BIA CSC Shortfall Report. In doing so, the Central Office shall, in consultation with the Office of Tribal Services and the Office of Tribal Self-Governance, provide a projection of the CSC shortfall for the current and subsequent fiscal year, together with a recapitulation of the shortfall for the most recently concluded fiscal year.

(E)   The Central Office shall finalize the BIA CSC Shortfall Report and shall forward the Report to the Assistant Secretary for Indian Affairs for approval by February 1st of each fiscal year.

(F)    After the BIA CSC Shortfall Report is approved by the Assistant Secretary for Indian Affairs, the Office of Tribal Services shall provide copies to OSG and to each Region. Each Region shall be responsible for providing a copy of the report to all awardees contracting within that Region; and OSG shall be responsible for providing a copy of the report to awardees compacting with OSG. Consistent with Section 106(c) of the Act, the Assistant Secretary shall also forward the Report to Congress.

**10.  Effective Date.**

The policy and procedures contained in this Policy are effective and applicable to awards made for fiscal year 2007 and subsequent fiscal years, upon signature by the Assistant Secretary for Indian Affairs.

**11. Approvals.**

_for_ William Pat Ragsdale                                      5-8-06
Director, Bureau of Indian Affairs                         Date


James Cason                                                         5-8-06
Associate Deputy Secretary                                  Date

NPM-SELFD-1
NEW
                              Page 18 of 18

Appendix A

# Standards for the Review and Approval

## of

## Contract Support Costs

## in the

## Bureau of Indian Affairs

1

Non-SILED-1-NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 20 of 44

Appendix A

## GUIDELINES FOR PROPOSAL PREPARATION AND COST ANALYSIS OF ISD REQUESTS

### INTRODUCTION

The Bureau of Indian Affairs (BIA) has developed its Contract Support Costs (CSC) policy with the active participation of Indian Tribes and interested tribal representatives. The BIA has always sought to maintain an openness concerning CSC issues and has consistently provided information, guidance, and technical assistance to Awardees in their development of CSC proposals. For some, CSC is a mystery – a confusing category of costs that are seemingly allowed or disallowed without rhyme or reason. For others, CSC provides "that little something extra" that can make the difference between having to sacrifice scarce program resources to cover administrative costs and actually building a stable tribal infrastructure capable of administering quality programs.

The following documents are intended to remove some of the mystery surrounding CSC. Awardees have requested that the BIA develop standards for CSC to be used in the review and approval of Indian Self-Determination (ISD) Fund requests. The Office of Management and Budget (OMB) has also supported the development of CSC standards as a means of ensuring consistency in the review of tribal ISD requests, and for assuring consistency between the BIA's and the Indian Health Service's methodologies for calculating contract support cost requirements. In order to help Awardees understand the BIA 's rationale for approving or disapproving of tribal CSC requests, it became necessary to develop a set of consistent standards. In fiscal year 2004, the BIA initiated the process of developing standards for CSC. Consensus with tribal representatives has been achieved on most items of cost. On issues that have not been resolved, the Federal position is incorporated into the document and footnoted.

Adoption and dissemination of these standards are prerequisites for any delegation of ISD negotiation responsibilities to BIA Regional Offices. Area negotiators will also require some training in the application of these standards so that there will be broad acceptance and consistent application of the standards.

### STATUTORY BACKGROUND

Sections 106(a)(1), (a)(2), (a)(3), (a)(5), and (a)(6) of Public Law (P.L.) 93-638, as amended, provide for funding of contract and compact awards for program costs and CSC.

Section 106 (a)(1) states that the amount of funding available to a self-determination contract shall not be less than the Secretary would have provided for the operation of the program.

Section 106 (a)(2) requires the Secretary to add CSC to the amount of the program funds the Secretary provides. Section 106 (a)(2) states that CSC is the cost of activities either not carried out by the Secretary, or carried out from resources other than those available under contract.

Sections 106(a)(2) and (a)(3) define CSC that are eligible for reimbursement. These costs are:

• Reasonable costs for activities that must be carried out by the Indian Tribe or tribal organization as a contractor/compactor to ensure compliance with the terms of the contract and prudent management.

New-SELPD-3 NEW

2

## Appendix A

- Reasonable, necessary, and allowable costs of the contractor/compactor that are allocable to the contract/compact based on applicable Federal cost principles.

- Costs that are not provided for under the allocation of program funds available for the contract/compact as defined in P.L. 93-638, as amended, Section 106(a)(1).

- Treated as either direct or indirect by the contractor/compactor based on applicable cost principles and the contractor/compactor's cost allocation policy.

Direct Contract Support Costs (DCSC) are both non-recurring and recurring. Non-recurring DCSC are those costs generally required for the program to begin operations. These costs are also referred to as start-up costs. They are not intended to be an additional category. Costs for these activities are not contained in either the indirect cost pool or the amount computed pursuant to Section 106(a)(1). Recurring DCSC are those costs that are associated directly with the operation of the program.

Indirect costs (IDC) are costs (1) incurred for a common or joint purpose benefiting more than one contract objective and (2) that are not readily assignable to the contract/compact objectives specifically benefited without effort disproportionate to the results achieved. Indirect costs are not funded as direct program costs but rather are incorporated in the contractor/compactor's indirect-cost reimbursement plan as negotiated annually with the cognizant Federal agency.

For programs without negotiated IDC rates, indirect type costs consist of those that are normally found in IDC pools of contractors with rates, but are negotiated directly between the contractor/compactor and the BIA. Generally, these amounts are negotiated as a lump-sum amount. Both indirect and indirect type costs are awarded as non-recurring, as indirect amounts must be negotiated on an annual basis. Indirect costs generally fall into one of the following three categories: (1) management and administration; (2) facilities and equipment; and (3) general services and expenses.

## OMB CIRCULAR A-87

OMB Circular A-87 contains cost principles for State, local, and Indian tribal governments. Most tribes and tribal organizations have adopted OMB Circular A-87 as their applicable cost principles. OMB Circular A-87 is useful as it defines the allowability of costs under Federal awards by applying the following three criteria. Costs must be: (1) allowable, (2) reasonable, and (3) allocable. These principles are incorporated herein and should be considered in terms of the allowability of CSC under BIA contracts and compacts. The following is copied from OMB Circular A-87, Attachment A:

1. **Factors affecting allowability of costs.** To be allowable under Federal awards, costs must meet the following general criteria:

   a. Be necessary and reasonable for proper and efficient performance and administration of Federal awards.

   b. Be allocable to Federal awards under the provisions of this Circular.

   c. Be authorized or not prohibited under State or local laws or regulations.

   d. Conform to any limitations or exclusions set forth in these principles [OMB Circular A-87], Federal laws, terms and conditions of the Federal award, or other governing regulations as to types or amounts of cost items.

   e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit.

   f. Be accorded consistent treatment. A cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like circumstances has been allocated to the Federal award as an indirect cost.

New-SELPD-1 NEW

3

## Appendix A

g.  Except as otherwise provided for in this Circular (OMB Circular A-87), be determined in accordance with generally accepted accounting principles.

h.  Not be included as a cost or used to meet cost sharing or matching requirements of any other Federal award in either the current or a prior period, except as specifically provided by Federal law or regulation.

i.  Be net of all applicable credits.

j.  Be adequately documented.

2.  Reasonable costs.  A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when governmental units or components are predominately federally-funded. In determining reasonableness of a given cost, consideration shall be given to:

a.  Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the governmental unit or the performance of the Federal award.

b.  The restraints or requirements imposed by such factors as: sound business practices; arms length bargaining; Federal, State and other laws and regulations; and, terms and conditions of the Federal award.

c.  Market prices for comparable goods or services.

d.  Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government.

e.  Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost.

3.  Allocable costs.

a.  A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such contract objective in accordance with relative benefits received.

b.  All activities that benefit from the governmental unit's indirect cost, including unallowable activities and services donated to the governmental unit by third parties, will receive an appropriate allocation of indirect costs.

c.  Any cost allocable to a particular Federal award or contract objective under the principles provided for in this Circular (OMB Circular A-87) may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by law or terms of the Federal awards, or for other reasons. However, this prohibition would not preclude governmental units from shifting costs that are allowable under two or more awards in accordance with existing program agreements.

d.  Where an accumulation of indirect costs will ultimately result in charges to a Federal award, a cost allocation plan will be required as described in Attachments C, D, and E of OMB Circular A-87.

4

New-SELFD-1 NEW

## Appendix A

### CONCLUSION

In an effort to make CSC more understandable, the BIA is providing the following guidelines (standards) for CSC proposal development. The following pages provide the standards against which the BIA will review tribal CSC requests. The following are provided as guidelines only and are not intended to be read as regulations dictating allowable tribal CSC. These standards should be interpreted in such a way as to be consistent with the Indian Self-Determination and Education Assistance Act, as amended (Act), its implementing regulations, and the BIA CSC Policy.

5

New-SELDA NBW

Appendix A

# GUIDELINES FOR PROPOSAL PREPARATION AND COST ANALYSIS OF ISD REQUESTS FOR
## START-UP SELF-DETERMINATION/CONTRACT SUPPORT COSTS

START-UP CONTRACT SUPPORT COSTS: Start-up costs, as defined by the Act, are one time costs incurred either prior to or after award to plan, prepare for, and assume the operation of a Program, Function, Service, or Activity (PFSA). Start-up costs are not a recurring contract support cost required for the future ongoing operation of the program. Start-up costs can vary significantly from program to program depending on the existing capacity of the Awardee, and the size and scope of the proposed award.

Start-up costs must be reasonable and necessary and pay for activities that are not provided in the amount computed pursuant to Section 106(a)(1) or in the Awardee's recurring direct or indirect contract support costs.

### START-UP COST – DURING THE INITIAL YEAR

Section 106(a)(5) of the Act states: "...during the initial year that a self-determination contract is in effect, the amount required to be paid under paragraph (2) [Section 106(a)(2)] shall include start-up costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary (A) to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and (B) to ensure compliance with the terms of the contract and prudent management."

Start-up costs include costs that occur after the award of the contract. Start-up costs are authorized pursuant to Section 106(a)(5) of the Act. They are costs that have been or will be incurred within the first year that the contract/compact is in effect and are necessary to plan, prepare for, or assume operation of the contract/compact. Start-up costs must be reasonable and necessary, and pay for non-recurring activities that normally are not carried on by the Secretary in the direct operation of the program or are provided by the Secretary in the support of the contracted program from resources other than those under contract. In addition, to the extent that any of these start-up costs are found to have been provided in the amount computed pursuant to 106(a)(1), or in the DCSC or indirect cost amounts, these duplicated amounts will not be allowable. Start-up costs cannot be used for costs that are otherwise provided for within program funding or for expanding program activities. As stated discussed, start-up costs also include costs incurred before the award of the contract.

### START-UP COST – BEFORE THE INITIAL YEAR

Section 106(a)(6) of the I Act states: "Costs incurred before the initial year that a self-determination contract is in effect may not be included in the amount required to be paid under paragraph (2) [Section 106(a)(2)] if the Secretary does not receive a written notification of the nature and extent of the costs prior to the date on which such costs are incurred"

Pursuant to Section 106(a)(6) of the Act, start-up costs incurred before the initial year that a self-determination contract or compact is in effect are allowable only when the Secretary has been provided written notification of the nature and extent of the costs prior to the date on which such costs are incurred.

6

NewSELPD-1 NEW

## Appendix A

Awardees are encouraged to estimate their costs accurately. Costs will not be disallowed in the event these costs otherwise found to be reasonable and necessary exceed the initial estimate.

The BIA has determined that the payment of start-up costs, including reimbursement of start-up costs already incurred, is contingent on the contract being finally awarded. If funds are not available to pay these costs in the year the contract is awarded, the BIA has determined, based on appropriation language, it is currently statutorily prohibited from paying them in future years (i.e., the CSC requirement for start-up costs cannot carry over from one fiscal year to the next). If the Awardee is not paid in the year the contract is awarded, the costs are never paid.

Start-up costs incurred prior to award are normally computed on the basis of actual expended costs; start-up costs to be incurred after the award date are awarded on the basis of a budget for costs submitted and negotiated with the BIA prior to final award.

The BIA only becomes liable to reimburse start-up costs incurred prior to the award date when the P.L. 93-638 contract or compact for the contemplated PFSA is actually awarded. There is thus a risk to a tribe that costs will be incurred in preparing to operate the contract that may not be reimbursed if:

- The tribe fails to notify the Awarding Official in writing of the nature and extent of the costs before they are incurred.
- Congress fails to appropriate sufficient (or any) CSC to fully pay the costs.
- Congress prohibits the BIA from paying the costs from the CSC appropriation.
- The tribe expends funds for activities or items that are outside the "nature" of the costs described in the pre-award letter.
- The tribe cannot provide documentation of the costs.
- The requested costs are not reasonable.
- The P.L. 93-638 contract proposal for which they are incurred is not awarded.
- The costs being requested have already been paid by the BIA through other means, such as another PFSA's 106(a)(1) amount, a Tribal Management Grant or other existing BIA grant or contract.

Awardees can reduce the risk associated with incurring start-up costs by ensuring that a pre-award letter is received by the BIA before the costs are incurred; maintaining close communication with the Regional Office regarding the reasonableness and nature of the costs being incurred; ensuring the estimated amount provided in the pre-award letter is sufficient to cover all the costs; and updating the pre-award letter as appropriate. Awardees should ensure that the description of the nature of the activities to be performed is inclusive enough to cover all potential activities needed to begin to operate the PFSA.

A pre-award request letter should address the unique needs of each tribe as it contemplates what it will require in the planning, preparation, and assumption of the contract. Awardees should provide additional letters if circumstances change or additional costs are anticipated.

The development of a proposal for start-up costs, including those incurred prior to the award, and the evaluation guidelines for each type of cost, are outlined on the following pages. The guidelines are for the development and evaluation of a proposal under typical circumstances. Some proposals will have unique circumstances that do not fit the criteria in these guidelines. In such cases, one must review the statutory intent and the BIA CSC Policy to determine if other costs will be required. In these circumstances, however, the Awardee should expect to furnish the BIA with documentation of the amounts, and reasons for the amounts, to reviewers at all levels of the BIA.

7

New-SELPD-1 NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 26 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **PERSONNEL COSTS INCLUDING FRINGE BENEFITS**<br><br>Personnel costs are allowable for personnel to plan, prepare for, and assume operation of the program. | Generally personnel costs are allowable for these activities carried out by tribal employees, such as a Tribal Administrator, planner or other employees (to the extent not already paid for with indirect costs) who assist with the planning, development and improvement of management systems, or negotiations for program assumption. | Awardees must provide a budget and budget justification or a description of costs that are reasonable and necessary to plan, prepare for, and assume operation of the contract.<br><br>Awardees must also provide documentation or careful estimates of the costs to be incurred. Awardees should keep careful financial records of these costs. Examples of data needed for review are: dates of service, hourly rate, estimated or actual number of hours billed, and purpose of the service. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount, the indirect cost amount, the indirect type cost amount, or paid under another BIA grant or contract. |

8

NewSELPD-1NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 27 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **SUPPLIES**<br><br>Costs for supplies are allowable to support the start-up activities only. | Costs of software or supplies may be allowable provided they support the activities necessary to plan, prepare for, and assume operation of the program, or the implementation of the systems developed.<br><br>Cost of supplies necessary to develop inventories have generally not been allowed.[1] | Awardees must provide a budget and budget justification or a description of costs that are reasonable and necessary to plan, prepare for, and assume operation of the contract or costs for implementation of the systems developed.<br><br>Awardees must also provide documentation or careful estimates of the costs to be incurred. Awardees should keep careful financial records of these costs. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount, the indirect cost amount, the indirect type cost amount, or paid under another BIA grant or contract. |

1. Some Tribal representatives feel that the cost for supplies should be allowed if the contract divides a program, the inventory is not transferred with the program, and the Tribe must build up an inventory of program supplies to operate the program.

New-SELFD-I NEW

9

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **TRAVEL**<br><br>Travel costs are allowable for Tribal Board Members, tribal personnel, and consultants to plan, prepare for, and assume operation of the program. | This includes travel costs for staff, board members, and consultants to attend meetings and negotiations in preparation for program assumption<br><br>Travel costs may be allowable for education, training, and developmental activities for either Board Members or tribal employees, provided that such travel is directly related to the program to be contracted | Awardees must provide a budget and budget justification or a description of costs that are reasonable and necessary to plan, prepare for, and assume operation of the contract.<br><br>Awardees must provide documentation of the expenditures including the name or position of the traveler, the purpose of the travel, and the costs and duration of the trip. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount, the indirect cost amount, indirect type cost amount, or paid under another BIA grant or contract. |

10

New-SELFD-1 NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 29 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **EQUIPMENT**<br><br>Cost of equipment to support the PFSA is allowable. | The cost of equipment necessary to plan, prepare for, and assume the operation of a PFSA is allowable. | Awardees must provide a budget and budget justification or a description of costs that are reasonable and necessary to plan, prepare for, and assume operation of the contract. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount, the indirect cost amount, indirect type cost amount, or paid under another BIA grant or contract. |

11

New-SELFD-1-NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 30 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **CONSULTANTS**<br><br>Consultant costs are allowable to plan, prepare for, and assume the PFSA. | Consultant costs directly related to proposal planning, preparation, contract, compact and AFA development, negotiations, board training, management systems development, etc. are allowable. | Budgets and budget justifications are required in the ISD/CSC proposal, including estimates or bids from consultants for the work to be performed. Estimates should include the rate and time involved for each task to be performed. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount; the indirect cost amount, indirect type cost amount, or paid under another BIA grant or contract. |

12

New-SELFD-1 NEW

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **OTHER**<br><br>Other costs are allowable to plan, prepare for, and assume the PFSA. | Awardees may incur other costs necessary to support the activities needed to plan for and start up the contract. These costs should be documented with a detailed description of the type and quantity and unit cost of the items and the need for such costs. | Budgets and budget justifications are required in the ISD/CSC proposal, including estimates of the reasonable and necessary costs to support the start-up activities. | All costs must be reasonable and necessary to plan, prepare for, or assume the proposed contract.<br><br>Costs may be considered duplicative if they have already been provided to an Awardee in the 106(a)(1) amount, the indirect cost amount, indirect type cost amount, or paid under another BIA grant or contract. |

13

New-SELFD-1 NEW

Appendix A

# GUIDELINES FOR PROPOSAL PREPARATION AND COST ANALYSIS OF REQUESTS FOR DIRECT CONTRACT SUPPORT COSTS (DCSC)

DIRECT CONTRACT SUPPORT COSTS (DCSC) are one of three types of contract support costs (CSC). They pay for ongoing activities that are not contained in either the amount computed pursuant to section 106(a)(1) or the indirect cost (IDC) pool or an "indirect type" cost budget. DCSC amounts are awarded on a recurring basis. The BIA provides inflationary increases on DCSC based on the OMB non-medical cost inflation rate to the extent appropriations are available. Other than for inflationary costs, a change in DCSC requirements entails a renegotiation with the delegated BIA representative of the amounts required. This may be requested on an annual basis if the Awardee feels circumstances warrant renegotiating these costs.

DCSC Proposal. The determination of DCSC requires a proposal from the Awardee. Awardees who do not submit a proposal that includes DCSC will not establish a DCSC requirement and will not be funded for these costs. A DCSC proposal requires adequate detail and documentation for the BIA or OSG to determine if the costs requested are allowable as DCSC and are not duplicated in the 106(a)(1) amount or in the IDC amounts requested. For a DCSC proposal, this normally includes the salary of the Federal employees transferred and the Federal fringe benefits paid on that salary by category. In addition, the Awardee must provide the personnel budget of the PFSA and the detailed fringe benefit costs of the Awardee's benefit package. The Awardee must also provide justification for costs in other budget categories for which DCSC is requested.

DCSC Requirement. It is understood that the historical 106(a)(1) amount, which has been provided to Awardees, does not include additional DCSC that Awardees must incur to prudently manage their contracts or compacts. To identify the Awardees' total DCSC requirement, the Awardee and a delegated BIA representative must negotiate these costs. In the past, Awardees may have included DCS-type costs in their 106(a)(1) budgets, even though the BIA / OSG may have never included such costs in the 106(a)(1) amount (for instance, workers compensation insurance and other liability insurance). In the past Awardees may have also included DCS-type costs in their indirect cost pools (a practice which is an alternative and permissible way of recovering these costs). To avoid duplication of costs, the BIA and the Awardee must ensure that any funds included in the DCSC requirement have not already been provided to the Awardee in the 106(a)(1) amount, the Awardee's indirect cost pool or the indirect type cost amount.

In circumstances where the BIA has never operated the PFSA, such as new programs or new appropriations for expanded programs, the BIA will compute the amount the Secretary would have provided to directly operate the program from a "profile" developed from other, similar BIA programs. When preparing the DCSC proposal, the Awardee and the delegated BIA representative should request the amounts the BIA has provided in the 106(a)(1) amount in support of the PFSAs to be transferred, but it should also include amounts the BIA would have used to support the PFSA from BIA or other Federal resources not included in the 106(a)(1) amount and not included in the indirect cost pool or indirect cost type amounts. In cases where the PFSA has not previously been operated by the BIA, the Awardee should request the cost "profile" from the BIA to determine what the 106(a)(1) amount would have been.

DCSC does not include fringe benefit costs on Federal employees that are not paid through the 106(a)(1) amount. These costs continue to be paid by the Federal government on Intergovernmental Personnel Act (IPA) employees, and DCSC for these employees are not due until the employee or position transfers to direct tribal hire. Awardees should carefully maintain historical data on IPA transfers. These positions become eligible for DCSC as they become vacant and are not expected to be replaced with another IPA. Similarly, Awardees should maintain historical records of Federal positions that were replaced with tribal employees at the time of the contract award. The Awardee must submit an ISD/CSC request or renegotiate the DCSC request or renegotiate the DCSC for costs that are included in the DCSC

14

Nov-SEI-PD-1.NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 33 of 44

## Appendix A

requirement. Contracts that do not have large personnel components or contracts operated primarily with IPA employees normally require smaller amounts of DCSC when calculated as a percentage of the total award. DCSC-type costs can vary significantly depending on the type of service and service delivery model selected by the tribe.

In addition to certain fringe benefit costs, the BIA will approve other selected costs as DCSC, including mail, phone, and printing costs (depending on local circumstances) to the extent these costs are centrally managed costs and are therefore unavailable for transfer to Awardees as part of the Section 106(a)(1) Secretarial amount. To the extent such costs are transferred to a Regional or BIA Office they will be available for inclusion in the 106(a)(1) amount and thus not eligible as DCSC. Reasonable costs for legal fees and general liability insurance are additional examples of costs that are allowable, since these are costs that the BIA either does not pay or are paid from resources other than those under contract. However, as is typical with tribes, such costs are not allowable as direct contract support costs when they are already included in an Awardee's indirect cost pool.

The delegated BIA representative is required to determine that amounts requested in the DCSC proposal are not duplicated in either the 106(a)(1) amount or in the indirect contract support amount. The review will include a careful analysis of this potential duplication and the deduction of any duplicated amounts from the DCSC requirement approved for the Awardee. In addition, the costs must be for activities that must be carried out by the tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which normally are not carried out by the BIA in the direct operation of the program.

The development of a DCSC proposal and the evaluation guidelines for each type of cost are outlined in the following pages. The guidelines are meant for the development and evaluation of a DCSC proposal under typical circumstances. Some DCSC proposals will have unique circumstances that do not fit the guidelines. In these cases, one must review the statutory intent and the BIA CSC Policy to determine if other DCSC will be required.

15

New-SELFD-I NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 34 of 44

## Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **SALARIES**<br><br>In general salaries and wages[2] for personnel are disallowed for direct contract support costs. | Awardees with or without indirect cost rates may be paid direct-salary costs for administrative employees as part of CSC, negotiated as "indirect type costs," not DCSC, even though they are paid directly and not through the indirect cost mechanism. | Direct salary costs of employees are generally not allowed as DCSC. | Salary requests, in general, are considered a duplication of the 106(a)(1) amount or an expansion of the negotiated 106(a)(1) amount. |
| Budgets for direct-salary costs are required for most DCSC proposals to accurately compute the requested fringe-benefit costs. | Although costs for direct salaries are generally disallowed, costs for certain fringe benefits on direct salaries are components of DCSC. The Awardee must provide sufficient salary detail to determine if the fringe-benefit costs requested are reasonable and necessary. | Tribal budgets are required from Awardees with a detailed salary listing for each position funded from the 106(a)(1) amount. | |

16

2 Direct salaries can be included in DCSC as a non-recurring amount in situations where it is allowable as an IDC-type cost but the Awardee has an IDC cost-allocation plan that specifically excludes these costs. If such costs are later transferred to the Awardee's IDC pool, the BIA will cease paying them as DCSC costs.

New-SELPD-1 NEW

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **FRINGE BENEFITS**<br><br>- Federal Insurance Contributions Act (FICA)<br>- Life, Health, and Disability Insurance<br>- Retirement (401k, 403b, etc.)<br><br>(All fringe benefits except workers compensation costs and unemployment insurance) | The BIA / OSG reviews the documented amounts requested by the Awardee and deducts the amount provided as part of the 106(a)(1) amount to the Awardee. The Awardee should request that the Agency provide a detailed breakout of each component of the fringe amount when providing the total 106(a)(1) amount available for the PFSAs to be contracted. | Documentation of fringe benefits should include the Awardee's rate for each type of fringe benefit for which DCSC is requested.<br><br>For a new Awardee, written quotes for costs should be provided to support the costs claimed. | The BIA / OSG totals the amount provided in the 106(a)(1) amount for FICA, health, life and disability insurance, and retirement. To the extent the budgeted tribal costs are determined to be reasonable and necessary and these costs exceed the amounts the Agency provides for these costs in the 106(a)(1) amount, the difference is allowed as a DCSC requirement for the PFSAs transferred. |

17

New-SELFD-1-NEW

Pl. Exh. 8<br>CRRC v. Kempthorne, et al.<br>Page 36 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **FRINGE BENEFITS** | | | |
| - Workers Compensation Insurance | Funding for workers compensation costs is not transferred as part of the 106(a)(1) amount. | Awardees should provide documentation for workers compensation costs. | Costs of workers compensation insurance are allowed as a DCSC requirement. |
| - Unemployment Insurance | Unemployment insurance is not provided as part of the 106(a)(1) amount. | Awardees should provide documentation of State Unemployment Insurance costs. | Costs of State Unemployment Insurance are allowed as a DCSC requirement. [3] |

Example of the fringe benefits calculation:

| Item | Tribal Amount | BIA Amount | Difference |
|---|---|---|---|
| FICA | 1,000 | 900 | --- |
| Retirement Insurance | 2,000 | 1,250 | --- |
| (Life, Health, Disability) | 750 | 1,000 | --- |
| **Sub-Totals** | 3,750 | 3,150 | 600 |
| Workers Compensation | 200 | --- | 200 |
| Unemployment | 400 | --- | 400 |
| **TOTALS** | 4,350 | 3,150 | 1,200 |

[3] The IRS has determined that Tribes and Tribal instrumentalities are not subject to Federal Unemployment Tax. Therefore, this cost will not be allowed in those instances.

18

New-SELFD-1 NEW

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| TRAVEL/VEHICLE LEASE | These are generally not provided as an allowable DCSC. Travel costs in support of administrative functions normally included in an IDC cost pool (such as Board of Directors travel cost) can be paid directly to the Awardee when the they do not have an IDC rate. In this situation, however, these types of costs are categorized as "indirect type costs." | Travel costs are not generally allowed by the BIA as a DCSC requirement. | Requests for travel are considered duplicative of the 106(a)(1) amount, or as an activity that would normally be carried on by the BIA in the direct operation of the program. |
| SUPPLIES | These are generally not provided as an allowable DCSC. | Supply costs are not generally allowed by the BIA as a DCSC requirement. | Requests for supplies are considered to be duplicative of the 106(a)(1) amount or as an activity that would normally be carried on by the BIA in the direct operation of the program. |

19

New-SELFD-1-NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 38 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **INSURANCE**<br><br>General insurance (property, fire, general liability) | The BIA, as a branch of the Federal Government, is self-insured. Therefore, reasonable insurance costs, such as property insurance on buildings and vehicles, and general liability insurance, can be allowable as DCSC. | A detailed estimate of costs of insurance for property, vehicles and general liability must be provided. It is important to document that costs are not included in the IDC pool where an IDC rate is used. | The BIA reviews insurance coverage to determine that it is not included in the Awardee's indirect cost pool or indirect type cost agreement. |
| **POSTAGE (excluding express mail)** | This cost is not borne by BIA programs in the general course of doing business. Funds for these costs have not been transferred to Regional Offices, and therefore this cost is allowable as DCSC. | These costs are allowable. | These costs are allowable. |
| **PRINTING AND DUPLICATION** | This is generally not included in the DCSC requirement. | This is not generally allowed by the BIA. | This is generally considered to be duplicative of the 106(a)(1) amount. |

20

New-SILPD-1 NSW

Pl. Exh. 8<br>CRRC v. Kempthorne, et al.<br>Page 39 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **COMMUNICATIONS**<br><br>Long distance calls, telefax costs; Intranet/Internet; maintenance agreements & etc. | Costs for long distance calls are borne by the Secretary through GSA/FTS agreements; and are not generally transferred as Sec.106(a)(1) amounts and may be eligible for DCSC.<br><br>Cell phones are considered 106(a)(1) costs and are not eligible for DCSC. | Awardee must provide documentation. | Review Awardee overall communications budget and separate out costs necessary for contracted programs and not included in the Awardee's indirect cost pool. These costs should be considered on a case-by-case basis. |
| **TRAINING**<br><br>Discipline-specific training | This is generally included in the DCSC requirement to the extent the Awardee must provide training to comply with requirements not applicable to the Government and, therefore, not transferred in the 106(a)(1) amount. | Awardees should provide details on the cost and purpose of the training. | This is duplicative to the extent it is provided in the 106(a)(1) amount. These costs should be considered on a case-by-case basis. |
| **TRAINING**<br><br>Long-term training (Continuing Education) | The BIA has made available funds supporting long-term continuing education costs in the 106(a)(1) amount. Federal sites provide for long-term training from within their operational budgets. No additional funds are made available for this cost from DCSC. | Not applicable. | This is duplicative. Funding is provided as a part of the 106(a)(1) amount. |

21

New-SELFD-1 NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 40 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **EQUIPMENT PURCHASE AND MAINTENANCE** | This is generally not included in the DCSC requirement. Funds for equipment purchase should be included in the 106(a)(1) amount or in the start-up program 106(a)(1) amount, or in the start-up amount for administrative equipment. | Not applicable. | This is considered duplicative because costs being requested have been passed on to the Awardee in the assumption of PFSA or other program 106(a)(1) amount, or are covered in the indirect cost pool. |
| **RENT/UTILITIES**<br>Facilities Costs | Cost for rent, leases, security, maintenance, and utilities are borne by the Secretary through GSA leases. Funds are generally not transferred under the Sec.106(a)(1) amount, and may be eligible for DCSC. | Awardee must provide documentation. | This cost may be duplicative to the extent it is provided in the Sec. 106(a)(1) amount, in the Awardee's indirect cost pool or in the Awardee's indirect cost type funding. In the case of facilities built with Federal funds the cost of construction should not be allowed. |
| **LEGAL / PROFESSIONAL SERVICE COSTS**<br>May include legal/professional advice necessary for direct operation of a program. | Costs for legal advice, legal opinions, legal representation, or other professional costs that are borne by the Secretary; and are not generally transferred as Sec. 106(a)(1) amount, and may be eligible for DCSC. | Awardees must provide documentation. | Review Awardee's overall legal and professional expense budget and separate out costs necessary for contracted PFSA. Ensure that such costs are specific and necessary to perform the PFSA. These costs may be duplicative to the extent it is provided in the Sec. 106(a)(1) amount. |

22

New-SELPD-1 NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 41 of 44

Appendix A

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| BACKGROUND INVESTIGATIONS | To the extent that funds are provided for in Sec. 106(a)(1) amount, they will not be allowable as DCSC. | Documentation must show how the costs are incurred. | Costs duplicative of the Sec. 106(a)(1) amount are not allowable as DCSC. |
| TRIBAL COUNCIL & BOARD OF DIRECTORS' COSTS | These costs would generally be included in the Awardee's Indirect cost pool to the extent determined to be eligible for Federal participation. | Awardees must provide documentation. | Costs duplicative of the Sec.106(a)(1) or amounts included in the Awardee's IDC pool are not allowable as DCSC. |
| CONTRACT COMPLIANCE Mandatory program requirements. | Costs for compliance to complete the program that are not provided for in Sec. 106(a)(1) amount are generally allowable under DCSC. | Awardees must provide documentation. | Costs duplicative of the Sec. 106(a)(1) amount are not allowable as DCSC. |

23

New-SELPD-1 NEW

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 42 of 44

**Appendix A**

| LINE ITEMS | GENERAL GUIDELINES | DOCUMENTATION | STANDARDS FOR REVIEW |
|---|---|---|---|
| **OTHER DCSC** | The BIA recognizes that Awardees differ in the types and extent of costs included within their indirect-cost pools. The BIA will recognize as DCSC any item of cost that meets the definition of DCSC at section 106 (a)(2) but is not already included in the Awardee's IDC pool or in the 106 (a)(1) amount). | Awardees are to provide a detailed description and justification of costs showing they should be allowable pursuant to 106(a)(2). | Each cost must meet the definition of DCSC at 106(a)(2) of the Act; must not be included in the IDC pool or indirect type costs of the Awardee; and must not be duplicative of the costs available in the 106(a)(1) amount. |

24

Pl. Exh. 8
CRRC v. Kempthorne, et al.
Page 43 of 44

Appendix A

# GUIDELINES FOR PROPOSAL PREPARATION AND COST ANALYSIS OF REQUESTS
## FOR
## INDIRECT COSTS (IDC)

**INDIRECT COSTS.** This document does not currently address indirect costs (IDC) or indirect type costs. Most tribes and tribal organizations have indirect cost rates that are negotiated with their cognizant Federal agency. The cognizant Federal agency for most tribes is the National Business Center, formerly the Office of Inspector General at the Department of Interior. For some tribal organizations who primarily contract or compact with the Indian Health Service, their cognizant Federal agency for determining an IDC rate is the Division of Cost Allocation under the Department of Health and Human Services. The respective addresses and phone numbers are as follows:

U.S. Department of Interior
Office of the Secretary
National Business Center
Indirect Cost Services
Attn: Deborah Moberly, Coordinator
2180 Harvard Street, Suite 430
Sacramento, CA 95815
Ph. (916) 566-7111
http://www.nbc.gov/icshome.html
email: ics@nbc.gov

U.S. Department of Health and Human Services
Division of Cost Allocation
Attn: Wallace Chan, Director
50 United Nations Plaza, Room 347
San Francisco, CA 94102
Ph. (415) 437-7820
http://rates.psc.gov/dcamers.htm

Awardees are encouraged to refer to OMB Circular A-87 and OASC-10 for guidance with indirect cost rates. This document is accessible on the Internet at:
http://www.whitehouse.gov/omb/circulars/a087/a087-all.html .

For assistance with indirect type costs, please refer to OMB Circular A-87 and contact your local Awarding Official.

25

Non-SELFD-1 NEW



# United States Department of the Interior

### OFFICE OF THE SOLICITOR
### ALASKA REGION

4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131

January 3, 2008

BIA.AK.1030

Lloyd B. Miller, Esq.                                    By mail and facsimile to 272-8332
Sonosky Chambers, et al.
900 West Fifth Avenue
Suite 700
Anchorage, Alaska 99501-2029

Dear Lloyd:

Subject: Chugach Regional Resources Commission (CRRC) contract matters

This is in partial reply to your letter of December 27, 2007.  First, with regard to the
award of a renewal contract for 2008, I consulted with BIA Alaska Region Awarding Official
Darryl Guthrie, Native Services Director Roger Drapeaux, and Natural Resources Manager Keith
Kahklen on Friday, December 28, 2007.  Based on that conversation, I can provide the following
responses to your inquiries.

<u>Contract renewal for 2008</u>

First, the BIA will prepare the new contract, which the Assistant Secretary has decided to
award.  Your client or your office does not need to handle this task.

Second, I must report that I am unable to give you any specific estimate for when the
funding to be included in the contract will be available.  I suggest we launch a three-pronged
strategy to try to expedite the process of getting the BIA's Central Office to give the Alaska
Region a sub-allotment including the necessary funding for CRRC's 2008 contract.  I will be
sending Assistant Secretary Carl Artman a memo, and BIA Regional Director Niles Cesar or his
staff will also be contacting him. But the BIA staff I discussed the situation with also felt it
might be helpful if your client was a "squeaky wheel" on the subject of making the funding
available ASAP.  The individuals who were identified as the key actors are Debbie Clark,
Deputy Assistant Secretary for Indian Affairs - Management, and Mary Jane Miller, her Director
of the Office of Budget Management.  It is understandable that with responsibility for
distributing funds on a national basis, they will be reluctant to give special priority attention to
CRRC's needs.  However, they would presumably be spurred to prompt action by a explicit
directive from the Assistant Secretary, so I would say Mr. Artman is still the person in the
position to minimize the otherwise foreseeable delay.

01/03/2008 17:20 FAX  907 271 4143        SOL AK REGION                    ☒002/010

Lloyd Miller, Esq.
Chugach Regional Resources Commission contract matters
January 3, 2008 - Page 2

Contract support costs[1]

    This is not something we have discussed in any detail before, but it seems like a good time to bring the issue up, since it relates to both the renewal contract and the past contract years 2006 and 2007, as to which CRRC has submitted Contract Disputes Act claims.  According to Mr. Guthrie, the CRRC had its first indirect rate of 27.7 percent for FY 2005, but that rate expired at the end of the contract year.  He indicated that CRRC was supposed to negotiate a new rate with the Department of the Interior's National Business Center (NBC) for each succeeding year, but had not yet successfully done so.  With respect to 2006, he said a indirect cost rate proposal was only recently submitted to the National Business Center, but not yet approved for want of necessary back-up documentation.  His source for this information was a paper trail of recent correspondence and e-mail exchanges between NBC and your client.  See copies attached.  The result was that contract support was added to the 2006 contract at a much lower level of 15 percent, which he characterized as a "negotiated" rate.  This action was based on the Guidance for Distributing FY 2006 Contract Support Funds, published in the Federal Register at 71 F.R. 5676 (February 2, 2006).

    Since the establishment of an approved rate for 2006 was never completed, and the CRRC proposal for a 2007 AFA was apparently never received, the indirect rate establishment process was presumably never pursued with the NBC for 2007, or for 2008.  Therefore, the initial awarding of a 2008 contract in the immediate future may not include a substantial--or any--amount of contract support, pending both the CRRC establishment of a rate applicable to 2008, and the usual BIA process for determining what percentage of total national contract support need can be met under the appropriations law cap on spending for for contract support.  In other words, the initial dollar amount to be included in a 2008 contract will not likely include contract support, and your client is urged to take steps to comply with the procedural requirements in place for establishing the amount or rate of contract support it is entitled to.

    I would also like to acknowledge that you have provided me with a copy of the BIA's May 8, 2006 National Policy Memorandum on Contract Support Cost, which you characterize as relieving CRRC from getting a new contract support cost rate annually.  I am sending a copy to the Alaska Regional Office, and look forward to clarifying this issue with them, and then with you and your client, but I will defer that task for now in the interest of concentrating on obtaining funding for the direct program portion of CRRC's 2008 contract.

---

[1] This information is based on my December 28 conversation with A.O. Darryl Guthrie.  During a telephone conversation with you on Monday, December 31, you suggested that the preliminary BIA view may not be in accordance with the current national policy.  You indicated you would send me a copy of that policy, and it is possible that the information provided in this discussion will be revised, based on further analysis.

Lloyd Miller, Esq.
Chugach Regional Resources Commission contract matters
January 3, 2008 - Page 3

Contract claims for 2006 and 2007

     Your client has submitted Contract Disputes Act claims for both 2006 and 2007.  You
and I have discussed the strategy of presenting these claims to the Civilian Board of Contract
Appeals, and then settling them in such a manner as to allow payment from the Judgment Fund.
However, as I told you during our conversation on December 31, 2007, I feel that such an
approach must begin with the Awarding Official issuing decisions on your client's claims.  I also
told you that I word work with Darryl Guthrie to help him get such decisions out as promptly as
possible.  In the meantime, to minimize the possibility for surprise or misunderstanding, I will
offer brief preliminary comments on the BIA's current thinking with respect to the two claims.

     2006.  As your December 27, 2007 letter indicated, you understand that the BIA is
contemplating approving this claim at least *in part*.  CRRC's November 14, 2007 letter
regarding 2006 claimed an additional payment of $98,605, apparently broken down as $50,475 of
direct payment, and $48,130 of contract support.  Based on discussions between your office,
mine, and Assistant Secretary Artman, the BIA is now prepared to agree that the references to
CRRC in the Conference Report accompanying the FY 2006 Interior Appropriations Act did not
justify reducing the direct program dollars to be included in the 2006 AFA.  Therefore, the
CRRC claim is likely to be allowed with respect to the $50,475 amount of direct funding not
previously included in the contract.  However, the full amount of the contract support portion of
the claim is less likely to be allowed in full.  For one thing, BIA records indicate that the claim
overlooks a September 27, 2006 Modification No. 5, which added $7,529 to the 2006 contract.
See copy attached.  Therefore, the *most* that could be awarded as additional contract support
would be $40,601, and the BIA is not prepared at this time to approve that entire amount,
pending the outcome of CRRC's interactions with the National Business Center, and further
consideration of the applicability and effect of the May 8, 2006 National Policy memorandum.

     2007.  There is apparently serious doubt as to whether the BIA ever received your client's
proposal for an FY 2007 AFA during the summer of 2006.  Although Peter Ashman upon
request faxed to my office a copy of a CRRC cover letter bearing the date July 1, 2006, the BIA
has no record of having received that letter or the accompanying proposal.  Ordinarily, if they
had, they would have sent written acknowledgment, as required by 25 C.F.R. § 900.15.
Arguably, failure to receive such a written notification, or at any later time to be notified of
missing items, or of the award or declination of the proposal, should have put CRRC on notice
that its 2007 proposal may not have been received.  The July 1, 2006 cover letter does not
indicate that it or the proposal were sent via return receipt mail, or that other steps were taken to
assure delivery.  However, it is my understanding that the BIA does not intend to deny the 2007
claim on the basis of lack of timely submission of the proposed AFA.  This conciliatory posture
is based in part on the circumstance that submission might have been excused by the BIA's
explicit advice to your client that there was no funding available, owing to the Alaska Region's
failure to receive a 2007 sub-allotment for funding the CRRC contract.  That lack of funding

Lloyd Miller, Esq.
Chugach Regional Resources Commission contract matters
January 3, 2008 - Page 4

was evidently the result of an erroneous Central Office interpretation of the legal effect of the 2007 Continuing Resolution's silence with regard to inclusion of any amount of funding specifically identified for CRRC. Therefore, it is arguable that the direct funding level for 2007 would continue to be $347,000.

Some of the remarks made above with regard to the 2006 contract support funds would apply to 2007 as well.

An additional complicating factor with regard to the 2007 claim is that the dollar amount at issue exceeds the $100,000 maximum settlement authority of the Solicitor's Office, which will necessitate Department of Justice review and approval of any settlement to be reached with respect to the 2007 claim.

Summary

The BIA will prepare the contract documents for the new 2008 contract. Both my office and the BIA's Alaska Region will make every effort to secure from the Central Office the earliest possible sub-allotment to fund renewal of CRRC's contract for 2008. If you or your client has contacts of your own to call upon in support of this effort, you are encouraged to pursue them.

With regard to the past contract claims, the BIA Alaska Region Awarding Official will issue CDA decisions on each as soon as possible, but in any case well before the 90 day deadline provided by law. To the extent that those decisions may approve all or a portion of the claims in principle, it is likely that denial will nevertheless be necessary based on unavailability of funds. At that point, your client can pursue administrative appeals which will hopefully result in settlements and payment of the claims from the Judgment Fund.

Thank you for your and your client's patience in awaiting the actions described above. Although they acted in good faith, it is regrettable that BIA Central Office personnel misinterpreted the legal effect of the Appropriations Conference Committee mention of funding for CRRC in its report on the FY 2006 Interior Appropriations Act, and the lack of any specific references to funding for your client or its contract in the FY 2007 Continuing Resolution. On the other hand, your client ought to console itself with the realization that it was also a mistake for the BIA to use the vehicle of a 638 contract as the mechanism by which to transfer funds to CRRC in the first place, with the unintended but fortuitous result that CRRC has secured a continuing entitlement to a contract to fund activities which were not PFSAs of the BIA, and which funding level is all out of proportion to the funds, if any, received for similar activities by other tribes either nationally or in Alaska.

This has already been an educational experience for both me and the Bureau of Indian Affairs, and I trust that the Bureau will profit from the application of its newfound understanding

01/03/2008 17:21 FAX  907 271 4143        SOL AK REGION                    ☑005/010

Lloyd Miller, Esq.
Chugach Regional Resources Commission contract matters
January 3, 2008 - Page 5

of appropriations law issues in other contexts.    Thank you again for your constructive approach
to these issues.

                              Sincerely,


                              Roger L. Hudson


attachments:
        recent correspondence between CRRC and NBC
        Modification No. 5, Contract No. CTB01X84923

cc:     Carl Artman, Assistant Secretary of the Interior - Indian Affairs
        Niles Cesar, Alaska Regional Director, BIA
        Darryl Guthrie, Awarding Official, Alaska Region, BIA
        Roger Drapeaux, Director, Native Services Division, Alaska Region, BIA
        Keith Kahklen, Natural Resources Manager, Alaska Region, BIA

Received Fax :                       Fax

01/03/2008 17:21 FAX  907 271 4143        SOL AK REGION                    ☑008/010



## United States Department of the Interior
### National Business Center
**Indirect Cost Services**
2180 Harvard Street, Suite 430
Sacramento, CA 95815


National
Business
Center

RECEIVED
by

DEC 2 0 2007
Alaska Region
Contracting Section        December 19, 2007

Ms. Patty Brown-Schwalenberg, Executive Director
Chugach Regional Resources Commission
6200 Lake Otis Parkway, Suite 201
Anchorage, Alaska 99507

Dear Ms. Brown-Schwalenberg:

We received the Chugach Regional Resources Commission's indirect cost proposal on
September 25, 2007, for the fiscal year (FY) ending September 30, 2006. However, we are
unable to process the proposal until we receive the additional information which we requested by
e-mails (copies attached) dated November 20, 2007, and December 5, 2007.

We need to receive this information in our office, at the address shown above, no later than
January 22, 2008, in order to continue processing the Commission's indirect cost proposal.
Please forward the above-requested information to the attention of Ms. Maria Nua, Program
Analyst, by this date.  If you have any questions regarding this request, please telephone Ms. Nua
at (916) 566-7111.

Sincerely,

Deborah A. Moberly
Indirect Cost Coordinator

Attachments

cc: Self-Determination Specialist, Alaska Regional Office, Bureau of Indian Affairs
     (with Attachments)

Ref:  J:Alaska/CHUGw627/FirstLetter

Phone (916) 566-7111        Fax (916) 566-7110        E-mail ICS@nbc.gov        Internet http://www.nbc.gov/icshome.html

01/03/2008 17:21 FAX  907 271 4143          SOL AK REGION                      ☑007/010

 **Norma Mullins**
11/20/2007 02:51 PM

To: alutiiqpride1@crrcalaska.org
cc:
Subject: Chugach Regional Resources Commission, Indirect Cost Proposal, FY 2006

Patty Brown-Schwalenberg, Executive Director
Chugach Regional Resources Commission

Our office has received the Commission's FY 2006 indirect cost proposal. After performing an initial screening, we are requesting for the following information/documents before we can continue processing the proposal.

1. Please provide this office with a copy of the FY 2004 audited financial statements and single audit reports.

2. Please prepare and submit an FY 2004 Indirect Cost Pool schedule (based on Actuals)

3. Page 14, Reconciliation
Please explain why is the Direct Cost Base amount of $966,532 different from the amount shown on page 10 of $915,820.

4. Page 8, FY 2004 Carryforward and FY 2006 Rate Computation
Please revise the following:

- FY 2004 Actual Direct Cost Base (based on the revision made to page 10 of the proposal, see Item No 3 above).
- % of Total should be at 100%
- FY 2004 Indirect Cost Pool (based on Item No. 2 above)

5. Attached for your use is a "Lobbying Certificate". Please prepare and submit.


LOBBYING COST CERTIFICATE.do


Please provide your response and the requested information to me no later than <u>December 4, 2007</u>. We will put a hold on the processing of the proposal until the above information is received.

If you have any questions concerning the above please call me or send an email.

NOTE: Our website <u>www.nbc.gov/icshome.html</u> includes a segment on "How to Prepare and Submit an ICP" which includes a "Completeness Checklist". Please select the checklist applicable to you, check off boxes, explain boxes not checked, sign and submit the checklist along with your Indirect Cost Proposal.

Thank you,
Norma Q. Mullins, Program Analyst
U.S. Department of the Interior
National Business Center
Indirect Cost Services
2180 Harvard St., Ste. 430

01/03/2008 17:21 FAX  907 271 4143          SOL AK REGION                              ☑008/010

ORIGINAL



**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF INDIAN AFFAIRS**
**Alaska Region**

DUPLICATE
ORIGINAL

### Indian Self-Determination Contract Modification

| 1. Contract Number CTE01X84923 | 2. Effective Date August 24, 2006 | 3. Modification Number: Five (5) | Page 1 | of | Pages 3 |
|---|---|---|---|---|---|

| 4. Issued To: Chugach Regional Resources Commission 6200 Lake Otis Parkway, Suite 201 Anchorage, Alaska 99507 Tele: (907) 562-6647    FAX: (907) 562-4939 | 5. Issued By: Bureau of Indian Affairs, Alaska Region Branch of Contracting P.O. Box 25520 Juneau, Alaska 99802-5520 Phone: (800) 645-8397    Fax: (907) 586-7625 |
|---|---|

6. This Public Law 93-638 contract is hereby modified as follows:

RECEIVED BY
OCT - 5 2006
Alaska Region
Contracting Section

**I. ANNUAL FUNDING AGREEMENT:**

This FY-2006 AFA is hereby increased from:          324,452

by: $          7,529

for a new FY-2006 Total of: $          331,981

**II. COST REIMBURSABLE PROGRAMS:**

- Remains the same - CFDA 15.039 Awarded at the FY-2006 Resource Management program funds to 100%.

**III. INDIRECT COSTS:**

$7,529  Pursuant to the Federal Register of February 2, 2006 the calculation of the FY-2006 Contract Support reflects application of a 15% Indirect Cost Rate applied to directs costs less capital expenditures and passthrough and is provided at the Final Allocation Level of 94.847%.

**IV. CONTRACT TOTAL**

| FY-2005 | $ | 417,984 | |
|---|---|---|---|
| FY-2006 | $ | 331,981 | |
| FY-2007 | $ | - | |
| | $ | 749,965 | *Contract Total* |

**V. THIS IS THE SECOND YEAR OF A THREE YEAR TERM CONTRACT.**

*All other terms and conditions of this contract shall remain the same.*

| 7. Signatures: Contractor is required to sign: | Yes ( XX )    No ( ) |
|---|---|
| *Patricia K Brown-Schulenberg*          9-27-06 Signature                                    Date | *Darryl G Guthrie*          8/28/11 Signature                                    Date |
| Patricia K Brown-Schulenberg    9-27-06 Printed Name and Title | Darryl G. Guthrie, Awarding Official Certificate No. BIA-2004-L1-000059 Printed Name and Title |

Received Fax :    Jan 03 2008 18:07    Fax Station: SOL AK REGION

01/03/2008 17:21 FAX  907 271 4143        SOL AK REGION                    ☑009/010

### CHUGACH REGIONAL RESOURCES COMMISSION
### CONTRACT NO:  CTE01X84923
### 'FY-2006 Annual Funding
### MODIFICATION Five (5)

Page 2

| Acctg Line | | | | | Prior Funding Level | Changes + or <-> | Current Funding Level | Program Total |
|---|---|---|---|---|---|---|---|---|
| **CFDA No. 15.039: Tribal Management and Development Programs:** | | | | | | | | 296,000 |
| 004 | E00460 | 0607 | 31970 | 252i | 5E00460024 | 296,000 | 0 | 296,000 | |
| | | | | Total Program Funding | 296,000 | 0 | 296,000 | 296,000 |
| **CFDA 15.024 - Indirect Costs** | | | | | | | | 35,981 |
| 005 | E00460 | 0607 | 39270 | 252i | | 28,452 | 0 | 28,452 | |
| 006 | E00460 | 0506 | 39270 | 252i | | 0 | 7,529 | 7,529 | |
| | | | | **TOTALS** | $324,452 | 7,529 | $324,452 | $331,981 |

**Chugach Regional Resources Commission**
**CONTRACT NO.: CTE01X84923**
**MODIFICATION Five (5)**
FY-2006 Annual Funding Agreement

**PART D - CONTRACT SUPPORT FUNDS**                                                     **Page 3**

| | Program Amount | | Approved Indirect Rate | | | | Contract Support Limitation | | Contract Support Funding |
|---|---|---|---|---|---|---|---|---|---|
| Chugach Reg. Shellfish Mariculture | 33,500 | x | 15.00% | = | 5,025 | x | 94.847% | = | 4,766 |
| Repairs and Maintenance | 1,500 | x | 0.00% | = | 0 | x | 94.847% | = | 0 |
| Nanwalek Sockeye Salmon Dev. P. | 13,500 | x | 15.00% | = | 2,025 | x | 94.847% | = | 1,921 |
| Contractual | 1,500 | x | 15.00% | = | 225 | x | 94.847% | = | 213 |
| Port Graham Pink Salmon Project | 50,000 | x | 15.00% | = | 7,500 | x | 94.847% | = | 7,114 |
| Program Development | 129,300 | x | 15.00% | = | 19,395 | x | 94.847% | = | 18,396 |
| Board Stipends | 7,700 | x | 0.00% | = | 0 | x | 94.847% | = | 0 |
| Technical/Legal Assistance | 33,897 | x | 0.00% | = | 0 | x | 94.847% | = | 0 |
| Supplemental funds | 25,103 | x | 15.00% | = | 3,765 | x | 94.847% | = | 3,571 |
| **TOTAL** | 296,000 | | | | 37,935 | | | | 35,981 |

Pursuant to the Federal Register of March 24, 2005 the calculation of the FY-2006 Contract Support reflects application of a 15% Indirect Cost Rate applied to direct costs less capital expenditures and passthrough and is provided at the Final Allocation Level of 94.847%.

Pursuant to the Bureau's Contract Support Policy, Contractor is required to apply for and negotiate an Indirect rate for FY-2006 and future years.

Program Funds received after August 10, 2006 are not eligible for Contract Support Funding.



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO·

MS - 6456

OCT 2 4 2005

Ms. Melanie B. Osborne, Attorney at Law
Sonosky, Chambers, Sachse, Miller & Munson, LLP
900 West Fifth Avenue, Suite 700
Anchorage, AK 99501-2029

      Re:  Chugach Regional Resources Commission Contract Support Funds

Dear Ms. Osborne:

On June 30, 2005, the Chugach Regional Resources Commission (the "Commission") sent a letter to the Secretary of the Interior demanding payment of contract support funds for Fiscal Year 2005 on Contract Number CTE01X84923.  This letter responds to that demand.

The Bureau of Indian Affairs (the "Bureau") has determined that, under the contract, the Commission carries out activities that the Secretary is authorized to administer for the benefit of Indians under the Snyder Act.[1] The Commission's "Chugach Fisheries Enhancement and Tribal Natural Resource Management Program" comprises the "Chugach Region Shellfish Mariculture Development Project," the "Nanwalek Sockeye Development Project," the "Port Graham Salmon Hatchery Project," and "Program Development." Congress has earmarked a portion of the Bureau's appropriations for transfer to the Commission to carry out these activities.

Therefore, the Bureau has prepared an amended Fiscal Year 2005 funding agreement that removes the following language from section 3 of the original signed funding agreement for Fiscal Year 2005:

> *No Contract Support Funds have been appropriated for support of this contract.  Section 106(a)(2) of the Indian Self-Determination and Education Assistance Act does not apply to this contract.  Funding for indirect costs shall be budgeted within the available direct program funding identified in the Annual Funding Agreement.*[2]

The Bureau requests that the Commission sign the amended Fiscal Year 2005 funding agreement.  If the amended funding agreement is signed, the Bureau will distribute to the Commission $70,984 in contract support funds for Fiscal Year 2005.

---

[1] 25 U.S.C. § 13.
[2] Fiscal Year 2005 Annual Funding Agreement between Chugach Regional Resources Commission and the United States of America, Secretary of the Department of the Interior, § 3, ¶ 2 (italics in original).

Page 1 of 3

We appreciate the Commission's patience on this matter.

Please feel free to call Sabrina A. McCarthy, Attorney-Adviser, at 202-219-2139 if you have any questions.

Sincerely,

William Pat Ragsdale
Director, Bureau of Indian Affairs

Pl. Exh. 10
CRRC v. Kempthorne, et al.
Page 2 of 2



# Chugach Regional Resources Commission

henega Bay

yak

Ianwalek

ort Graham

Jutekcak
Iative Tribe

atitlek

aldez Native
ribe

## CHUGACH REGIONAL RESOURCES COMMISSION

### *FISHERIES ENHANCEMENT and NATURAL RESOURCES PROGRAM DEVELOPMENT PROJECT*

### FY08 P.L. 93-638 PROPOSAL TO THE BIA

## INTRODUCTION

The Chugach Regional Resources Commission (CRRC), a private non-profit consortium of all Alaska Tribal Governments (federally and non-federally recognized) located within Alaska's Chugach Native Region in southcentral Alaska, has been working with its member Tribes for the past 13 years in natural resource management and development. The CRRC board of directors is composed of one representative appointed by the Tribal government of each of the seven Tribes in the region. The majority of the Board consists of the Village Chiefs/Presidents from each Tribe. The member Tribes include the Nanwalek IRA Council, Port Graham Village Council, Chenega IRA Council, Tatitlek IRA Council and Native Village of Eyak, and the non-federally recognized Tribes from the cities of Seward (Qutekcak Native Tribe) and Valdez (Valdez Native Tribe).

Initially, the emphasis of the CRRC natural resource program was on the development of fisheries projects that would provide either an economic base for a village or create economic opportunities for Tribal members. In FY 96 CRRC initiated a natural resource management program with the objective of establishing natural resource management capabilities in the villages so that they can actively participate in resource use and allocation issues that affect them.

The success of these programs from both an economic and a social standpoint have made them an integral part of overall village and association development. The Chugach Native communities want to continue working with CRRC on these programs through the funding of a contract under the Bureau of Indian Affairs P.L. 93-638 Contract Program for the Chugach Fisheries Enhancement and Natural Resource Program Development Project.

## PROGRAM OVERVIEW

All projects initiated under the fisheries development program continue to progress. The salmon development project for Port Graham is currently working on developing value added processed fisheries products from their hatchery fish. CRRC has provided funding

Pl. Exh. 11
CRRC v. Kempthorne, et al.
Page 1 of 4

in the past under this contract to the Port Graham Village Council for this effort. The Port Graham Corporation's cannery and Tribal hatchery are working together to harvest and process the pink salmon returning to the hatchery. The Port Graham hatchery, which was also destroyed in the January 1998 fire, was rebuilt and has obtained sufficient broodstock holding, egg take, incubation and rearing equipment to allow it take up to 110 million pink salmon eggs and short term rear the resultant fry. This is an eight-fold increase over the hatchery's previous egg take capacity and will create hatchery pink salmon returns of around 3 million adults. The new hatchery is also equipped to incubate up to 10 million sockeye salmon eggs.

Activities during this coming year will build upon the work that has been accomplished thus far. The hatchery staff is planning an 80 million egg take for FY 08. Additional rearing pens purchased in FY05 enabled the hatchery to rear all the resultant fry from the FY 04 egg take. The new sockeye program for Port Graham Bay begun in FY04 is expected to result in the third egg take in FY08. In addition, the hatchery will continue incubating the sockeye eggs for the Nanwalek project.

The Nanwalek Sockeye Project, designed to enhance the sockeye run to the English Bay River adjacent to the village, has been working to develop a strategy for controlling outbreaks of IHN and to stabilize production. A professional biologist, under contract to CRRC, is involved with this program. In FY08, the Nanwalek Sockeye Project staff will continue weir operation to ensure accurate counts of sockeye are kept, and, if funds permit, conduct a small egg take in cooperation with the Port Graham Village Council. This project has helped insure that the sockeye subsistence needs for both Nanwalek and Port Graham are met every year as well as providing for a local commercial harvest that residents of both villages have benefited from.

The Mariculture Program that was initiated in Tatitlek is still on track with the goal of developing a large sized grow-out operation for oysters and plans will expand to include cockles in FY08. The market for Alaska oysters is steadily improving and the goal for FY08 is to market 600 dozen oysters a week. Tatitlek has plans to expand oyster production as rapidly as possible under new leadership. This will help to capture market share by taking advantage of the increased demand for this valuable product. The new processing facility is now housing the entire project and staff, which will be a great help in streamlining operations.

In FY06, the Qutekcak Native Tribe in Seward turned the management of the shellfish hatchery over to CRRC. Now called the Alutiiq Pride Shellfish Hatchery, it is currently producing oyster seed, littleneck clam seed, geoducks, cockles, razor clams, and continuing its research and development into the culture techniques for producing cockles. Work will continue in FY 08 to develop culture techniques for producing cockles and improving geoduck production and oyster production for local farmers,

Pl. Exh. 11
CRRC v. Kempthorne, et al.
Page 2 of 4

including Tatitlek. Work will begin in FY08 to develop culture and grow-out techniques for red king crab and blue king crab.

Since the inception of the natural resource management program the emphasis has been on the development of natural resource plans for each village. These plans include a description of the natural resource base surrounding each village, a village profile, and a discussion of the condition of the various local natural resources and its relative importance to each village. With this task nearly complete program emphasis has turned toward the development of a natural resource training curriculum, technical workshops and field trips to view other tribal natural resource management programs. Work will focus on the development of local management capabilities as well as exploring the possibility of developing and initiating co-management and/or cooperative agreements with federal and state agencies. In addition, the CRRC has been working with the University of Alaska-Fairbanks to develop and deliver this Tribal natural Resource management curriculum that integrates traditional ecological knowledge with western science. The University plans to open these classes to students statewide beginning in the spring semester of 2008.

The idea for a region-wide Gathering was conceived by the CRRC Board and staff in 1998, in response to the publicity surrounding the Exxon Valdez Oil Spill and the fact that it had been ten years since it occurred. The first Gathering was held on March 24, 1999, and was so successful, that the Board directed the staff to make this an annual event. The purpose of the Gathering is to provide a forum for all Tribes affected by the Exxon Valdez Oil Spill to come together to learn more about critical natural resource issues affecting the villages through panel presentations, enjoy a traditional meal, and get entertained by traditional village dance groups. The event concludes with a candlelight vigil in honor of those who have passed on, and a dance. Costs associated with this event average around $30,000 per year and donations are solicited from the Tribes, Tribal organizations, and village and regional corporations. This year, part of this cost will be supported by the P.L. 93-638 contract because the Gathering agenda will be focusing on new projects and programs currently being developed under this contract.

## CONCLUSION

By establishing the Chugach Regional Resources commission, the Tribal governments of the Chugach Region have made a commitment to the protection and preservation of the natural resources in their traditional use areas, including lands held in trust by the federal government, as well as village and regional corporation lands and state and federal lands. The Tribes depend upon CRRC to assist them in developing their resource management capabilities so that they can become better resource managers. The Tribal resolutions passed by the CRRC member Tribal Governments in 1993 serve as a testimony to their long-standing commitment to this organization and its mission. Support from the Bureau of Indian Affairs through this P.L. 93-638 contract goes a long way towards meeting the natural resource goals of the Tribes in the Chugach Region.

**FY08 BUDGET**

The Chugach Fisheries Enhancement and Tribal Natural Resource Management Program is being implemented through the Chugach Regional Resources Commission. Overall, the program budget will consist of the following budget categories.

**FY08 BIA Budget**

| Project Components: | Projected Cost |
|---|---|
| A. Chugach Region Shellfish Mariculture Development<br>• Oyster grow-out operations in Tatitlek<br>• Oyster marketing<br>• Alutiiq Pride Shellfish Hatchery (Seward) | $40,000 |
| B. Nanwalek Sockeye Salmon Development Project<br><br>• Seek funds for disease free water engineering study<br><br>• Operate smolt out-migration weir | $20,000 |
| C. Port Graham Pink Salmon Hatchery<br>• Broodstock development<br>• Sockeye and pink salmon fry production<br>• Training and education for hatchery crew | $35,000 |
| D. Program Development<br>• Resource evaluation (Valdez Spot Shrimp)<br>• Project development (Chenega Fisheries/Eyak Shellfish)<br>• Gathering 2008 | $205,000 |
| **Total Direct Costs** | **$300,000** |
| **Indirect Cost (27.7%)** | **$83,100** |
| **TOTAL BUDGET** | **$383,100** |